SENSITIVE SECURITY INFORMATION / UNDER SEAL

**ORAL ARGUMENT NOT YET SCHEDULED**

No. 23-1290
Consolidated with No. 23-1328

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

CITY OF BILLINGS, CITY OF BISMARCK, CITY OF COLORADO SPRINGS, DANE COUNTY, FLATHEAD MUNICIPAL AIRPORT AUTHORITY, GREATER ASHEVILLE REGIONAL AIRPORT AUTHORITY, CITY AND BOROUGH OF JUNEAU, MASSACHUSETTS PORT AUTHORITY, METROPOLITAN AIRPORTS COMMISSION, MILWAUKEE COUNTY, OKLAHOMA CITY AIRPORT TRUST, CITY OF PHILADELPHIA, RALEIGH DURHAM AIRPORT AUTHORITY, CITY OF SAN JOSE, SPOKANE AIRPORT BOARD, and AIRPORTS COUNCIL INTERNATIONAL – NORTH AMERICA
*Petitioners,*

v.

TRANSPORTATION SECURITY ADMINISTRATION AND DAVID P. PEKOSKE, ADMINISTRATOR,
*Respondents.*

ON PETITION FOR REVIEW OF A DECISION
OF THE TRANSPORTATION SECURITY ADMINISTRATION

## MOTION BY PETITIONERS CITY OF BILLINGS ET AL. FOR A STAY OF IMPLEMENTATION OF TSA'S AVIATION WORKER SCREENING NATIONAL AMENDMENT

Melissa C. Allison
David S. Mackey
Carlos R. Rosende
Anderson & Kreiger LLP
50 Milk Street, 21st Floor
Boston, MA 02109
mallison@andersonkreiger.com
dmackey@andersonkreiger.com
crosende@andersonkreiger.com
T: 617.594.5940

April 11, 2024                *Counsel for Petitioners*

**SUBJECT TO PROTECTIVE ORDER IN City of
Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................... ii

INTRODUCTION .....................................................................................1

LEGAL AND PROCEDURAL BACKGROUND.......................................4

    Statutory and Regulatory Framework for Worker Screening ...............................4

    TSA's Proposed National Amendment ..................................................6

    TSA's Final National Amendment and Response to Industry Comments.............9

STATEMENT OF RELIEF REQUESTED FROM AGENCY ..............................11

ARGUMENT .........................................................................................11

    A.    The Airport Petitioners Are Likely to Prevail on the Merits. .................12

        1.    The National Amendment Violates a Repeated Congressional Mandate for Comprehensive Federal Screening. ................................................12

        2.    The National Amendment is Arbitrary and Capricious. .........................15

        3.    The National Amendment Unconstitutionally Commandeers Local Public Officials to Enforce Federal Security Requirements. ...................18

        4.    The National Amendment Violates the Public Notice and Comment Requirements of the APA. ................................................19

        5.    The National Amendment Requires Local Montana Officials to Engage in Conduct Which Violates State Constitutional Rights to Privacy. ......21

    B.    The Airport Petitioners Will Suffer Irreparable Injury If the Stay is Denied. ..........................................................................22

    C.    TSA Will Suffer Little Harm if a Stay is Granted. ...............................25

    D.    A Stay Advances the Public Interest..................................................25

CONCLUSION .......................................................................................26

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW",
AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT
AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

# TABLE OF AUTHORITIES

## Cases

*Bonacci v. Transportation Security Administration*,
909 F.3d 1155 (D.C. Cir. 2018) ...............................................................14

*Electronic Privacy Information Center* v. *U.S. Dept. of Homeland Sec.*,
653 F.3d 1 (D.C. Cir. 2011)......................................................................20

*Feinerman v. Bernardi*,
558 F. Supp. 2d 36 (D.D.C. 2008) ...........................................................23

*Humane Society of United States v. Zinke*,
865 F.3d 585 (D.C. Cir. 2017) .................................................................17

*In re: September 11 Litigation*,
280 F. Supp. 2d 279 (S.D.N.Y. 2003)............................................... 20, 26

*Kentucky Mun. Energy Agency v. FERC*,
45 F.4th 162 (D.C. Cir. 2022) ..................................................................17

*National Shooting Sports Foundation, Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) .................................................................16

*People v. McKnight*,
446 P.3d 397 (Colo. 2019) .......................................................................22

*Printz v. United States*,
521 U.S. 898 (1997) .............................................................................. 18, 19

*Smoking Everywhere, Inc. v. U.S. Food & Drug Administration*,
680 F. Supp. 2d 68 (D.D.C. 2010), *aff'd sub nom. Suttera, Inc. v. FDA*, 627 F.3d
891 (D.C. Cir. 2010).................................................................................23

*Southwest Airlines Co. v. TSA*,
554 F.3d 1065 (D.C. Cir. 2009) ...............................................................13

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW",
AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT
AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

*State v. Goetz*,
  345 Mont. 421 (2008) ..................................................................................21

*State v. Hamilton*,
  314 Mont. 507 (2003) ..................................................................................22

*United Steel v. Mine Safety and Health Admin.*,
  925 F.3d 1279 (D.C. Cir. 2019) ................................................ 15, 16

*Wash. Metro Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977) ...................................................................11

*York v. Wahkiakum School District No. 200*,
  178 P.3d 995 (Wash. 2008) ........................................................................22

**Statutes**

FAA Extension, Safety and Security Act of 2016, Pub. L. No. 114-190,
  § 3407(a)(3) ............................................................... 6, 12, 14

49 U.S.C. § 44901 .................................................................. 1, 4, 12

5 U.S.C. § 551 ..............................................................................20

5 U.S.C. § 553 ........................................................................ 2, 8, 20

TSA Modernization Act, Pub. L. No. 115-254, tit. I, § 1934, 132 Stat. 3186 (2018)
  ................................................................................... 6, 14, 15

**Rules**

Circuit Rule 18(a)(1) ....................................................................1, 11

Fed. R. App. P. 18(a)(1) ...................................................................11

**Regulations**

49 C.F.R. § 1540.107(a) ....................................................................4

49 C.F.R. § 1540.5 ..........................................................................5

**SUBJECT TO PROTECTIVE ORDER IN <u>City of
Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

**SENSITIVE SECURITY INFORMATION / UNDER SEAL**

49 C.F.R. § 1542.105 ................................................................................. 8, 10, 21

67 Fed. Reg. 8340 (Feb. 22, 2002) (to be codified at 49 C.F.R. pt. 1540) ...............5

**Legislative History**

147 Cong. Rec. H8302 (Nov. 16, 2001) .................................................................15

147 Cong. Rec. S10,437 (Oct. 10, 2001) ...............................................................13

147 Cong. Rec. S10,438 (Oct. 10, 2001) ...............................................................13

147 Cong. Rec. S10,803 (Oct. 17, 2001) ...............................................................15

147 Cong. Rec. S11,978 (Nov. 16, 2001) ..............................................................14

147 Cong. Rec. S11,982 (Nov. 16, 2001) .................................................... 1, 13, 14

H.R. Rep. No. 107-296 (2001) ...............................................................................13

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

# INTRODUCTION

Pursuant to Circuit Rule 18(a)(1), the Petitioners, the City of Billings *et al*. ("the Airport Petitioners"), request a stay of the September 25, 2024, implementation date of the Transportation Security Administration's ("TSA's") Aviation Worker Screening National Amendment, TSA-NA-23-02 ("National Amendment"), until one-hundred twenty (120) days after this Court rules on the merits of the Airport Petitioners' claim. A copy of the National Amendment is attached at Addendum pp. 1-11.

First, the Airport Petitioners are likely to succeed on the merits. The National Amendment shifts to local airports the responsibility and costs for aviation worker screening at the nation's airports. TSA's abdication of this statutory responsibility is inconsistent with one of the foundational principles of the Aviation and Transportation Security Act ("ATSA"), 49 U.S.C. §§ 44901 *et seq*.: the "[f]ederalization of the screening process." 147 Cong. Rec. S11,982 (Nov. 16, 2001) (statement of Sen. Rockefeller). The National Amendment is also arbitrary and capricious. TSA is the agency with the latest intelligence information and expertise in screening and security. TSA offers no rationale – other than saving money – for shifting aviation worker screening to local airports.

**SUBJECT TO PROTECTIVE ORDER IN <u>City of Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
**WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.**

The National Amendment violates the Tenth Amendment of the United States Constitution by forcing local airport sponsors to bear costs of $302 million over five years, and enormous, potentially uninsurable liability, to implement this distinctly federal program. Finally, the National Amendment imposes responsibilities on certain Airport Petitioners which run afoul of state constitutional restrictions.

In addition to these substantive defects, TSA promulgated the National Amendment without complying with the Administrative Procedures Act, 5 U.S.C. § 553(b) ("APA"). Because TSA did not follow the APA's public notice and comment requirements, TSA never solicited the views of those most affected by the change, the traveling public.

The Airport Petitioners will be irreparably harmed if the stay is denied. Denying the stay would risk degrading security and create potentially catastrophic liability for airports. In addition, according to TSA's own cost analysis, airports will pay $62 million in year one to "stand-up" the worker screening program. If this Court vacates the National Amendment after the implementation date, the costs already incurred by airports will be irretrievably lost, and airports will face the additional expense and disruption of terminating the employees hired to

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>**
**<u>Billings</u> v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

perform worker screening, or terminating contracts with private screening contractors hired to do the job.

The possibility of harm to TSA if the stay is granted is minimal. TSA has borne primary responsibility for worker screening for the last two decades, and will continue to do so until the implementation date of September 25, 2024. Any hardship to TSA that results from carrying out worker screening for an additional 120 days after this Court rules would be *de minimis* compared to the hardship imposed on the airport industry.

Finally, the public interest requires a stay. The public will benefit from TSA maintaining this responsibility while the Court addresses the merits of the Airport Petitioners' claim. Without a stay, airports nationwide would be forced to hire personnel to comply with the National Amendment, only to terminate those personnel (as TSA resumes its role) if this Court rules in the Airport Petitioners' favor. Beyond these employment dislocations, this worker screening "musical chairs" is contrary to the public interest because it risks degrading security.

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

## LEGAL AND PROCEDURAL BACKGROUND[1]

### Statutory and Regulatory Framework for Worker Screening

Following the 9/11 terrorist attacks, Congress acted quickly to federalize the screening function at our nation's airports. ATSA required TSA to "provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft" and mandated that "the screening shall . . . be carried out by a Federal Government employee." 49 U.S.C. § 44901(a). Though ATSA itself speaks of "the screening of all *passengers* and property," 49 U.S.C. § 44901(a) (emphasis added), TSA's own regulatory framework recognizes that screening only passengers, but not others entering the secured and sterile areas of airports, would be inadequate to achieve the statutory purpose.

According to 49 C.F.R. § 1540.107(a), "[n]o *individual* may enter a sterile area or board an aircraft without submitting to the screening and inspection of his or her person and accessible property" (emphasis added). The regulatory preamble reiterates that "section 1540.107 . . . applies to *individuals* entering a sterile area

---

[1] Further discussion of the legal and procedural background of the National Amendment, and the arguments supporting the Airport Petitioners' claim, are contained in the Brief of the Petitioners City of Billings *et al.* ("Opening Brief"), Dkt. 2043307, filed on March 1, 2024.

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

*where screening is conducted by TSA . . .*"  Civil Aviation Security Rules, 67 Fed. Reg. 8340, 8344 (Feb. 22, 2002) (to be codified at 49 C.F.R. pt. 1540) (emphasis added).  Indeed, TSA defines "sterile area" as that "portion of an airport . . . that provides passengers access to boarding aircraft *and to which the access generally is controlled by TSA . . . through the screening of persons and property*."  49 C.F.R. § 1540.5 (emphasis added).  Consistent with this regulatory framework, TSA has borne principal responsibility for conducting "random and unpredictable physical screening/inspection of employees working in or accessing secured areas."  Record Appendix ("App.") 1186.[2]

In 2006, TSA issued a series of Security Directives (SD-1542-06) requiring airport operators to participate with TSA in random worker inspections, at a rate approved by local Federal Security Directors ("FSDs"), to verify that airport workers had "valid ID and access control media" and to determine they were not "carrying prohibited items."  App. 1209.  Airports did so with relatively modest contributions from their own employees.  For example, the Massachusetts Port Authority ("Massport"), the owner and operator of Logan International Airport,

---

[2] Record Appendix references are to the Record Appendix, Dkt. 2043308, filed with the Airport Petitioners' Opening Brief.

SUBJECT TO PROTECTIVE ORDER IN <u>City of Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.  UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

began devoting ▮ employee hours/month at Logan to fulfill the TSA directive. App. 750. Throughout this period, "TSA maintained primary responsibility" for the inspection of airport workers. App. 750; *see also, e.g.,* App. 767 (at Spokane, "majority" of worker inspections "performed by the TSA without Airport personnel present"); App. 834 (same at Dane County).

In 2016, Congress took action to mandate additional inspections of airport workers by TSA. In the FAA Extension, Safety and Security Act of 2016 ("2016 Security Act"), Congress directed TSA to "develop a model and best practices" that would, among other measures, "subject airport workers to random physical security inspections conducted by TSA representatives in accordance with this section," 2016 Security Act, Pub. L. No. 114-190, § 3407(a)(3), and two years later Congress reiterated TSA's responsibility in the TSA Modernization Act, Pub. L. No. 115-254, tit. I, § 1934, 132 Stat. 3186, 3573 (2018) (mandating that inspections be "TSA-led").

## TSA's Proposed National Amendment

TSA issued the proposed National Amendment in October 2020. App. 102. Contrary to ATSA, TSA regulations, the 2016 Security Act and the 2018 TSA Modernization Act, the proposed National Amendment "placed the responsibility

SUBJECT TO PROTECTIVE ORDER IN <u>City of</u> <u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

to screen aviation works [sic] at airports on the airport operator." App. 592; *see also* App. 734-735. The proposed National Amendment required that "[t]he airport operator must, at a minimum, conduct the aviation worker screening ▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓ App. 106, that the screening "must be able to detect unauthorized weapons, explosives and incendiaries," App. 106, and that the screening must include at a minimum a "▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓." App. 106. The screening frequency would be based on the number of airport workers holding access media and the number of access points from the terminal to the secured and sterile areas of the airport. App. 105-119.

As reflected in TSA's cost analyses, the proposed National Amendment would impose $302 million in screening costs on airports over five years. App. 701. For example, at Oklahoma City the additional required staffing "would cost approximately between $800,000 and $1,000,000 annually." App. 790. At Glacier Park, the commitment would expand from ▓▓ employee hours/week ▓▓ hours/week, requiring the airport to hire four additional employees. App. 776. At Milwaukee, the airport would be required to conduct screening for up to ▓▓ hours per week. App. 978. Billings and Colorado Springs would each be required to

SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.
7

hire six more individuals, App. 804, 989, and Raleigh-Durham would have to hire three more full-time employees. App. 817.

TSA did not promulgate the National Amendment in accordance with the APA, 5 U.S.C. §§ 553(b)-(c), but instead distributed it only to airport and aircraft operators. TSA did so because, it contends, 49 C.F.R. § 1542.105(c) permits, without any public notice, "the designated official" to "amend a security program" if "safety and the public interest require an amendment." Because of TSA's unreasonably broad application of § 1542.105(c), the travelling public had no opportunity to express its views.

TSA received comments from 170 airports as well as the two largest airport trade associations, the Airports Council International-North America ("ACI-NA"), App. 1244, and the American Association of Airport Executives ("AAAE"). App. 1257. The commenters noted that TSA, not the airport operator, is vastly better positioned to screen airport workers than local airport operators. App. 1244; App. 1262. The industry also expressed concerns about budget and staffing burdens, *e.g.*, App. 1244-1256, 1260, 1269-1270, 1273; potential liability, *e.g.*, App. 1262, 1272; TSA's refusal to provide specific screening procedures and training, *e.g.*, App. 1254, 1269; and a host of other issues.

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u> <u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

## TSA's Final National Amendment and Response to
## Industry Comments

On April 27, 2023, TSA issued the final National Amendment, TSA-NA-23-02, with an effective date of September 25, 2023.  App. 664.  TSA made only modest changes to the proposed National Amendment, *e.g.*, exempting smaller airports, extending the deadline for purchase of explosive detection screening equipment, and excluding emergency exit doors from the Amendment's reach, but otherwise left its requirements largely intact.  App. 664-672.

TSA purported to respond to industry comments, but gave them no real consideration.  App. 587.  TSA did not even address the point that TSA is far better suited than local airports to effectively screen airport workers.  *See* App. 592; *see also* App. 734-735.  TSA declined to propose "any specific screening method," saying only that "visual screening [would not be] sufficient."  App. 598.  As for airports' liability concerns, TSA "acknowledge[d] that the nature of the [National Amendment's] requirements may subject airports to liability."  App. 640.

With respect to the financial burden on airports, "TSA acknowledge[d] the additional staffing and budget burden that airport operators may need to incur."  App. 617.  While TSA's estimated cost to airports over a five-year period is $302 million, App. 701, TSA's estimate of its own costs for conducting worker

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>**
**<u>Billings</u> v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.  UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

screening over that period is $300,000, less than .1% of the total cost of the program (TSA budgeted $16.2 million for its auditing and enforcement costs). App. 659, 679, 723.

On June 21, 2023, TSA issued "guidance" reiterating its hands-off approach. App. 728. TSA repeated: "the airport is responsible for implementing and conducting screening. . . and developing any prohibited lists of unauthorized weapons, explosives and incendiaries." App. 734-735. TSA repeated: it "will not provide training, nor will it prescribe how a search must be accomplished. The methods and training requirements must be developed and implemented by the airport." App. 741. Finally, TSA reiterated its non-answer to the liability issue: "[i]n general, federal regulations preempt state laws. Airports should have current liability protection that would be applicable. TSA will not provide a legal opinion on the issue of legal liability and insurability." App. 734.

From July 12, 2023 through September 6, 2023, pursuant to 49 C.F.R. § 1542.105(c)(2), the Airport Petitioners each submitted to TSA Petitions for Reconsideration of the National Amendment. TSA denied each of these Petitions for Reconsideration, though shortly thereafter it announced a 12-month "Informed Compliance" period. App. 992, 996. TSA pledged not to "pursue civil

SUBJECT TO PROTECTIVE ORDER IN City of
Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

enforcement action against airports that are making good faith efforts" towards compliance by September 25, 2024, but claimed that it was "not extending or modifying the effective date" of the Amendment. App. 996. The Airport Petitioners then timely filed consolidated petitions for review with this Court, Dkt. 2023213, 2028490, and filed their Opening Brief on March 1, 2024.

## STATEMENT OF RELIEF REQUESTED FROM AGENCY

Pursuant to Fed. R. App. P. 18(a)(1), and Circuit Rule 18(a)(1), the Airport Petitioners previously requested from TSA a stay of the National Amendment until 120 days after this Court issues its ruling on the merits. A copy of this request is attached at Addendum pp. 12-16. TSA denied that request on March 26, 2024. A copy of that denial is attached at Addendum pp. 17-20.

## ARGUMENT

A motion to stay must address: "i) the likelihood that petitioners will prevail on the merits; ii) the prospect of irreparable injury to the petitioners if relief is withheld; iii) the possibility of harm to other parties if relief is granted; and iv) the public interest." Circuit Rule 18(a)(1). The grant of a stay is "preventative, or protective; it seeks to maintain the *status quo* pending a final determination of the merits." *Wash. Metro Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841,

SUBJECT TO PROTECTIVE ORDER IN City of
Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW",
AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT
AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

844 (D.C. Cir. 1977).  Each of these factors supports the Airport Petitioners' motion.

## A.    The Airport Petitioners Are Likely to Prevail on the Merits.

The Airport Petitioners advanced five independent arguments as grounds for vacating the National Amendment, Opening Brief at pp. 25 to 56, and are likely to prevail on each.

1.    <u>The National Amendment Violates a Repeated Congressional Mandate for Comprehensive Federal Screening.</u>

The National Amendment is directly contrary to the federal screening regime established in ATSA and reinforced in the 2016 Security Act.  Although ATSA references the "screening of all passengers and property," 49 U.S.C. § 44901(a), screening only passengers, but not others who come in contact with passengers in the secured and sterile areas, would be wholly inadequate.  As TSA itself has previously argued to this Court,

> [ATSA] authoriz[es] the inspection of the person and property of *any individual – passenger or non-passenger – who enters the controlled boarding area.  See* 49 C.F.R 1540.105.107.  Petitioners' notion that this phrase nonetheless excludes the inspection of non-passengers and the property they carry suggests a limitation on TSA's authority *that is completely at odds with the statute's overriding purpose of safeguarding passengers from harm.*

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>**
**<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

Addendum at pp. 21, 39 (Final Brief For Respondent Transportation Security Administration in *Southwest Airlines Co. v. TSA*, 554 F.3d 1065 (D.C. Cir. 2009)) (emphasis added).

TSA's previous position on this issue is consistent with Congressional intent. As Senator Kerry explained in the aftermath of 9/11, the entire aviation industry demanded "a Federal system with Federal employees and Federal standards that guarantees the safety of our aircraft access and our airways." 147 Cong. Rec. S10,437 (Oct. 10, 2001). Senator Kerry extolled "the virtue of having this national system of employees who are accountable to one standard, accountable across the country to one system." 147 Cong. Rec. S10,438 (Oct. 10, 2001). Based on these goals, Congress "agreed on a bipartisan and bicameral basis to 'federalize' airport screeners," finding that "[f]ederalization of the screening process is a necessary step." 147 Cong. Rec. S11,982 (Nov. 16, 2001) (statement of Sen. Rockefeller). In short, "security functions at United States airports should become a Federal government responsibility." H.R. Rep. No. 107-296, at 54 (2001) (Conf. Rep.).

Congress expressly stated that TSA's screening duties are not limited to passengers. "All personnel who have anything to do with maintenance, cleaning,

SUBJECT TO PROTECTIVE ORDER IN <u>City of Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

fueling, or catering must be screened." 147 Cong. Rec. S11,978 (Nov. 16, 2001)

(statement by Sen. Burns). Or as Senator Rockefeller put it,

> [t]he legislation we approve today will require . . . *screening of all passengers, baggage, and employees . . .* Every person and every bag, at every airport, big and small, will be screened by Federal law enforcement personnel, no exceptions.

147 Cong. Rec. S11,982 (Nov. 16, 2001) (emphasis added).

Fifteen years later, Congress restated the Federal government's

comprehensive screening responsibilities in the 2016 Security Act. TSA has itself

argued to this Court that the 2016 Security Act:

> directed TSA to reinforce existing procedures by '*expand[ing] the use of transportation security officers . . .* to conduct enhanced, random and unpredictable . . . inspections of airport workers within the sterile area . . .TSA is working with airport operators, airline operators and state authorities to implement this mandate.

Addendum at p. 86 (Public Redacted Brief For Respondent Transportation Security

Administration in *Bonacci v. Transportation Security Administration*, No. 17-1116

(D.C. Cir.), reported at 909 F.3d 1155 (D.C. Cir. 2018) (emphasis added)). Two

years later, the 2018 TSA Modernization Act required that worker inspections be

"consistent" with the 2016 Security Act, and that worker screening be "TSA-led."

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.
14

TSA Modernization Act, Pub. L. No. 115-254, tit. I, § 1934, 132 Stat. 3186, 3573 (2018).

The National Amendment violates this repeated Congressional mandate. TSA cannot disregard clear Congressional intent just to save money. "[O]nly by federalizing those screeners can the American public be assured that 'cost-cutting' will not occur to the detriment of their safety." 147 Cong. Rec. S10,803 (Oct. 17, 2001) (statement by Sen. Byrd). "Security in this bill comes first, and it will forever more come first without being driven by cost concerns." 147 Cong. Rec. H8302 (Nov. 16, 2001) (statement by Rep. Defazio).

2.      The National Amendment is Arbitrary and Capricious.

First, TSA has repeatedly pointed to the "insider threat" to justify the need for screening aviation workers, but the administrative record is devoid of any rationale for addressing that threat by shifting responsibility from TSA to airport operators. "An agency must 'articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made,'" and where "the record lacks a reasonable justification for the [agency decision] and any comparative analysis whatsoever, [an agency's] explanation is arbitrary and capricious." *United Steel v. Mine Safety and Health Admin.*, 925 F.3d 1279, 1285

SUBJECT TO PROTECTIVE ORDER IN <u>City of
Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW",
AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT
AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.
15

(D.C. Cir. 2019) (citation omitted).  Although the administrative record is replete with TSA's assertions that aviation workers should be subject to security screening, *see, e.g.*, App. 54, 508-509, TSA never compared the effectiveness of this approach to alternatives, or explained why TSA should not conduct worker screenings itself.

Instead, TSA merely stated that worker screening "cannot be sustained by TSA without having an impact on other screening operations."  App. 733.  In other words, TSA's only rationale is saving money.  But even that statement is unsupported.  The record contains no evidence that TSA estimated what it would cost the agency to maintain full responsibility for worker screening, nor is there any evidence that TSA seriously contemplated maintaining this role.  *See National Shooting Sports Foundation, Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (an agency must consider "significant and viable" and "reasonably obvious alternative[s]" (citations omitted)); *United Steel*, 925 F.3d at 1285 (lack of comparative analysis in the record suggests agency action is arbitrary and capricious).

Second, TSA failed to consider comments by the industry regarding whether TSA itself is in the best position to administer worker screening, *see, e.g.*, App.

SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.
16

733, and whether the National Amendment imposes potentially catastrophic liabilities on airport operators. *See, e.g.,* App. 734. In deciding whether an agency action was reasonable, the Court must determine "whether the agency…failed to consider an important aspect of the problem it faces." *Humane Society of United States v. Zinke*, 865 F.3d 585, 605 (D.C. Cir. 2017) (citations omitted). An agency's decision is arbitrary and capricious if "[a]n important factor…was left out of the analysis all together." *Id.* at 606. TSA's failure to address these important issues renders the National Amendment arbitrary and capricious.

TSA hires, trains, and oversees large numbers of federal screeners, and is uniquely capable of rapidly adjusting screening procedures and training in response to emerging threat intelligence. App. 830-831, 984. Yet TSA did not address the industry's comments regarding the disparity between TSA's capabilities and those of airport operators, or the concern that delegating worker screening to airports risks degrading airport security. *See Kentucky Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022) ("agencies cannot disregard important aspects of a problem").

Finally, the Airport Petitioners submitted comments that the Amendment would impose an unacceptable risk of liability on airport operators in the event of a

SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

security breach or terrorist attack.  *See, e.g.,* App. 598, 610, 749, 758-759.  But

TSA did nothing more than "acknowledge that the nature of the [National

Amendment's] requirements may subject airports to liability."  App 640.  Later

TSA noted, unhelpfully, that "[a]irports should have current liability protection

that would be applicable.  TSA will not provide a legal opinion on the issue of

legal liability and insurability."  App. 734.  These responses suggest TSA never

seriously considered the gravity of the liability issue.

3.      The National Amendment Unconstitutionally Commandeers Local Public Officials to Enforce Federal Security Requirements.

The National Amendment violates the Tenth Amendment's prohibition

against shifting the burden of Federal programs onto state or local officials.  In

*Printz v. United States*, 521 U.S. 898 (1997), County Sheriffs challenged on Tenth

Amendment grounds the Brady Bill's command that local law enforcement

officials conduct background checks on handgun purchasers.  *Id.* at 902.  The

Supreme Court held, under the Tenth Amendment, that "the Federal Government

may neither issue directives requiring the States to address particular problems, nor

command the States' officers, or those of their political subdivisions, to administer

or enforce a federal regulatory program."  *Id*. at 935.  In language especially

pertinent here, the Court noted that, if the federal government had the power to

SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings</u> v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

enlist local officials to implement federal regulatory programs, it could "take credit for 'solving' problems without having to ask [its] constituents to pay for the solutions with higher federal taxes." *Id.* at 930.

But beyond TSA's shifting the enormous cost of the National Amendment to local governments, there is an even more serious consequence. Should an airport worker wrongly gain access to the secured area, the local airport operator is put "in the position of taking the blame." *Id.* As the Court described in *Printz* with respect to the requirements of the Brady Bill, "it will be [local police chiefs], not some federal official who stands between the gun purchaser and immediate possession of his gun. And it will likely be [local police chiefs], not some federal official, who will be blamed for any error." *Id.* According to TSA, when the National Amendment takes effect, "the airport is responsible for implementing and conducting screening." App. 734. TSA fully acknowledges that "the nature of the requirements [in the National Amendment] may subject airports to liability." App. 640.

4.  The National Amendment Violates the Public Notice and Comment Requirements of the APA.

The APA "generally require[s] an agency to publish notice of a proposed rule in the Federal Register and to solicit and consider public comments upon its

SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings</u> v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW",
AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT
AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.
19

proposal." *Electronic Privacy Information Center* v. *U.S. Dept. of Homeland Sec.*, 653 F.3d 1, 5 (D.C. Cir. 2011) (hereinafter "EPIC") (citing 5 U.S.C. §§ 553(b) and (c)). The National Amendment is a "rule" that should have been the subject of public notice and comment; it is a binding statement of general application that was used by TSA to implement a new nationwide policy. *See* 5 U.S.C. § 551(4).

This Court has already rejected a similar effort by TSA to skip "public rule making proceedings," 5 U.S.C. § 553(b)(1), when TSA decided, without an opportunity for public comment, to screen passengers with advanced imaging technology rather than magnetometers. *EPIC,* 653 F.3d at 8. TSA made a similar misstep here. It only gave the airport and aircraft operators the chance to submit written comments. But TSA cannot avoid the APA's requirement for "public rule making proceedings" by making a unilateral assessment of who might have relevant comments and excluding from its rulemaking process the travelling public (among others), which is undeniably interested in the safety and security of airports. *See In re September 11 Litigation*, 280 F. Supp. 2d 279, 292-293 (S.D.N.Y. 2003) (airport screeners "perform their screening duties, not only for those boarding airplanes, but also for society generally").

**SUBJECT TO PROTECTIVE ORDER IN <u>City of Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

Nor can TSA rely on 49 C.F.R. § 1542.105(c), which grants to "designated official[s]," typically local FSDs, the authority to amend an Airport Security Program ("ASP"). This rule authorizes an FSD to change an airport's individually tailored ASP, but nothing in this rule authorizes a "National Amendment" to ASPs, mandated by the Administrator rather than an FSD, that imposes new industry-wide obligations. TSA is using the ASP process to exercise authority Congress has not given to it. Further, § 1542.105(c) only enables an ASP amendment "[i]f safety and the public interest require." There is no safety or public interest advanced by shifting aviation worker screening obligations to airports.

5.      The National Amendment Requires Local Montana Officials to Engage in Conduct Which Violates State Constitutional Rights to Privacy.

Two Airport Petitioners, the City of Billings and Flathead Municipal Airport Authority (the owner and operator of Glacier Park International Airport), also sought reconsideration of the National Amendment on the ground that it requires local officials to engage in conduct that violates the Montana Constitution. App. 783, 811. Warrantless searches under the Montana Constitution are narrower than under the federal Constitution. *See State v. Goetz*, 345 Mont. 421, 427 (2008). Under the Montana Constitution, searches of personal property without "an objectively reasonable belief" that the property "posed some real threat to safety"

SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

are deemed unlawful. *State v. Hamilton*, 314 Mont. 507, 517-18 (2003). Only in the rarest of circumstances would an airport screener have any "objectively reasonable" basis to determine that an aviation worker or their personal property "posed some real threat to safety." *Id*. at 518. As a result, a Montana Court could well conclude that searches under the National Amendment are unconstitutional. And Montana is not the only state whose constitution provides greater privacy protections and restrictions on random searches than the federal constitution. *See York v. Wahkiakum School District No. 200*, 178 P.3d 995, 1005 (Wash. 2008); *People v. McKnight*, 446 P.3d 397, 405-412 (Colo. 2019).

**B.     The Airport Petitioners Will Suffer Irreparable Injury If the Stay is Denied.**

In the absence of a stay, the airport industry will be irreparably harmed. Especially given the recently extended briefing schedule, Dkt. 2037100, it is highly unlikely that this Court will issue its decision on the merits until after the September 25, 2024 implementation date. As a result, since implementation of the National Amendment will impose sole responsibility for worker screening on individual airport operators rather than TSA, denying the stay not only risks degrading security, but also imposes on airports enormous costs and potentially catastrophic liability.

**SUBJECT TO PROTECTIVE ORDER IN <u>City of Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

Without a stay, airports around the country will be required to hire thousands of screeners or enter into contracts with private security contractors to comply with the National Amendment, and some airports will have to make accelerated infrastructure changes at a premium cost to accommodate screening operations. App. 1248. TSA itself estimates the start-up cost to the industry, in year one alone, at $62 million. App. 659. But if this Court later vacates the National Amendment, airports will then be required to lay off these employees and terminate any contracts with private screeners, resulting in additional costs and employment dislocations nationwide. These unrecoverable costs constitute irreparable harm. *Feinerman v. Bernardi*, 558 F. Supp. 2d 36, 51 (D.D.C. 2008); *Smoking Everywhere, Inc. v. U.S. Food & Drug Administration*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010), *aff'd sub nom. Sottera, Inc. v. FDA*, 627 F.3d 891 (D.C. Cir. 2010). And as the industry learned from 9/11, the National Amendment would impose on airports extraordinary liability risk which, in the event of a terror attack, could far exceed the limits of any applicable insurance.

In its letter denying the Airport Petitioners' request for a stay, TSA incorrectly suggested that there is no risk of irreparable harm because some airports are already taking steps to comply by the deadline. *See* Addendum at p.

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

19.  That is a *non-sequitur*.  Airports are taking steps to comply because, in the absence of a stay, they will be legally required to comply, and will be subject to enforcement action and civil penalties for failure to do so.  Forced compliance on the part of the Airport Petitioners hardly reflects a lack of irreparable injury.

TSA's letter also misleadingly asserts that "nearly all of the 173 airports [subject to the National Amendment] are compliant with the National Amendment …." *Id.*  But then TSA clarifies that these so-called "compliant" airports have merely "expanded their pre-existing aviation worker screening procedures," but must still "develop and implement additional future procedures" to be in compliance by the deadline.  *Id.*  Similarly, TSA asserts that nine of the Airport Petitioners "are either fully compliant, or have taken significant steps" toward compliance, but then identifies only one airport that is "fully compliant."  *Id.*  For four of the airports identified by TSA, the "significant steps" toward compliance that TSA identifies are limited to creating "plans" for aviation worker screening. In short, there is no indication that "nearly all," or even most, airports are currently in compliance with the National Amendment; but even if they were, it would not undermine this request for a stay since airports comply under threat of enforcement action.

**SUBJECT TO PROTECTIVE ORDER IN <u>City of</u>
<u>Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

## C.   TSA Will Suffer Little Harm if a Stay is Granted.

TSA has not even attempted to argue that abdication of its screening responsibility will create better security. Instead, TSA's sole rationale is saving money. *See* App. 733. But TSA has borne the cost of worker screening for two decades, and all the Airport Petitioners request is that TSA continue to do so for 120 days after this Court issues its ruling on the merits. Any burden on TSA caused by this short continuation of its screening responsibilities would be miniscule in comparison to the financial and logistical burden and liability risks for airports described above.

## D.   A Stay Advances the Public Interest.

The public interest in security favors the grant of a stay. In the 9/11 Litigation, Judge Alvin Hellerstein memorably addressed the public's interest in airport screening operations:

> We live in the vicinity of busy airports, and we work in tall office towers, depending on others to protect us from the willful desire of terrorists to do us harm . . . [Airport screeners] perform their screening duties, not only for those boarding airplanes, but also for society generally. It is both their expectation, and ours, that the duty of screening was performed for the benefit of passengers and those on the ground, including those present in the Twin Towers on the morning of September 11, 2001.

SUBJECT TO PROTECTIVE ORDER IN City of
Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW",
AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.
UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT
AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

*In re September 11 Litigation*, 280 F. Supp. 2d at 292-293. "Society generally" has an extraordinary interest in the efficacy of worker screening. That interest is poorly served if TSA stops screening airport workers and local airports must then step in with their own personnel and procedures, only for TSA to resume worker screening and airports be required to terminate thousands of screeners or security contractors, if and when the Airport Petitioners prevail.

## CONCLUSION

For the above reasons, the Airport Petitioners respectfully request this Court grant the Airport Petitioners' Motion for Stay.

The City of Billings *et al.*,

By their attorneys,

/s/   *Melissa C. Allison*
Melissa C. Allison
   mallison@andersonkreiger.com
David S. Mackey
   dmackey@andersonkreiger.com
Carlos R. Rosende
   crosende@andersonkreiger.com
ANDERSON & KREIGER LLP
50 Milk Street, 21st Floor
Boston, MA 02109
T: 617.594.5940

April 11, 2024

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

## CERTIFICATE OF COMPLIANCE

1.      This motion complies with the type-volume requirements of Federal Rules of Appellate Procedure 27(d)(2)(A) and Circuit Rule 27(a)(2) because the motion contains 5,184 words, as determined by the word-count function of Microsoft Word 365; and

2.      This motion complies with the typeface requirements of the Federal Rules of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this motion has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

Dated:  April 11, 2024                    /s/   *Carlos R. Rosende*
                                          Carlos R. Rosende

SUBJECT TO PROTECTIVE ORDER IN City of
Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

## STATEMENT OF NOTIFICATION OF OPPOSING COUNSEL

Pursuant to D.C. Cir. Rule 18(a)(2), undersigned counsel hereby certifies that on April 11, 2024, he notified opposing counsel by telephone that the Airport Petitioners intended to file this motion to stay.

Dated:  April 11, 2024                                   /s/   *David S. Mackey*
                                                         David S. Mackey

**SUBJECT TO PROTECTIVE ORDER IN** <u>City of</u>
<u>Billings v. TSA</u>**, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

## CERTIFICATE OF SERVICE

I hereby certify on April 11, 2024, I caused a true and correct copy of this motion to be served on Respondents by Federal Express.

/s/ *Carlos R. Rosende*
Carlos R. Rosende

April 11, 2024

**SUBJECT TO PROTECTIVE ORDER IN** <u>City of</u>
<u>Billings v. TSA</u>**, Nos. 23-1290, 1328 (D.C. Cir.)**
**WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.**

# ADDENDUM

SUBJECT TO PROTECTIVE ORDER IN City of
Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS
DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE
TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED
RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC
DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

~~SENSITIVE SECURITY INFORMATION / UNDER SEAL~~

# TABLE OF CONTENTS

**Page**

Transportation Security Administration's Aviation Worker Screening National Amendment 23-02 ("National Amendment")............................................................1

Airport Petitioners' Request for Stay, March 19, 2024 .........................................12

TSA's Denial of Airport Petitioners' Request for Stay, March 26, 2024 ...............17

Final Brief for Respondent Transportation Security Administration in *Southwest Airlines Co. v. Transportation Security Administration*, No. 07-1279 (D.C. Cir.) ........................................................................................21

Public Redacted Brief for Respondent Transportation Security Administration in *Bonacci v. Transportation Security Administration*, No. 17-1116 (D.C. Cir.) .......54

**SUBJECT TO PROTECTIVE ORDER IN <u>City of Billings v. TSA</u>, Nos. 23-1290, 1328 (D.C. Cir.)**
~~WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.~~

# EXHIBIT A

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

SENSITIVE SECURITY INFORMATION



**Transportation
Security
Administration**

U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598

## REQUIREMENT TO AMEND
## TSA-APPROVED AIRPORT SECURITY PROGRAM

| | |
|---|---|
| AIRPORT OPERATORS | U.S. Airports |
| NUMBER | TSA-NA-23-02 |
| SUBJECT | Aviation Worker Screening |
| PROGRAM | Airport operators regulated under title 49 of the Code of Federal Regulations (CFR) § 1542.103(a) |
| | Aircraft operators regulated under 49 CFR part 1544 with an Exclusive Area Agreement under 49 CFR § 1542.111 and 49 CFR § 1544.227 |
| | Foreign air carriers regulated under 49 CFR part 1546 with an Exclusive Area Agreement (EAA) pursuant to 49 CFR § 1542.111 |
| APPLICABILITY | Category X, I, and II airports |
| ISSUED | 04/27/2023 |
| EFFECTIVE | 09/25/2023 |

### PURPOSE AND GENERAL INFORMATION

The Transportation Security Administration (TSA) seeks to enhance insider threat deterrence and detection by creating an expectation that every aviation worker with access to the Secured or Sterile Areas of a U.S. domestic, federally-regulated airport could be screened for unauthorized weapons, explosives, or incendiaries, as appropriate, each work day.

This Airport Security Program (ASP) National Amendment also applies to aircraft operators regulated under 49 CFR part 1544 and foreign air carriers regulated under 49 CFR part 1546 that hold an Exclusive Area Agreement (EAA) pursuant to 49 CFR §§ 1542.111 and 1544.227. In

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

this ASP National Amendment, whenever TSA uses the term "airport operator" it refers to both airport operators and aircraft operators and foreign air carriers holding an EAA, if applicable.

The airport operator must amend its ASP and applicable EAAs to address the procedures described in this ASP National Amendment, TSA-NA-23-02. Aviation worker screening conducted by airport operators prior to the issuance of this amendment may be used to satisfy the requirements in this National Amendment, provided the screening meets the requirements in Section I.G.

The airport operator must ensure each of the Sections in the Approved Procedures is included in its ASP, unless specifically noted within the Section. If an airport operator's ASP or any applicable EAA already address the security requirements detailed below, the airport operator, aircraft operator, or foreign air carrier need only amend its ASP or EAA to the extent necessary to address those requirements not already included.

DEFINITIONS

For the purposes of this ASP National Amendment, these terms are defined as follows:

Access Point: A portal by which an aviation worker accesses a Secured Area or Sterile Area from a Public Area in a passenger terminal building(s). The following are not considered to be Access Points for purposes of this ASP National Amendment:

Aviation Worker: An individual with unescorted access authority to an airport's Secured Area and/or Sterile Area and who is not a traveling passenger. The definition also includes any individual under the escort of an aviation worker authorized to access the designated area.

Aviation Worker Screening Assessment: An online survey issued by TSA to evaluate aviation worker screening procedures as part of TSA's phased implementation approach to aviation worker screening.

Explosives Detection Screening Equipment (EDSE): Security designed to detect the presence of explosives on an individual's person and accessible property.

Operational Screening Hour: Operational screening activity at one Access Point conducted by one team of screeners. A team of screeners consists of two or more individuals. If more than one team is conducting a screening activity at more than one Access Point during the same hour, they are considered separate Operational Screening Hours, and both hours would count towards the airport's total allocation requirement. Operational Screening Hours are not considered the same as Full-Time Equivalent (FTE) hours.

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.



Random Continuous Manner: The procedure by which an operator randomly selects an aviation worker for screening and, upon completing the screening of that aviation worker, selects the next available aviation worker for screening.

Screening: Non-discriminatory physical and/or technology-based process used to search aviation workers and their property to deter, detect, and prevent the introduction of unauthorized weapons, explosives, and incendiaries into a Secured Area or Sterile Area.

Aviation Worker Screening Tool: A TSA-developed tool that serves two functions. First, the Screening Requirement Calculator (SRC) provides airport operators the amount of operational screening hours on a per week basis. Secondly, the Random Screening Scheduler (RSS) provides the airport operator a randomized screening schedule based on the reported access points and calculated screening requirement.

APPROVED PROCEDURES

I.   Aviation Worker Screening

     A. Notice and Signage. The airport operator must—

        1. Provide notice to aviation workers possessing airport-issued identification (ID) media of the following requirements:

           a. Aviation workers are subject to screening for unauthorized weapons, explosives, and incendiaries.

           b. Non-compliance with the airport operator's aviation worker screening policy could result in penalties, which may include confiscation of their airport operator-issued ID media and/or revocation of unescorted access authority.

        2. Post signage at all Access Points using either—

           a. The TSA-provided signage in Attachment 1; or

           b. Local airport operator signage that addresses all of the following notifications:

              1) Notice of potential screening;

              2) Declaration that unauthorized weapons, explosives, and incendiaries are not permitted in Secured Areas or Sterile Areas; and

              3) Refusal to undergo screening may result in penalties.

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

TSA-Final Airport Security Program Amendment                                 TSA-NA-23-02

B.  Except for those individuals exempted from aviation worker screening in Section I.C., the airport operator must subject all aviation workers, including individuals under escort, to screening at an Access Point where screening is occurring.

C.  The airport operator must exempt only the following individuals from aviation worker screening listed:

D.  Training

1.  The airport operator must ensure airport operator direct employees and authorized representatives are trained on all security procedures for which they have responsibility under this ASP National Amendment.

2.  The airport operator must maintain training records for all airport operator direct employees and authorized representatives performing screening as required under this ASP National Amendment for a minimum of 90 calendar days following termination, separation, or reassignment from screening roles.  The airport operator must make training records available to TSA upon request.

E.  The airport operator must use the Aviation Worker Screening Tool – Screening Requirement Calculator (SRC) to determine the airport's weekly Operational Screening Hour requirement.

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**

WARNING:  This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520.  No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation.  Unauthorized release may result in civil penalty or other action.  For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

F. The airport operator must conduct screening based on the airport's weekly Operational Screening Hour requirement in Section I.E. and generate a weekly schedule using one of the two following options:

 1. Aviation Worker Screening Tool – Random Screening Scheduler (RSS):

    a. The airport operator may utilize a schedule generated by the RSS.

    b. When using the RSS, the airport operator must apply the schedule provided by the RSS.

    c. When an airport operator has an operational need to deviate from the RSS-generated schedule, the airport operator must notate the deviation in its weekly schedule.

        1) Any deviation must provide sufficient Operational Screening Hours to meet the airport's weekly Operational Screening Hour requirement generated by the SRC.

        2) The airport operator must notify the Federal Security Director (FSD) or designee of any deviations in a timeframe and manner agreed upon by the FSD or designee.

 2. Airport-Generated Schedule:

    a. The airport operator may develop and use a randomized schedule that covers a broad spectrum of Access Points and timeframes, to include peak and off-peak times and less-frequented Access Points.

    b. The airport operator must receive FSD or designee approval at least one calendar day prior to the initial implementation of any Airport-Generated Schedule.

    c. When an airport operator has an operational need to deviate from the randomly-generated schedule, the airport operator must notate the deviation in its weekly schedule.

        1) Any deviation must provide sufficient Operational Screening Hours to meet the total airport's weekly Operational Screening Hour requirement generated by the SRC.

        2) The airport operator must notify the FSD or designee of any deviations in a timeframe and manner agreed upon by the FSD or designee.

G. If the airport operator had aviation worker screening operations in place prior to the effective date of this national amendment, the airport operator may use it to satisfy the

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

ADDENDUM 6

TSA-Final Airport Security Program Amendment                                    TSA-NA-23-02

requirements in this national amendment. The airport operator must obtain FSD concurrence that the screening operations satisfy the requirements within this national amendment, and must meet the following elements:

1. Screening operations must have an element of randomization;

2. Screening operations must meet the minimum screening requirements described in Section I.J.; and

3. Screening operations must occur at an Access Point as defined herein going from the passenger terminal within the Public to Secured or Sterile Areas.

H. The airport operator must maintain a record of the aviation worker screening schedule generated by either option in Section I.F., including any deviations made, for 30 calendar days and make the record available to TSA upon request.

I. Regardless of its choice of scheduling option in Section I.F, at least every 90 calendar days, the airport operator must ensure the following information entered into the TSA Scheduling Tool is accurate and up-to-date:

1. Current list of Access Points.

2. Number of Secured Area ID media holders.

J. Aviation Worker Screening Procedures

1. The airport operator must conduct aviation worker screening at scheduled Access Points in one of the following locations:

    a. A location immediately behind the Access Point in the Secured Area or Sterile Area.

    b. If the airport operator cannot conduct screening operations immediately behind the Access Point as described in Section I.J.1.a. because the size and layout of the area is not adequate, it may conduct screening operations within the proximity of the Access Point.

    c. If the airport operator cannot conduct screening operations in accordance with Sections I.J.1.a. and b. above, the operator must obtain concurrence from its FSD to conduct screening operations in front of the door. The concurrence is valid for as long as the Access Point configuration remains unchanged.

2. The airport operator must, at a minimum, conduct the aviation worker screening in a random continuous manner.

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need-to-know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

3. The airport operator must develop and implement screening methods capable of detecting unauthorized weapons, explosives, and incendiaries. The airport operator may allow an aviation worker to possess tools of the trade only if the item(s) are required in the performance of the aviation worker's official duties.

4. The screening of aviation workers must, at a minimum, consist of the following searches:

   a. A search of the aviation worker's person;

   b. A search of the aviation worker's outer coats and jackets; and

   c. A search of the aviation worker's accessible property.

5. The airport operator must visually inspect the ID media of the aviation worker for validity during screening.

6. The airport operator must implement the use of explosives detection screening equipment (EDSE) into aviation worker screening no later than ▮ months after the issuance date of this ASP National Amendment.

   a. The EDSE must be capable of detecting the presence of explosives carried on the person, in outer coats and jackets, and in the individual's accessible property.

   b. If the EDSE methods are not applied continuously to each aviation worker, the airport operator must implement them in an unpredictable manner.

II. Aviation Worker Screening Resolution Procedures

   A. The airport operator must develop resolution procedures to—

   1. Respond to the discovery of an unauthorized weapon, explosive, or incendiary;

   2. Respond to other alarms generated by screening processes;

   3. Respond to an aviation worker who refuses to be screened or refuses to complete screening after it has begun; and

   4. Notify the FSD or designee after the discovery of an unauthorized weapon, explosive, or incendiary as soon as practicable and in a timeframe and manner agreed upon by the FSD or designee.

   B. The airport operator must carry out resolution procedures following—

   1. The discovery of an unauthorized weapons, explosives, or incendiaries;

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

SENSITIVE SECURITY INFORMATION

TSA-Final Airport Security Program Amendment                                    TSA-NA-23-02

2. Other alarms generated by the screening process; or

3. Notification to the FSD or designee after the discovery of an unauthorized weapon, explosive, or incendiary.

C. If the aviation worker refuses to be screened, the airport operator must either—

1. Refuse the aviation worker access to the Secured Area or Sterile Area and follow local airport procedures; or

2. Require the aviation worker to exit the Secured Area or Sterile Area and follow local airport procedures.

III. Explosives Detection Screening Equipment (EDSE) Implementation Plan

A. The airport operator must develop and maintain an EDSE Implementation Plan. The airport operator must—

1. Identify in the EDSE Implementation Plan—

a. How it will use EDSE to detect unauthorized explosives during aviation worker screening.

b. Specific details of the EDSE that will be purchased, which must be in a number and manner adequate to support the airport operator's aviation worker screening operation;

c. The approximate date when EDSE will be purchased; and

d. The approximate date the EDSE will be operational.

2. Submit the EDSE Implementation Plan to the FSD or designee within ▩ months of the issuance date of this ASP National Amendment.

B. If after submission, the airport operator becomes aware of a substantive change to the EDSE Implementation Plan, the airport operator must coordinate with the FSD or designee and submit an updated EDSE Implementation Plan.

*NOTE: The EDSE Implementation Plan need not be incorporated into the ASP.*

IV. Aviation Worker Screening Assessment. The airport operator must complete the Aviation Worker Screening Assessment within 45 calendar days after being notified by TSA.

V. Aviation Worker Screening Data Collection

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

| TSA-Final Airport Security Program Amendment | TSA-NA-23-02 |
|---|---|

A. The airport operator must collect the following data on a daily basis for each aviation worker screening Access Point:

 1. Total number of aviation workers screened; and

 2. Total number of unauthorized weapons, explosives, and incendiaries discovered.

B. The airport operator must transmit the data in a timeframe and manner agreed upon by the FSD or designee.

SCOPE AND DURATION

In accordance with 49 CFR § 1542.105(c), this document amends the airport operator's TSA-approved ASP. Accessibility and dissemination of this document must be controlled in accordance with 49 CFR § 1542.101(c).

ACKNOWLEDGMENT OF RECEIPT

Upon receipt of this National Amendment, the airport operator must provide written confirmation to the FSD, which acknowledges receipt and confirms that the airport operator will provide a copy to any affected EAA holder.

APPROVAL OF ALTERNATIVE MEASURES

The airport operator must immediately notify the FSD whenever any action required by this National Amendment cannot be carried out. The airport operator must submit proposed alternative measures and the basis for submitting those measures in writing to the Assistant Administrator for Policy, Plans, and Engagement through the FSD.

David P. Pekoske
Administrator

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)

WARNING: This record contains Sensitive Security Information that is controlled under 49 CFR parts 15 and 1520. No part of this record may be released to persons without a "need to know", as defined in 49 CFR parts 15 and 1520, except with the written permission of the Administrator of the Transportation Security Administration or the Secretary of Transportation. Unauthorized release may result in civil penalty or other action. For U.S. Government agencies, public disclosure is governed by 5 U.S.C. 552 and 49 CFR parts 15 and 1520.

TSA-Final Airport Security Program Amendment                    TSA-NA-23-02

Attachment 1

# By Order of the Department of Homeland Security
# Transportation Security Administration

# INDIVIDUALS ENTERING
# THE SECURED AREA OR
# THE STERILE AREA
# ARE SUBJECT TO SCREENING

Unauthorized weapons, explosives, and incendiaries
are prohibited.

Refusal to undergo screening may result in the
temporary or permanent revocation of unescorted
access authority as well as a penalty prescribed by
local, state, or federal law, as applicable.

**SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)**
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

ADDENDUM 11

# EXHIBIT B

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

**SENSITIVE SECURITY INFORMATION**



**DAVID S. MACKEY**
dmackey@andersonkreiger.com
T: 617-621-6531

March 19, 2024

**By E-mail**
David P. Pekoske [David.Pekoske@tsa.dhs.gov]
Administrator
Transportation Security Administration
6595 Springfield Center Drive
Springfield, VA 20598

*Re:    Request for Stay of Implementation of Aviation Worker Screening National Amendment, TSA-NA-23-02*

Dear Administrator Pekoske:

We represent the Airports Council International – North America ("ACI-NA"), acting in a representational capacity on behalf of its members, as well as fifteen individually-named airport sponsors (collectively, with ACI-NA, the "Airport Petitioners")[1].  As you know, the Airport Petitioners each filed Petitions for Reconsideration of the Aviation Worker Screening National Amendment, TSA-NA-23-02 ("National Amendment"), which shifts the responsibility, cost, and liability for aviation worker screening from the Transportation Security Administration ("TSA") on to the nation's airports.  TSA denied each of these Petitions for Reconsideration, and the Airport Petitioners then timely filed Petitions for Review of those denials with the D.C. Circuit Court of Appeals under 49 U.S.C. § 46110.  *City of Billings et al. v. Transportation Security Administration*, No. 23-1290, consolidated with 23-1328.  The Airport Petitioners filed their opening brief ("Petitioners' Brief") in the matter on March 1, 2024.

The Airport Petitioners hereby respectfully request an immediate stay of the National Amendment, currently scheduled for implementation on September 25, 2024, for each of the airports subject to the National Amendment, so that airports are not required to comply with the

---

[1] The individual airport sponsors are the Oklahoma City Airport Trust, Spokane International Airport, Milwaukee County and General Mitchell International Airport, Juneau Airport, Massachusetts Port Authority, Raleigh-Durham Airport Authority, Dane County, Flathead Municipal Airport Authority, City of Colorado Springs, Greater Asheville Regional Airport Authority, City of Bismarck, City of San Jose, City of Philadelphia, City of Billings, and Metropolitan Airports Commission.

~~WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520,~~

ANDERSON & KREIGER LLP  |  50 MILK STREET, 21st FLOOR, BOSTON, MA 02109  |  617.621.6500

~~EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.  UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.~~

ADDENDUM 13

David P. Pekoske
March 19, 2024
Page 2

### SENSITIVE SECURITY INFORMATION

National Amendment until one hundred-twenty (120) days after the Court of Appeals has ruled on the merits of the Petitions for Review.

For the reasons set forth in the Airport Petitioners' Petitions for Reconsideration to TSA, and in the Petitioners' Brief, we are confident that the Court of Appeals will find the National Amendment unlawful for a variety of reasons. The Airport Petitioners have argued that the National Amendment is inconsistent with the foundational principle behind the Aviation and Transportation Security Act ("ATSA"), 49 U.S.C. §§ 44901 *et seq*., that the screening of all persons who enter the sterile and secured area of our nation's airports should be performed by federal employees according to federal standards applied throughout the country, and that cost concerns cannot justify TSA's abdication of this responsibility. Petitioners' Brief at 25-36. The National Amendment is also arbitrary and capricious. The Airport Petitioners acknowledge the concerns about "insider threat" identified by TSA, but TSA, not airports, has direct access to intelligence information and is best positioned to hire and train personnel, and to keep the physical screening procedures updated and standardized, to guard against this risk. Independently, and in accordance with TSA regulations, airports have implemented numerous measures to mitigate concerns about the risk posed by insiders. However, there is simply no rationale, other than cost, for shifting the screening responsibility to address this insider risk to airports. *Id.* at 37-46.

In addition, the National Amendment violates the Tenth Amendment by placing the cost and liability associated with worker screening on airports. The administrative record speaks volumes on this point. TSA's "Disposition of Comments" and answers to "Frequently Asked Questions" reflect that the National Amendment has placed responsibility for worker screening solely on airports. Petitioners' Brief at 17-21. TSA's cost analyses confirm as much, reflecting that, other than TSA's costs to audit airports' compliance with the National Amendment, airports will bear 99.9% of the costs of worker screening. *Id.* at 19-20, 35-36, 48. Specifically, over the next five years, airports will bear somewhere between $302M and $350M in costs to implement the program, and TSA will bear a total of $300,000 in "oversight" of airports' performance. *Id.* Nor does TSA have any substantive answer to airports' concerns about liability, acknowledging that the National Amendment subjects airports to liability, refusing to provide any opinion on the issue, and urging airports to consult with their legal counsel. *Id.* at 18-19, 50.

There are additional flaws in the National Amendment: TSA promulgated the National Amendment without the public notice and comment required by the Administrative Procedure Act, 5 U.S.C. § 553. Petitioners' Brief at 53-56. It also requires state and local officials to conduct screening in ways which may well violate their own state laws protecting rights to privacy more broadly than the Fourth Amendment. *Id*. at 56-60.

We understand that TSA takes a different view on these issues, and that resolution of the dispute will require a decision by the Court of Appeals. But the question whether the National Amendment should go into effect before the Court rules must be decided promptly. The

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

David P. Pekoske
March 19, 2024
Page 3

## SENSITIVE SECURITY INFORMATION

potential hardship to airports, and to employees or contractors hired by airports to perform the screening, if the National Amendment takes effect before the Court of Appeals has ruled, justify the grant of a stay pending that ruling.

If a stay pending the Court's ruling is denied, local airport sponsors around the country will be forced to comply with the National Amendment's September 25, 2024 deadline, and to hire thousands of individuals to perform worker screening, enter into contracts with private security firms to conduct the screening, and undertake the task of designing and implementing training protocols. TSA has never addressed concerns raised by airports and ACI-NA about the vulnerability associated with the introduction of thousands of new individuals – in most cases, low-paid contractors – to perform worker screening. Nor has TSA addressed airports' cost concerns. As TSA's own cost analyses reflect, the start-up, "year-1" cost for airports is $52.9M. But then, if the Court ultimately vacates the National Amendment, airports will likely lay-off the thousands of workers they have just hired, or cancel the contracts with private security firms that they have just executed. The lay-offs and contract cancellations will likely involve considerable expense in the form of severance payments and contractual penalties for early termination. This scenario also risks disruption in the lives of many workers who may have left jobs to accept positions as airport screeners, only to be laid off if the Court vacates the National Amendment.

Nor can TSA claim that delaying the National Amendment's implementation date will harm TSA or the public in any significant way. TSA's only articulated rationale for shifting the burden of worker screening to airports is cost savings. But TSA has already extended the implementation date of the National Amendment by a full year, from September 25, 2023 to September 25, 2024. Continuing to bear the cost of its random aviation worker screening efforts for an additional several months, a cost TSA has born for more than two decades, while the Court determines the legality of the National Amendment hardly justifies the potential financial consequences to airports or employment disruptions for screeners hired by airports. Nor does extending the implementation date appreciably increase security risk. TSA is unquestionably more capable than airports to perform worker screening, and has born that responsibility since the enactment of ATSA.

Accordingly, we respectfully request that TSA stay the effect of the National Amendment for all affected airports, until one hundred-twenty (120) days after the Court issues its decision. We also respectfully request your formal response to this request within seven (7) days, by Tuesday, March 26, 2024, so that the Airport Petitioners may, if necessary, seek a stay from the Court of Appeals. This should be more than adequate time to respond, given that since January, counsel for Airport Petitioners has repeatedly discussed this request to extend the implementation date with TSA counsel.

SUBJECT TO PROTECTIVE ORDER IN City ofBillings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

David P. Pekoske
March 19, 2024
Page 4

**SENSITIVE SECURITY INFORMATION**

Thank you for your consideration of this request.

Sincerely,

*/s/  David S. Mackey*

David S. Mackey

cc:    Melissa Cook Allison
       Carlos R. Rosende
       Leif Overvold
       Sharon Swingle
       Jennie Breitmeyer
       Karen Hickey

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.

# EXHIBIT C

SUBJECT TO PROTECTIVE ORDER IN City of Billings v. TSA, Nos. 23-1290, 1328 (D.C. Cir.)
WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR
PARTS 15 AND 1520.  NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW", AS
DEFINED IN 49 CFR PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE
TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.  UNAUTHORIZED
RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.  FOR U.S. GOVERNMENT AGENCIES, PUBLIC
DISCLOSURE IS GOVERNED BY 5 U.S.C. 552 AND 49 CFR PARTS 15 AND 1520.



U.S. Department of Homeland Security
**Transportation Security Administration**
6595 Springfield Center Drive
Springfield, Virginia 20598

March 26, 2024

David S. Mackey
Counsel to Airports Council International – North America (ACI-NA)
Anderson Kreiger, LLP
50 Milk Street, 21st Floor
Boston, MA 02109

      Re: *Request for Stay of Implementation of Aviation Worker Screening National Amendment, TSA-NA-23-02*

Dear Mr. Mackey:

The Transportation Security Administration (TSA) is in receipt of ACI-NA's letter to Administrator David P. Pekoske, dated March 19, 2024, in which ACI-NA requests a voluntary stay of the implementation date for TSA's Airport Security Program National Amendment, TSA-NA-23-02, Aviation Worker Screening ("National Amendment"), issued to 173 airports nearly 11 months ago, on April 27, 2023. Although there is no regulatory mechanism for ACI-NA or the fifteen airports[1] that joined the *City of Billings* petition to seek a voluntary stay of an airport security program amendment from the TSA Administrator, nor is there any associated seven-day response period, TSA responds to ACI-NA's request, as follows.

As stated in ACI-NA's letter, the National Amendment is the subject of a pending Petition for Review, filed with the United States Court of Appeals for the District of Columbia Circuit, pursuant to 49 U.S.C. § 46110. The Department of Justice represents TSA in that action, in which ACI-NA filed its opening brief on March 1, 2024, and in which TSA's response brief is currently due to be filed on May 1, 2024.

In response to ACI-NA's voluntary stay request, TSA incorporates by reference the detailed justifications and explanations that support the National Amendment set forth in TSA's September 1, 2023 response to ACI-NA's August 4, 2023 petition to the TSA Administrator for administrative reconsideration, as well as the direct responses offered to each of the petitioner

---

[1] The petitioner airports are: Oklahoma City Airport Trust, Spokane International Airport, Milwaukee County and General Mitchell International Airport, Juneau Airport, Massachusetts Port Authority, Raleigh-Durham Airport Authority, Dane County, Flathead Municipal Airport Authority, City of Colorado Springs, Greater Asheville Regional Airport Authority, City of Bismarck, City of San Jose, City of Philadelphia, City of Billings, and Metropolitan Airports Commission.

airports' requests for reconsideration. The contents of TSA's September 1st response are responsive to and address the issues raised in ACI-NA's most recent letter requesting a stay.

I did want to address ACI-NA's particular contention that TSA "delayed" the implementation date for the National Amendment, as this assertion is incorrect. The National Amendment was issued on April 27, 2023, with an effective date of September 24, 2023. It applies to the largest and busiest airports within the country's transportation system, 173 airports in total. In response to subsequent concerns expressed by these airports that they would need additional time, for administrative and budgetary reasons, in order to come into compliance with the National Amendment, TSA issued a Notice of Informed Compliance that provided nearly 13 months – until September 25, 2024 – for airport operators to achieve compliance with the National Amendment, without facing civil enforcement action during that time, absent egregious conduct. The Notice of Informed Compliance did not delay the National Amendment from taking effect, but rather, granted time for airports to develop and implement effective screening protocols for aviation workers, operating within their usual administrative and budgetary calendars, and that Informed Compliance period continues today. Airports, thus, have had the past six months, and will have the next six months, to take the steps necessary to be in full compliance with the National Amendment when the Informed Compliance period ends on September 25, 2024.

I must express TSA's deep concern that ACI-NA seeks a stay of the National Amendment as to *all* of the 173 airports to which it applies and not just as to the petitioner airports. Mackey Letter, p.1 (The Airport Petitioners hereby respectfully request an immediate stay of the National Amendment…for each of the airports subject to the National Amendment…"). As of March 2024, nearly all of the 173 airports are compliant with the National Amendment because they have, during the period of Informed Compliance, expanded their pre-existing aviation worker screening procedures and have collaborated with TSA to develop and implement additional future procedures.

Indeed, at least nine of the airport authorities who have petitioned for review of the National Amendment are either fully compliant, or have taken significant steps toward implementing aviation worker screening during the period of Informed Compliance. For example, Massport and San Jose International Airport are using the TSA-provided tool to calculate the number of workers that must be screened, conducting physical searches of workers and their property, and will continue to expand the volume of workers screened every day. Philadelphia International Airport has retained the services of a private contractor to conduct identification checks and conduct searches of aviation workers and their property in full compliance with the National Amendment. The Minneapolis-Saint Paul International Airport is leveraging TSA's security checkpoints to conduct aviation worker screening. Milwaukee Mitchell International Airport has posted signage alerting workers to random security checks, purchased screening equipment, and is training contracted employees to screen workers to comply with the National Amendment. The airports in Juneau, Asheville, Bismarck, and Colorado Springs are collaborating with TSA on aviation worker screening plans and, in some instances, have submitted the plans to TSA for review. A stay of the National Amendment will erode these significant security improvements and cast aside the security value the improvements have already begun to provide to the traveling public.

2

Under these circumstances, a wholesale postponement of the National Amendment's deadline would undercut the substantial enhancement to aviation security that will be achieved by ensuring that aviation workers across the transportation system are subject to random screening as of September 25, 2024 when accessing the secured area of an airport. Accordingly, any broad-based delay to that effort is contrary to that overarching goal and contrary to public interest, particularly in light of the increasing threat posed by insiders in aviation.

Respectfully,

Digitally signed by CHAD M GORMAN
Date: 2024.03.26 12:07:42 -04'00'

_____
Chad M. Gorman
Deputy Executive Assistant Administrator
Operations Support
Transportation Security Administration

Cc:    Administrator David P. Pekoske, Transportation Security Administration
       Francine J. Kerner, Chief Counsel, Transportation Security Administration
       Leif Overvold, Civil Appellate Staff, U.S. Department of Justice
       Sharon Swingle, Deputy Director, Civil Appellate Division, U.S. Department of Justice

3

# EXHIBIT D

2008 WL 4346480 (C.A.D.C.) (Appellate Brief)
United States Court of Appeals,
District of Columbia Circuit.

SOUTHWEST AIRLINES CO., et al., Petitioners,

v.

TRANSPORTATION SECURITY ADMINISTRATION, Respondent.

No. 07-1279 and Consolidated Case Nos. 07-1280-1294, 1296-1298, 1323, 1338, 1347.
April 23, 2008.

On Petitions for Review of Final Orders of the Transportation Security Administration
(Not Yet Scheduled for Oral Argument)

**Final Brief for the Respondent**

Jeffrey S. Bucholtz, Acting Assistant Attorney General, Scott R. Mcintosh, (202) 514-4052, Jeffrey Clair, (202) 514-4028, Attorneys, Civil Division, Room 7243, Department of Justice, 950 Pennsylvania Ave., N.W., Washington D.C. 20530-0001.

TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............................................... i
TABLE OF AUTHORITIES .................................................................................................. v
GLOSSARY ......................................................................................................................... xii
STATEMENT OF JURISDICTION ...................................................................................... 1
STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ........................................... 1
STATEMENT OF THE CASE .............................................................................................. 3
A. Carrier Fees under the Aviation and Transportation Security Act ..................................... 3
B. TSA's Implementing Regulations ................................................................................... 6
C. P.L. 108-334 and GAO's Review of Carrier Screening Costs ......................................... 8
D. TSA's Additional Fee Assessments ................................................................................ 12
E. TSA's Final Administrative Decisions ............................................................................ 15
SUMMARY OF THE ARGUMENT ..................................................................................... 19
STANDARD OF REVIEW .................................................................................................. 23
ARGUMENT ....................................................................................................................... 25
I. Congress Has Expressly Barred Judicial Review of Fees Collected on or after October 1, 2007 ......... 25
II. TSA Has Statutory Authority to Base Air Carrier Fees on Average Industry Costs Where a Carrier's Claimed Individual Costs Are Not Verified by an Independent Audit ...................................................... 31
III. TSA Has Statutory Authority to Consider the Costs of Screening Non-passengers in Determining the "Overall Limit" on Air Carrier Fees ............................................................................................... 38
IV. TSA's Increased Fee Assessments Are Consistent with the 2005 Appropriations Act ..................... 44
A. GAO's Findings Are a Sufficient Basis for Additional Fee Assessments ........................... 44
B. TSA's Authority to Collect Additional Fees Is Not Dependent upon the Findings of the GAO ......... 47
V. TSA's Cost Estimates Are Reasonable and must Therefore Be Sustained under the Highly Deferential, "Arbitrary and Capricious" Standard of Review ........................................................... 52
A. TSA Reasonably Rejected Cost Reports That Were Not Verified by an Independent Audit .............. 52
B. TSA Reasonably Relied on Average Industry Screening Costs in Instances Where the Individual Carrier's Costs Were Not Verified by an Independent Audit ...................................................... 56
C. TSA Reasonably Relied on GAO's Findings ................................................................... 64
VI. TSA Employed Fair Decisionmaking Procedures That Comply with the Administrative Procedure Act and the Due Process Clause ..................................................................................................... 68
A. The APA's Requirements for an Evidentiary Hearing Do Not Apply Absent a Statutory Requirement That the Agency's Determination Be Made after a Formal Hearing ................................. 69
B. TSA's Procedures Comport with Due Process ................................................................ 73

ADDENDUM 22

VII. The Individual Carrier Claims Are Meritless ........................................................................................ 78

A. American Airlines Has Not Complied with Statutory and Regulatory Requirements for Presenting a Contract Claim Against TSA ........................ 78

B. Northwest Airlines' Fees Were Properly Based on the Federal Cost of Providing Civil Aviation Security Services ........................ 81

C. Spirit Airlines Did Not Submit an Acceptable Audit ........................................................................ 82

CONCLUSION ........................................................................................ 83

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) (7) (c) OF THE FEDERAL RULES OF APPELLATE PROCEDURE

CERTIFICATE OF SERVICE

STATUTORY ADDENDUM

## TABLE OF AUTHORITIES

Cases:

*American Federation of Labor and Congress of Indus. Organizations v. Chao,* 409 F.3d 377 (D.C. Cir. 2005) .......... 33

*Amgen, Inc. v. Smith,* 357 F.3d 103 (D.C. Cir. 2004) ............ 26

*Assoc. of Civilian Technicians, Inc. v. FLRA,* 283 F.3d 339 (D.C. Cir.), cert. denied, 537 U.S. 1045 (2002) ................... 28

*Barnhart v. Walton,* 535 U.S. 212 (2002) ............................. 24

*Block v. Community Nutrition Institute,* 467 U.S. 340 (1984) ........................................................................................ 27

*Board of Governors of Fed. Reserve Sys. v. MCorp Financial, Inc.,* 502 U.S. 32 (1991) ...................................... 29

*Boca Airport, Inc. v. FAA,* 389 F.3d 185 (D.C. Cir. 2004) ..... 23

*Bowen v. Georgetown University Hospital,* 488 U.S. 204 (1988) ........................................................................................ 50

*Bowsher v. Synar,* 478 U.S. 716 (1986) ............................... 49

*C.N.G. Transmission Corp. v. FERC,* 40 F.3d 1289 (D.C. Cir. 1994) ................................................................................. 75

*Cable & Wireless P.L.C. v. FCC,* 166 F.3d 1224 (D.C. Cir. 1999) ......................................................................................... 78

\* *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837 (1984) ....................................................... 24, 41, 52

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971) ................................................................................ 24

*City of Dania Beach v. FAA,* 485 F.3d 1181 (D.C. Cir. 2007) ... 80

*City of West Chicago, Ill. v. U.S. Nuclear Regulatory Comm'n,* 701 F.2d 632 (7th Cir. 1983) ................................ 71

*Cobell v. Norton,* 428 F.3d 1070 (D.C. Cir. 2005) ................ 53

*COMSAT Corp. v. FCC,* 114 F.3d 223 (D.C. Cir. 1997) ........ 26

*Council of Prison Locals v. Brewer,* 735 F.2d 1497 (D.C. Cir. 1984) ................................................................................. 28

*Dart v. United States,* 848 F.2d 217 (D.C. Cir. 1988) ............ 26, 29

*District No. 1, Pacific Coast Dist., Marine Engineers' Beneficial Ass'n v. Maritime Admin.,* 215 F.3d 37 (D.C. Cir. 2000) ................................................................................... 72

*FDIC v. Meyer,* 510 U.S. 471 (1994) ................................... 30

*FTC v. Cement Institute,* 333 U.S. 683 (1948) ..................... 75

*GTE South, Inc. v. Morrison,* 199 F.3d 733 (4th Cir. 1999) ... 51

*Gencom Inc. v. FCC,* 832 F.2d 171 (D.C. Cir. 1987) ............ 71

*Gottlieb v. Pena,* 41 F.3d 730 (D.C. Cir. 1994) .................... 74

*Gray Panthers v. Schweiker,* 652 F.2d 146 (D.C. Cir. 1980) .. 76

*Greene v. Babbitt,* 943 F. Supp. 1278 (W.D. Wash. 1996) ..... 73

*Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564 (1982) .... 42

*Griffith v. FLRA,* 842 F.2d 487 (D.C. Cir. 1988) .................. 28, 29

*Heckler v. Chaney,* 470 U.S. 821 (1985) .............................. 59

*Holy Land Found. for Relief and Dev't v. Ashcroft,* 333 F.3d 156 (D.C. Cir. 2003), cert. denied, 540 U.S. 1218 (2004) ..... — 75

*Izaak Walton League of America v. Marsh,* 655 F.2d 346 (D.C. Cir. 1981), cert. denied, 454 U.S. 1092 (1981) ........... — 71

*Kreis v. Sec'y of the Air Force,* 866 F.2d 1508 (D.C. Cir. 1989) ............................................... — 33

*Leedom v. Kyne,* 358 U.S. 184 (1958) ...................... — 28, 29

*Long Term Care Partners, LLC v. United States,* No. 06-1930, 2008 WESTLAW 307448 (4th Cir. Feb. 5, 2008) .. — 29

*Marketing Assistance Program, Inc. v. Bergland,* 562 F.2d 1305 (D.C. Cir. 1977) ...................................... — 72

*Marsh v. Oregon Natural Resources Council,* 490 U.S. 360 (1989) ......................................................... — 65

*Mathews v. Eldridge,* 424 U.S. 319 (1976) ........................ — 75

*Milk Train, Inc. v. Veneman,* 310 F.3d 747 (D.C. Cir. 2002) .. — 53

*Morrisey v. Brewer,* 408 U.S. 471 (1972) ...................... — 75

*Morton v. Mancari,* 417 U.S. 535 (1974) ...................... — 49

* *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29 (1983) ..................................... — 25, 68

*NMA v. MSHA,* 512 F.3d 696 (D.C. Cir. 2008) ..................... — 36

*National Air Traffic Controllers Ass'n AFL-CIO v. Federal Service Impasses Panel,* 437 F.3d 1256 (D.C. Cir. 2006) ...... — 29

*National Cable & Telecommunications Ass'n v. Brand X Internet Services,* 545 U.S. 967 (2005) .............................. — 41

*National Mining Ass'n v. Kempthorne,* 512 F.3d 702 (D.C. Cir. 2008) ........................................... — 52

*National Railroad Passenger Corporation v. Boston & Maine Corp.,* 503 U.S. 407 (1992) ............................... — 41

*New York State Dept. of Law v. FCC,* 984 F.2d 1209 (D.C. Cir. 1993) ............................................... — 71

*Philbrook v. Glodgett,* 421 U.S. 707 (1975) ........................ — 42

*Public Citizen v. U.S. Dept. of Justice,* 491 U.S. 440 (1989) . — 50

*Reeve Aleutian Airways, Inc. v. United States,* 982 F.2d 594 (D.C. Cir. 1993) ....................................... — 76

*Resolution Trust Corp. v. Schroeder,* 86 F.3d 114 (8th Cir. 1996) ........................................................ — 81

*SEC v. Chenery Corp.,* 318 U.S. 80 (1943) ........................ — 51

*SEC v. Chenery Corp.,* 332 U.S. 194 (1947) ....................... — 51

*Shea v. Director, OWCP, U.S. Dept. of Labor,* 929 F.2d 736 (D.C. Cir. 1991) ....................................... — 51

*Stone v. FDIC,* 179 F.3d 1368 (Fed. Cir. 1999) .................... — 73

*Tennessee Valley Authority v. Hill,* 437 U.S. 153 (1978) ....... — 49

*Thomas Jefferson University v. Shalala,* 512 U.S. 504 (1994) ........................................................ — 83

*U.S. Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519 (D.C. Cir. 1978) ..................................... — 71

*United States v. Bisson,* 839 F.2d 418 (8th Cir. 1988) ........... — 81

* *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224 (1973) ................................................... — 69, 70

*United States v. Morgan,* 313 U.S. 409 (1941) ...................... — 74

*United States v. Testan,* 424 U.S. 392 (1976) ....................... — 30

*United States v. X-Citement Video, Inc.,* 513 U.S. 64 (1994) . — 42

*Verizon Telephone Companies v. FCC,* 269 F.3d 1098 (D.C. Cir. 2001) ............................................... — 51

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519 (1978) ............................. — 73

*Village of Bensenville v. FAA,* 376 F.3d 1114 (D.C. Cir. 2004) ................................................................. 53

*West Virginia v. EPA,* 362 F.3d 861 (D.C. Cir. 2004) ............ 53

\* *Withrow v. Larkin,* 421 U.S. 35 (1975) .............................. 23, 74

Constitution:

Due Process Clause .................................................... 23

Statutes:

Consolidated Appropriations Act, P.L. 110-161, § 540, 121 Stat. 1844 (December 26, 2007) .................................... 1, 25, 79

\* Homeland Security Appropriations Bill for 2005, P.L. 108-334, Title II, 118 Stat. 1298 (2004) .............................. 10, 12, 15, 25, 27, 43, 45, 46, 48, 50, 64

P.L. 107-71, 115 Stat. 625 (2001) .......................................... 3

5 U.S.C. 553 ......................................................................... 7

5 U.S.C. 553(b) .................................................................... 37

5 U.S.C. 554(d) .................................................................... 69

5 U.S.C. 556 ......................................................................... 70

5 U.S.C. 557 ......................................................................... 69, 70

5 U.S.C. 706 ......................................................................... 37

5 U.S.C. 706(2) .................................................................... 23, 24

5 U.S.C. 706(2) (A) ............................................................. 23, 24

6 U.S.C. 203(2) .................................................................... 3

6 U.S.C. 557 ......................................................................... 5

31 U.S.C. 702(a) .................................................................. 49

31 U.S.C. 717 ....................................................................... 65

49 U.S.C. 114 ....................................................................... 3

49 U.S.C. 114(a) .................................................................. 3

49 U.S.C. 114(o) .................................................................. 79

49 U.S.C. 40110 ................................................................... 79

49 U.S.C. 40110(d)(4) ......................................................... 79

49 U.S.C. 44901 ................................................................... 4

49 U.S.C. 44901(a) .............................................................. 3, 39, 41

49 U.S.C. 44917 ................................................................... 4

49 U.S.C. 44933 ................................................................... 4

49 U.S.C. 44940(a)(1) ......................................................... 81

49 U.S.C. 44940(a)(1)(A)-(I) ............................................. 82

49 U.S.C. 44940(a)(2) ......................................................... 4, 10, 47, 81

49 U.S.C. 44940(a)(2)(A) .................................................... 25, 43

49 U.S.C. 44940(a)(2)(A)(Supp. II 2002) .......................... 25

\* 49 U.S.C. 44940(a)(2)(B)(i) ............................................ 5, 38

\* 49 U.S.C. 44940(a)(2)(B)(ii) ........................................... 6, 20, 32, 57

\* 49 U.S.C. 44940(a)(2)(B)(iii) .......................................... 6, 21, 34-37, 57

\* 49 U.S.C. 44940(a)(2)(B)(iv) .......................................... 1, 25, 26

49 U.S.C. 44940(a)(2)(B)(iv) (Supp. II 2002) ..................... 25

49 U.S.C. 44940(b) .............................................................. 5, 43, 82

49 U.S.C. 44940(c) .............................................................. 4

49 U.S.C. 44940(d)(1) ......................................................... 7, 47, 72

49 U.S.C. 44940(d)(3) ......................................................... 47, 72

49 U.S.C. 44940(e)(4) ......................................................... 7, 47, 58, 59

49 U.S.C. 46110 ................................................................... 1, 23, 80

49 U.S.C. 46110(c) .............................................................. 23

Regulations:

14 C.F.R. 17.23-17.39 .......................................................... 79

14 C.F.R. 17.43 .................................................................... 79

49 C.F.R Part 1511 .............................................................. 7

49 C.F.R. 1511.5(c) ............................................................. 8, 35

49 C.F.R. 1511.5(d) ............................................................. 7, 8

ADDENDUM 25

| | |
|---|---|
| 49 C.F.R. 1511.5(g) .............................................................. | 8, 35 |
| 49 C.F.R. 1511.7(a) & (b) .................................................. | 8 |
| 49 C.F.R. 1511.9 ................................................................ | 8, 54 |
| 49 C.F.R. 1511.9(a) ........................................................... | 8 |
| 49 C.F.R. 1511-1513 ......................................................... | 7 |
| 49 C.F.R. 1540.105-107 .................................................... | 41 |
| 49 C.F.R. 1540.111 ........................................................... | 40 |
| 67 Fed. Reg. 7926 (Feb. 20, 2002) .................................... | 7 |
| 69 Fed. Reg. 58943 (Oct. 1, 2004) .................................... | 36 |
| Legislative Materials: | |
| 153 Cong. Rec. H15742-01 (December 17, 2007) ................ | 27 |

## STATEMENT OF JURISDICTION

The Court has appellate jurisdiction over most of petitioners' claims under 49 U.S.C.A. 44940(a) (2) (B) (iv), as amended by the Consolidated Appropriations Act, P.L. 110-161, § 540 (December 26, 2007), and 49 U.S.C. 46110. [1] As we will explain more fully below, however, (*see* pp. 25-31, *infra*), the Court has no jurisdiction to review user fees collected on or after October 1, 2007.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

This case challenges the amount of user fees imposed on air carriers to defray the costs of federally-provided, aviation security services. The questions presented by petitioners' joint brief are:

1. Whether the Court has jurisdiction to enter relief with respect to Aviation Security Infrastructure Fees collected on or after October 1, 2007.

2. Whether the Transportation Security Administration has statutory authority to base a carrier's fee liability on the industry's average cost of screening a passenger where the carrier has not verified its claimed, individual costs by an independent audit.

3. Whether TSA has statutory authority to consider security costs incurred in ensuring that non-passengers do not pose a threat to passenger health or safety.

4. Whether TSA's revised fee assessments are consistent with the 2005 appropriation for aviation security set forth in Public Law 108-334 (2004).

5. Whether TSA's audit requirements and related fee determinations are arbitrary and capricious.

6. Whether TSA's procedures for administrative review of fee assessments comport with the Administrative Procedure Act and the Due Process Clause. [2]

## STATEMENT OF THE CASE

### A. *Carrier Fees Under The Aviation and Transportation Security Act.*

The Aviation and Transportation Security Act was enacted shortly after the terrorist attacks of September 11, 2001. P.L. 107-71, 115 Stat. 625 (2001). Among other provisions, the statute established the Transportation Security Administration and vested it with primary responsibility for maintaining civil aviation security. [3] 49 U.S.C. 114.

ADDENDUM 26

The Act directs TSA to "provide for the screening of all passengers and property *** that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation." 49 U.S.C. 44901(a). These provisions make the federal government responsible for security functions that were previously the responsibility of air carriers. Before September 11th, carriers, under programs approved by the FAA, typically carried out security screening at U.S. airports by briefly interviewing passengers, using a computer data base to identify certain passengers for more intense scrutiny, requiring passengers and others to pass through a metal detector at a security checkpoint, and x-raying checked baggage. GAO, *Aviation Fees: Review of Air Carriers' Year 2000 Passenger and Property Screening Costs*, ("*GAO Report*"), Administrative Record ("AR.") 1 at 5, JA 9. The Aviation and Transportation Security Act made civil aviation security services a federal responsibility, thus relieving air carriers of the responsibility - and full cost - of providing screening services for passengers and property. It thus directs TSA to provide for the screening of passengers and property carried aboard a passenger aircraft and to take other measures to ensure civil aviation security. *See* 49 U.S.C. 44901, 44917, 44933.

Congress authorized TSA to impose two user fees to fund these security services. The statute directs TSA to impose a uniform fee on passengers of air carriers in air transportation originating at airports in the United States. 49 U.S.C. 44940(a)(1). The passenger fee is capped at $2.50 per enplanement and may not exceed $5.00 per one-way trip. 49 U.S.C. 44940(c). This fee is not at issue here.

The statute also authorizes TSA to impose an additional fee on air carriers to pay the difference, as estimated by TSA, between the amounts collected in passenger security fees and the costs of providing screening personnel, screening equipment, and other specified security services. 49 U.S.C. 44940(a) (1) and (2).

Congress directed TSA to "ensure that the fees are reasonably related to the Transportation Security Administration's costs of providing services rendered." 49 U.S.C. 44940(b). Air carrier fees, however, may not exceed several statutory limits. First, the statute imposes an "overall limit" prohibiting TSA from imposing on the industry fees that, in any given fiscal year, total more than the amount, as determined by TSA, that carriers paid for screening passengers and property in calendar year 2000. This statutory limit thus states:

> (i) **Overall limit.**--The amounts of fees collected under this paragraph for each fiscal year may not exceed, in the aggregate, the amounts paid in calendar year 2000 by carriers described in subparagraph (A) for screening passengers and property, as determined by the Under Secretary. [4]

49 U.S.C. 44940(a)(2)(B)(i).

Second, the statute imposes an additional limit on the amount of fees that may be collected from any individual carrier. For fiscal years 2002 through 2004, the statute prohibits TSA from collecting fees that exceed the amount, as determined by TSA, that the carrier paid for screening passengers and property in calendar year 2000. It thus provides:
**(ii) Per-carrier limit.**--The amount of fees collected under this paragraph from an air carrier described in subparagraph (A) for each of fiscal years 2002, 2003, and 2004 may not exceed the amount paid in calendar year 2000 by that carrier for screening passengers and property, as determined by the Under Secretary.

49 U.S.C. 44940(a)(2)(B) (ii).

ADDENDUM 27

Finally, the statute affords TSA greater discretion with respect to the limitation on individual carrier fees imposed in fiscal year 2005 and subsequent years. In particular, it specifically permits TSA to base a per carrier fee limit on criteria other than the carrier's screening costs in calendar year 2000. The statute thus provides:

**(iii) Adjustment of per-carrier limit.**--For fiscal year 2005 and subsequent fiscal years, the per-carrier limitation under clause (ii) may be determined by the Under Secretary on the basis of market share or any other appropriate measure in lieu of actual screening costs in calendar year 2000.

49 U.S.C. 44940(a)(2)(B)(iii).

## B. *TSA's Implementing Regulations.*

On February 20, 2002, TSA announced the imposition of a fee on air carriers, effective February 18, 2002, and published "interim final" rules governing the determination of fee amounts, procedures for remitting payment, and enforcement of fee obligations, [5] 67 Fed. Reg. 7926 (2002), adding 49 C.F.R. 1511-1513. The rulemaking noted that the air carrier fees are subject to statutory limitations based on the costs incurred by the industry and by individual carriers in screening passengers and property during calendar year 2000. *Ibid.* It also noted that 49 U.S.C. 44940(e)(4) expressly authorizes TSA to require air carriers to provide such information as TSA decides is necessary to verify that fees have been remitted in the proper amount. *Ibid*.

The regulations accordingly required each covered air carrier to submit to TSA a form detailing the costs paid for passenger and property screening in calendar year 2000. 49 C.F.R. 1511.5(d) and Appendix A. The form, referred to as "Appendix A," directed carriers to report costs by various specific cost categories (such as checkpoint screening personnel or screening equipment maintenance and installation) and to account for all the direct and indirect costs incurred by the carrier for a pertinent item or service. 49 C.F.R. Part 1511 Appendix A.

The regulations also required each carrier to obtain an independent audit of their reported costs and to retain all documents, records or other information related to the cost report and audit. 49 C.F.R. 1511.9. The audit requirement states that:

> Each air carrier and foreign air carrier must submit an audit performed by an independent certified public accountant of the information provided *** The accountant must express an opinion as to the fairness and reasonableness of the air carrier's and foreign air carrier's procedures used for accounting and remitting the fees. The accountant's working papers with respect to the audit must accompany this submission.

49 C.F.R. 1511.9(a).

For fiscal years 2002 through 2004, TSA generally set each carrier's annual fee at the amount of costs detailed on the carrier's "Appendix A" cost report form. The regulations thus provided that, unless TSA determined that a different amount would be appropriate, the air carrier's monthly fee for FY 2002-2004 would be equal to the pro-rated amount of costs reported by the carrier for calendar year 2000. *See* 49 C.F.R. 1511.5(c); 1511.7(a) & (b). The regulations further provided that the amount of the fee "will be redetermined for fiscal years 2005 and beyond, and such redeterminations may be based on the carrier's respective market share or any other appropriate measure ***." 49 C.F.R. 1511.5(g).

## C. *P.L. 108-334 and GAO's Review of Carrier Screening Costs.*

ADDENDUM 28

The costs reported by carriers, and the attendant, carrier- specific limits on air carrier fees, were far lower than TSA anticipated. In August 2001, the Air Transportation Association, an industry trade association and petitioners' amicus here, sent a memorandum to the General Accounting Office [now known as the Government Accountability Office] stating that, based on information provided by its members, "ATA believes that the estimated costs of implementing federal security requirements and conducting required security programs amounts to nearly $1 billion per year for the entire industry." *GAO Report*, *supra*, AR. 1 at 5, JA 9. Senior industry executives repeated this estimate in congressional testimony delivered just after September 11th, advising Congress that the large carrier industry "spend[s] about a billion dollars a year on security at airports alone." *Weak Links: How Should The Federal Government Manage Airline Passenger and Baggage Screening: Joint Hearing Before the Sen. Comm. on Governmental Affairs and Subcomm. on Oversight of Government Management, Restructuring and the District of Columbia*, 107th Cong., 1st Sess. 49 (2001) (testimony of Robert W. Baker, Vice Chairman, American Airlines); *see also H.R. 2891, To Preserve The Continued Viability of the U.S. Air Transportation System: Hearing Before the H. Comm. on Transportation and Infrastructure*, 107th Cong., 1st Sess. 42, 48, 57 (2001) (testimony of Leo F. Mullin, Chairman and CEO of Delta Air Lines).

The carriers' reported costs for calendar year 2000, however, were significantly lower. In hearings on its 2005 appropriations bill, TSA advised Congress that carriers had only reported on their Appendix A cost forms approximately $319 million in total screening costs for calendar year 2000. *See Department of Homeland Security Appropriations for 2005: Hearing Before a Subcomm. of the H. Comm. on Appropriations*, 108th Cong., 2d Sess. 446, 453 (2004) (TSA Answers to Questions For The Record Submitted by Chairman Harold Rogers). TSA further noted that 92% of these claimed costs had not been verified by the independent audit required by agency regulations. *Id*. at 453. The agency, in its submission to Congress, concluded that, "Based on analysis of the information submitted and several on-site reviews, it appears that the airlines have significantly under-reported their 2000 passenger and property screening costs." *Ibid*.

Congress addressed these concerns in the Department of Homeland Security Appropriations Bill for 2005, P.L. 108-334, Title II, 118 Stat. 1298 (2004). This statute directs GAO to "review, using a methodology deemed appropriate by the Comptroller General, the calendar year 2000 cost information for screening passengers and property pursuant to section 44940(a) (2) of title 49, United States Code, of air carriers and foreign air carriers engaged in air transportation and intrastate air transportation" and to report its findings to congressional appropriations and oversight committees. *Ibid*. It further directs TSA to take immediate steps to collect any underpayment indicated by GAO, thus stating that:

> beginning with amounts due in calendar year 2005, if the result of this review is that an air carrier or foreign air carrier has not paid the appropriate fee to the Transportation Security Administration pursuant to section 44940(a) (2) of title 49 United States Code, the Secretary of Homeland Security shall undertake all necessary actions to ensure that such amounts are collected.

*Ibid.*

The GAO completed its review and reported to Congress in April 2005. It estimated that carriers had under-reported the costs they incurred for screening services in calendar year 2000 by $129 million, and that the carriers accordingly paid $129 million less in fees each year than was required under applicable law. *GAO Report*, AR. 1 at 7, JA 11. GAO explained that it had focused on the three primary cost components covered by TSA's "Appendix A" cost report: (1) direct screening costs, (2) airport costs associated with passenger and cargo screening and passed along to carriers, and (3) internal costs associated with the screening function. *Ibid*. It compiled an array of data on these cost components through direct data collection, review of the carriers' cost reports and audit workpapers, interviews, and sampling methodologies. *Id*. at 19-25, JA 23-29. It then used a variety of statistical techniques to extrapolate its findings to the carrier industry. *Ibid*. Based on this analysis, GAO concluded:

ADDENDUM 29

> We estimate that passenger and property screening costs incurred by air carriers in calendar year 2000 for the major cost components were $448 million, resulting in a difference of $129 million from air carrier-reported costs of $319 million. As such, TSA is not obtaining all of the proceeds of the [Aviation Security Infrastructure Fee] authorized by the [the Aviation and Transportation Security Act].

*Id.* at 14, JA 18.

### D. TSA's Additional Fee Assessments.

In January 2006, TSA determined that petitioners had under-reported screening costs incurred in calendar year 2000 and, as a result, failed to pay the full amount of Aviation Security Infrastructure Fees due by law. *See, e.g.*, *Southwest Initial Decision,* AR. 24, JA 273-77. [6] TSA, in accordance with P.L. 108-334, accordingly assessed petitioners and other carriers additional fees to recover the unpaid amounts due for the preceding calendar year, 2005. *Ibid*. It also recalculated petitioners' fee liability for fees due in 2006 and subsequent years, assessing each carrier's fee liability at an amount equal to TSA's revised estimate of the amount the carrier had spent on screening services in calendar year 2000. *Ibid*.

TSA based these additional fee assessments on several findings and determinations. First, using the GAO report as guidance, TSA concluded that carriers, on an industry-wide basis, had under-reported screening costs for calendar year 2000 by $104 million. *Id*. at 2, JA 274. TSA derived this figure by starting with GAO's $129 million estimate of under-reported costs and then adjusting it downward to account for changed circumstances, such as instances in which an airline that incurred screening costs in 2000 subsequently ceased doing business, or instances in which unreported costs were recovered by other means. TSA concluded that this calculation indicated an underpayment of $104 million that must be recovered through additional assessments for the 2005 fiscal year.

Second, TSA determined an industry-wide, average cost per passenger screened in 2000. It made this calculation by dividing GAO's estimate of aggregate screening costs for the industry by the number of all passengers screened in 2000. TSA found that the industry average cost per passenger screened was $0.84 in 2000. *Ibid*.

Third, TSA computed each carrier's reported cost per passenger screened by dividing each carrier's total reported costs by the number of passengers the carrier screened in 2000. *Ibid*.

Fourth, TSA compared each carrier's reported cost per passenger to the industry average. If the carrier's average was equal to or greater than the industry average, no further liability was assessed. If the carrier's average was below the industry average, TSA then determined whether the carrier's reported costs had been verified by an independent audit. If the carrier had provided a sufficient audit, then no further assessment was made. If, however, the carrier had below average costs that were not verified by an independent audit, the carrier was subject to further assessment. *Ibid*.

Fifth, for those carriers subject to an additional assessment, TSA computed the difference between the carrier's reported average cost and an adjusted industry average cost of $0.82 per passenger screened. [7] It then multiplied the resulting differential by the number of passengers the carrier screened in 2000. This yielded TSA's determination of the amount that the carrier had underpaid for calendar year 2005. *Ibid*.

Finally, TSA made a similar calculation with respect to fees due in 2006 and subsequent years. It thus determined that, in the absence of a sufficient audit, a carrier reporting average costs below the industry average would be assessed annual fees equal

to the adjusted, industry-average cost per passenger, multiplied by the number of passengers the carrier screened in calendar year 2000. *Id*. at 3, JA 275.

TSA advised carriers of these additional liabilities in correspondence directed to each individual carrier. The notices detailed the bases for the assessment determinations, the specific amounts due, and the procedures and deadlines for submitting payment. The notices also advised carriers that they could request further administrative review and submit additional factual information, documentation, citations to authority, and argument in support of their position on appeal. *Id*. at 5, JA 277.

### E. TSA's Final Administrative Decisions.

TSA, with one exception not relevant here, sustained the initial fee assessments on petitioners' administrative appeals. First, TSA rejected petitioners' contention that the additional fee assessments exceeded the agency's statutory authority. It noted that Congress had expressly granted TSA authority to calculate the statutory limit on the challenged fees. It reasoned that nothing in the statute constrains TSA's discretion to choose an appropriate methodology for determining costs or otherwise prohibits TSA from using industry averages to estimate the costs of a specific carrier - particularly where the carrier has failed to provide independent verification of its reported costs. And it concluded that, under the authority conferred by the Department of Homeland Security's 2005 Appropriations Act, P.L. 108-334, GAO's determination that the industry had under-reported costs is a sufficient basis for imposing additional fee assessments. *Southwest Decision,* AR. 32 at 2, JA 560.

Second, TSA concluded that, without a sufficient audit, it could not reasonably rely on petitioners' reported cost data to determine fees and statutory fee limits. It explained that the agency had imposed an audit requirement in order to obtain an *independent* verification of the accuracy and completeness of the carrier's reported cost data, and that declarations from a carrier's own financial management officials could not substitute for the independent assessment an audit provides. TSA also rejected petitioners' contentions that it was impossible to provide an independent audit acceptable to the agency. It explained that the agency had carefully considered objections to the audit requirement during the rulemaking process. It noted that, in response to comments made by industry representatives and the American Institute of Certified Public Accountant, TSA relaxed the audit requirement so as to permit carriers to submit a "qualified" audit opinion if supplemented by appropriate explanatory information. And it observed that, unlike petitioners, most of the carriers had been able to submit unqualified audit reports to the agency. *Id*. at 3-4, JA 561-62.

Third, TSA concluded that it had reasonably relied on GAO's findings in estimating the carriers' screening costs for calendar year 2000. As an initial matter, TSA found that GAO had properly included the costs of screening non-passengers in its estimates. It reasoned that non-passenger screening was necessary to ensure the security of traveling passengers, and that the costs of non-passenger screening were therefore included within the screening costs Congress sought to recover in authorizing imposition of a carrier fee. *American Airlines Decision,* AR. 42 at 3, JA 632.

TSA then considered the declaration of petitioners' expert, Dr. Brian Campbell, an aviation consultant who critiqued various aspects of GAO's methodological assumptions, sampling techniques, and statistical computations. The agency undertook a point-by-point refutation of Dr. Campbell's highly technical objections, thus reasoning:

(1) GAO's conclusions with respect to the allocation of law enforcement costs were based on reasonable assumptions drawn from interviews with key personnel and extensive sampling;

(2) GAO's conclusions concerning the costs of employing private screening contractors were based on a large and sufficiently representative sample size;

(3) the mathematical regression technique GAO applied to this data in order to extrapolate findings to the universe of costs accorded appropriate treatment to putative "outlier" data points and generated conclusions carrying a statistical confidence level comparable to that determined by TSA's independent calculations;

ADDENDUM 31

(4) a possible error in GAO's computation of the confidence level for conclusions drawn about certain airport costs did not undermine the quality or utility of GAO's cost estimate; and

(5) GAO's estimates of the carriers' internal costs were reasonable because they were largely based on the carriers' own data and relied on conservative assumptions in instances where the lack of actual data required costs to be imputed to the carrier. *Southwest Decision,* AR. 32 at 5-10, JA 563-68.

Based on this analysis, TSA concluded that it could reasonably rely on GAO's conclusions in reassessing petitioners' fee obligations. *Ibid*.

Fourth, TSA concluded that the agency's decisionmaking procedures were fair and consistent with applicable law. TSA reasoned that petitioners had sufficient information to mount an effective challenge to the fee assessment, noting that petitioners had been provided all the core documents and the main underlying documents used in the fee assessment, and that petitioners had been permitted to supplement these materials with any additional information they deemed appropriate. TSA further concluded that an oral hearing was not necessary because the principal issues concerned the determination of a debt - a matter that could be resolved by review of documentary evidence and written submissions, and one that did not turn on any issue of individual credibility or veracity. *Id*. at 10-11, JA 568-69.

Finally, TSA rejected petitioners' demand for a decisionmaker who was independent of any employee who participated in the initial decision to assess additional fees. TSA's decisionmaker, the agency's Assistant Administrator and Chief Financial Officer, explained that he was in no way bound to or unduly influenced by the views of the subordinates who had made the initial fee decision, that the administrative appeal was not a judicial or quasi-judicial proceeding where strict procedural requirements applied, and that the availability of subordinate staff who had participated in the initial decision, rather than biasing the final decision, ensured that it would be balanced and fully informed by the agency's institutional expertise. *Id*. at 11, JA 569.

Twenty-two carriers have now appealed these final administrative decisions to this Court. Petitioners, consistent with the Court's briefing order, have filed a joint brief addressing issues common to their respective appeals. We address these arguments in points I-VI of the Argument section below. Three petitioners, Northwest Airlines, Spirit Airlines, and American Airlines, have filed separate briefs raising additional, independent issues. We address their contentions in point VII.

## SUMMARY OF THE ARGUMENT

TSA's fee assessments are a reasonable exercise of its statutory authority. Congress, acting in the aftermath of the terrorist attacks of September 11, 2001, directed TSA to assume federal responsibility for maintaining civil aviation security. It authorized TSA to impose on air carriers an obligation to contribute to the costs of providing the necessary services - costs that carriers had previously borne directly. Petitioners' efforts to avoid these financial obligations are without merit.

First, petitioners' challenge to fee assessments collected on or after October 1, 2007 is barred by statutory provisions expressly foreclosing judicial review. Congress, to ensure that disputes over fee liability would be quickly and conclusively resolved, barred all judicial review of fees collected on or after October 1, 2007. Petitioners' effort to sidestep these limitations by falsely equating a dispute over the meaning of a statute with an *ultra vires* action cannot support the assumption of jurisdiction foreclosed by this express congressional command.

Second, the statute affords TSA broad discretion to base user fee assessments on a reasonable estimate of the amount a carrier spent on security costs in calendar year 2000. Petitioners argue that the statute's "per carrier" limit requires TSA to determine the specific "actual" amount each individual carrier spent on security services in 2000 and therefore prohibits the use of estimates based on average costs within the industry. But the statute they rely on for this assertion, 49 U.S.C. 44940(a) (2) (B) (ii), affords TSA broad discretion to use reasonable cost estimates in circumstances where the carrier cannot substantiate its claimed "actual"

ADDENDUM 32

costs with an independent audit, and related provisions in 49 U.S.C. 44940(a) (2) (B) (iii) make clear that this discretion is even broader with respect to 2005 and the subsequent fiscal years at issue here.

Third, the statute does not require TSA to exclude the security-related costs of determining whether non-passengers pose a threat to passenger safety. The statute's "overall" fee limit provides that the aggregate amount of user fees imposed on carriers may not exceed the amount the industry spent on protecting passengers in calendar year 2000, when such costs were a private responsibility. Nothing in the text or purposes of this provision suggests that TSA is barred from considering all the security costs incurred by carriers in that year, including any costs associated with determining whether non-passengers and the property they carried were a risk to aviation security.

Fourth, petitioners err in asserting that TSA's 2005 appropriations legislation bars the agency from collecting prior underpayments or adjusting future assessments unless the GAO determines that a specific individual carrier has not paid the appropriate fee. The more plausible construction is that Congress, concerned with reports that carriers were paying substantially less in user fees than the billion dollar estimates announced by industry executives, directed GAO to investigate the matter and mandated that TSA take appropriate action if the results of the GAO's review indicated significant under-reporting of carrier costs. TSA's decisions to increase fee assessments in light of GAO's finding of a substantial, industry-wide underpayment is consistent with these provisions and furthers Congress's intent to ensure that all carriers pay an appropriate fee.

Fifth, TSA's exercise of its statutory powers is reasonable and must therefore be sustained under the highly deferential, "arbitrary and capricious" standard of review. Petitioners argue that it was arbitrary for TSA to demand an independent audit and to resort to cost estimates based on assertedly faulty GAO data when carriers did not provide independent cost verification. None of these contentions, however, warrants displacing the agency's expert, discretionary judgment. The regulatory requirement that carrier costs be verified by an independent audit is consistent with standard financial practice and sensible on its face. Moreover, the feasibility of submitting a sufficient audit is indicated by both the substantial number of carriers who complied, as well as by TSA's flexibility in relaxing the audit standards to accommodate the needs of the industry.

Finally, TSA's decisionmaking procedures fully comport with the requirements of the Administrative Procedure Act and the Due Process Clause. The agency gave petitioners written notice of the fee assessments and afforded them an opportunity to submit documentary evidence and written argument in support of a further administrative appeal. Contrary to petitioners' contentions, neither the APA nor the Constitution require an oral hearing to resolve what is essentially an accounting dispute. Nor do they compel a strict functional separation between the agency's final decisionmaker and other agency officials preparing or investigating the fee claim. *See Withrow v. Larkin,* 421 U.S. 35 (1975).

For all these reasons, TSA's decisions should be affirmed.

## STANDARD OF REVIEW

Congress has authorized judicial review of the determinations at issue here pursuant to 49 U.S.C. 46110. Subsection (c) of that statute provides that "[f]indings of fact by *** the Administrator, if supported by substantial evidence, are conclusive." 49 U.S.C. 46110(c).

The statute does not expressly define a review standard for non-factual questions. Accordingly, review of TSA's exercise of discretion or its resolution of questions of law is governed by the judicial review standards set forth in 5 U.S.C. 706(2) (A) of the Administrative Procedure Act. *See Boca Airport, Inc. v. FAA,* 389 F.3d 185, 189 (D.C. Cir. 2004). The APA in turn provides that an agency decision may be disturbed only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2) (A).

Review of whether the agency's construction of its statutory authority is "in accordance with law" under this standard proceeds under the framework established by *Chevron, U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984).

The reviewing court must first determine, using the "traditional tools of statutory construction," whether Congress has spoken directly to the question at issue. If the legislative intent is clear, that is the end of the matter, "for the court, as well as the agency must give effect to the unambiguously expressed intent of Congress." *Id*. at 842-43 & n.9. If, however, Congress has not directly addressed the issue, the agency's interpretation must be sustained if based on any permissible construction of the statute. *Id*. at 843-44; *Barnhart v. Walton,* 535 U.S. 212, 218 (2002).

Review of whether the agency's discretionary determinations are "arbitrary and capricious" is narrow and highly deferential. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971). The court "is not empowered to substitute its judgment for that of the agency" but must rather sustain the agency's decision if the agency has considered the relevant information and articulated "a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal quotation and citation omitted).

## ARGUMENT

### I. Congress Has Expressly Barred Judicial Review of Fees Collected On Or After October 1, 2007.

As originally enacted, the Aviation and Transportation Security Act provided that TSA's fee determinations would be final, conclusive, and not subject to judicial review. 42 U.S.C. §§ 44940 (a) (2)(A) (Supp. II 2002), (a) (2) (B) (iv) (Supp. II 2002). In 2007, Congress carved out a narrow exception to these jurisdictional limitations and authorized judicial review of "estimates and additional [fee] collections made pursuant to the appropriation for Aviation Security in Public Law 108-334," - the 2005 appropriations statute that directs TSA to recover any security fee under-payments due in 2005 and subsequent years. *See* Consolidated Appropriations Act, P.L. 110-161, § 540, 121 Stat. 1844 (December 26, 2007), amending 49 U.S.C. 44940(a) (2) (A) and (B) (iv). The 2007 amendment, however, further provides, that "such judicial review shall be limited only to additional amounts collected by the Secretary before October 1, 2007."

Thus, as amended, the pertinent jurisdictional provision, with new matter in added italics, states:
**(B) Limitations**.--

***

**(iv) Finality of determinations**.--

Determinations of the Under Secretary under this subparagraph [*i.e.* subparagraph, 49 U.S.C. 44940(a) (2) (B), pertaining to limits on air carrier fees] are not subject to judicial review *except for estimates and additional collections made pursuant to the appropriation for Aviation Security in Public Law 108-334: Provided, That such judicial review shall be pursuant to section 46110 of title 49, United States Code: Provided further, That such judicial review shall be limited only to additional amounts collected by the Secretary before October 1, 2007.*

49 U.S.C.A. 44940(a)(2)(B)(iv).

Petitioners and their amicus assert that, notwithstanding this plain and unequivocal bar to judicial review of fees collected on or after October 1, 2007, the Court has jurisdiction to review whether such fee collections are in excess of TSA's statutory authority. The carriers note that there is a presumption against construing statutes to foreclose judicial review of agency action. And citing cases such as *Amgen, Inc. v. Smith,* 357 F.3d 103 (D.C. Cir. 2004), *COMSAT Corp. v. FCC,* 114 F.3d 223 (D.C. Cir. 1997), and *Dart v. United States,* 848 F.2d 217, 221 (D.C. Cir. 1988), they further note that the presumption in favor of judicial review applies with added force with respect to claims that an agency has exceeded its statutory authority. *See* Pet. Joint Br. at 1-2; ATA Br. at 17-19.

ADDENDUM 34

None of these cases, however, affords any basis for assuming jurisdiction to enter relief with respect to fees collected on or after October 1, 2007. As the Supreme Court has explained:

> The presumption favoring judicial review of administrative action is just that - a presumption. This presumption, like all presumptions used in interpreting statutes, may be overcome by specific language or specific legislative history that is a reliable indicator of congressional intent.

*Block v. Community Nutrition Institute,* 467 U.S. 340, 349 (1984).

Here, the congressional intent to bar review is clear and unequivocal. The amended statute retains the original bar to judicial review of TSA's "determinations" of the overall and per carrier limits on user fees, carves out a limited exception for collections made pursuant to TSA's 2005 appropriation for aviation security (P.L. 108-334), and then expressly limits the scope of that exception by barring judicial review of amounts collected on or after October 1, 2007. The legislative history, moreover, though sparse, confirms that Congress intended to enact only a limited, one-time exception to the existing bar to judicial review - an objective consistent with the statutory language limiting review to fees collected before October 1, 2007. *See* 153 Cong. Rec. H15742-01 (December 17, 2007) (noting section 540 intended to authorize "one time judicial review" of fee assessments made pursuant to P.L. 108-334).

Nothing in this clear and direct preclusion of review suggests that Congress intended to except from the jurisdictional bar claims that TSA misapplied or misconstrued its statutory authority. Rather, any contention that TSA exceeded its statutory authority in setting a fee or fee limit is plainly a challenge to TSA's "determination" of the appropriate fee and, as such, falls squarely within the statutory limitations on judicial review. Indeed, if such claims were nonetheless permitted to go forward, the express preclusion of judicial review would have little practical utility. That, in turn, would frustrate Congress's evident intent to ensure that the revenues necessary to provide aviation security services are not compromised by prolonged disputes over fee liability. Petitioners thus err in asserting that statutory challenges to fees collected on or after October 1, 2007 are excepted from the express statutory preclusion of judicial review.

Petitioners also err in asserting that *Leedom v. Kyne,* 358 U.S. 184 (1958), affords an alternative basis for assuming jurisdiction over fees collected on or after October 1, 2007. *Leedom* jurisdiction is a narrow, rarely invoked jurisdictional basis, one reserved for extraordinary circumstances in which an agency has manifestly violated a clear statutory mandate or prohibition. *Assoc. of Civilian Technicians, Inc. v. FLRA,* 283 F.3d 339, 344 (D.C. Cir.), *cert. denied*, 537 U.S. 1045 (2002); *Griffith v. FLRA,* 842 F.2d 487, 493 (D.C. Cir. 1988); *Council of Prison Locals v. Brewer,* 735 F.2d 1497, 1500-01 (D.C. Cir. 1984). *Leedom* jurisdiction is thus intended to permit judicial review of agency action that is "lawless behavior," *Dart,* 848 F.2d at 224 (D.C. Cir. 1988), and, as such, is confined "to agency error so extreme that one may view it as jurisdictional or nearly so." *Griffith,* 842 F.2d at 493.

Petitioners attempt to fit their contentions into this narrow doctrine by stressing that they challenge whether TSA has acted within its statutory authority. The Supreme Court, however, has rejected the argument that *Leedom* can be read broadly "as authorizing judicial review of any agency action that is alleged to have exceeded the agency's statutory authority." *Board of Governors of Fed. Reserve Sys. v. MCorp Financial, Inc.,* 502 U.S. 32, 43 (1991). Rather, for *Leedom* jurisdiction to lie, the agency must not merely err; it must undertake actions that are patently *ultra vires.* Consequently, *Leedom* jurisdiction is not applicable to agency actions that, like those at issue here, are taken under color of statutory authority, even if the agency's construction of its authority is ultimately deemed in error. *Cf. National Air Traffic Controllers Ass'n AFL-CIO v. Federal Service Impasses Panel,* 437 F.3d 1256, 1264 (D.C. Cir. 2006) (*Leedom* jurisdiction inappropriate where there is a reasonable dispute as to meaning of statute); *Long Term Care Partners, LLC v. United States,* No. 06-1930, 2008 WESTLAW 307448 at * 6 (4th Cir. Feb. 5, 2008) (*Leedom* jurisdiction inappropriate where agency offers plausible interpretation of statute).

ADDENDUM 35

Finally, while petitioners correctly note that a congressional intent to foreclose judicial review of constitutional claims must be clear, this principle has no application here. Contrary to petitioners' contentions, the jurisdictional scheme does not categorically bar jurisdiction over petitioners's due process claim. Rather, the statute vests the Court with jurisdiction to consider petitioners' constitutional claim, to determine whether the administrative decisions underlying all the fees at issue here comport with due process, and to enter any appropriate relief, provided relief is limited to fees collected before October 1, 2007. It is not uncommon for Congress to vest a Court with jurisdiction over a constitutional claim but to impose limitations on the remedies the court may impose if a constitutional violation is shown. The cases construing such statutes do not apply any presumption against construing a limitation on relief in accordance with its plain terms. *See, e.g.*, *FDIC v. Meyer,* 510 U.S. 471, 483-86 (1994) (statute authorizing suit against federal agency does not authorize action for damages arising out of alleged due process violation); *United States v. Testan,* 424 U.S. 392, 397-98 (1976) (Tucker Act vests Claims Court with jurisdiction to award damages for violation of money-mandating constitutional provision, but not jurisdiction to enter equitable relief). The statutory limitation on the scope of relief the Court may enter thus does not implicate the presumption against construing a statute to foreclose judicial review of constitutional claims. Nor should that presumption be invoked to frustrate an unequivocal congressional intent to ensure that fees collected after October 1, 2007 remain final and not subject to judicial review.

## II. TSA Has Statutory Authority To Base Air Carrier Fees On Average Industry Costs Where A Carrier's Claimed Individual Costs Are Not Verified By An Independent Audit.

Petitioners assert that TSA has violated express statutory provisions limiting each air carrier's fee to the amount the specific carrier paid for screening passengers and property in calendar year 2000, when these security services were a private responsibility. Pet. Joint Br. at 31. They argue that, because TSA based the challenged fee assessments in part on average costs within the industry, rather than the specific carrier's actual costs, the fee assessments are *ultra vires* and must be set aside. Petitioners' amicus echos this assertion, arguing that TSA "abandoned the basis prescribed by statute and regulation for setting" fees, "*i.e.* the actual screening costs for calendar year 2000 that each carrier had reported" to TSA. ATA Br. at 12-13.

As an initial matter, petitioners mischaracterize TSA's determination. Petitioners essentially argue that, because TSA has relied in part on the average industry cost of screening a passenger, the agency is not measuring the carrier's specific screening costs at all. That premise is incorrect. TSA used industry averages as a means of approximating the carrier's specific costs, and it did so only with respect to those carriers whose claimed "actual" costs could not be verified by an independent audit. In those instances, TSA took the average cost per passenger screened in the industry, used it as a reasonable proxy for the carrier's specific cost per passenger, and then multiplied it by a carrier-specific variable: the number of passengers the particular carrier screened in calendar year 2000. Contrary to petitioners' contentions, the resulting figure *is* a measure of the amount each particular carrier's paid for screening passengers and property in calendar 2000.

The carriers nonetheless maintain that the statute requires TSA either to accept the carriers' own, unvalidated cost reports, or to validate costs itself through a succession of individual, carrier-specific audits. Yet although the carriers castigate TSA for violating this asserted requirement, they are unable to identify a statutory provision or applicable regulation that imposes it.

Petitioners cite 49 U.S.C. 44940(a) (2) (B) (ii) as the source of this putative "actual cost" requirement. Pet. Joint Br. at 4, 31. Subparagraph (ii), however, provides that a carrier's fee "may not exceed the amount paid in calendar year 2000 by that carrier for screening passengers and property, *as determined by the Under Secretary.*" 49 U.S.C. 44940(a) (2) (B) (ii) (emphasis added). These provisions thus make clear that the security costs incurred by a carrier in 2000, and the attendant limit on statutory fees, are to be determined by TSA, not by the unverifiable assertions of a carrier.

This grant of authority vests TSA with great latitude to determine appropriate measures of carrier costs. The Court has recognized that statutes which refer, not to the objective existence of a key fact, but to an administrative official's determination of the key fact, are intended to vest the agency with broad discretionary judgment. As then Judge (now Chief Justice) Roberts observed, "We have noted in the past the 'distinction between the objective existence of certain conditions and the Secretary's

ADDENDUM 36

determination that such conditions are present,' stressing that a statute phrased in the latter terms 'fairly exudes deference' to the Secretary." *American Federation of Labor and Congress of Indus. Organizations v. Chao,* 409 F.3d 377, 393 (D.C. Cir. 2005) (Roberts, J., concurring in part and dissenting in part), quoting *Kreis v. Sec'y of the Air Force,* 866 F.2d 1508, 1513 (D.C. Cir. 1989).

Subparagraph (ii) thus affords TSA broad discretion to decide the most appropriate means of making this cost determination. In particular, TSA has the discretion under subparagraph (ii) to decide whether the carrier's reported cost information should be deemed reliable. And upon finding that the carrier's claimed costs are not in fact reliable, TSA also has the discretion to determine carrier costs by some other means, including the use of industry cost averages or any other reasonable method of estimating the carrier's individual costs in the absence of reliable, carrier-specific information.

TSA, moreover, has even broader discretion with respect to 2005 and subsequent fiscal years, the years at issue here. Subparagraph (iii) of the statute thus provides:

> (iii) **Adjustment of per-carrier limit.**--For fiscal year 2005 and subsequent fiscal years, the per-carrier limitation under clause (ii) may be determined by the Under Secretary on the basis of market share or any other appropriate measure in lieu of actual screening costs in calendar year 2000.

49 U.S.C. 44940(a) (2) (B) (iii).

As this subparagraph states, per carrier fee limits for fiscal year 2005 and subsequent years need *not* be determined on the basis of "the actual amount paid by any Petitioner for screening services in [calendar year] 2000." Pet. Joint Br. at 31. Rather the "per carrier" fee limit "may be determined by [TSA] on the basis of market share *or any other appropriate measure in lieu of actual screening costs in calendar year 2000."* 49 U.S.C. 44940(a) (2) (B) (iii) (emphasis added). Thus, for 2005 and subsequent fiscal years, the applicable statute does not require TSA to set the fee limit on the basis of the carrier's "actual costs" in 2000. Nor does it otherwise bar TSA from basing the fee limit on average costs within the industry, other methods of estimating a specific carrier's costs, or other factors, such as market share, that are wholly unrelated to costs in the first instance.

Essaying a different tack, the carriers argue that TSA limited the discretion conferred by this statute in regulations and a Federal Register notice that assertedly require the use of "actual screening costs" in 2005 and subsequent fiscal years. Pet. Joint Br. at 7 n.5; ATA Br. at 25-26. Neither contention withstands scrutiny. The "interim final" regulations setting the per carrier cost limit are expressly limited to fiscal years 2002-2004. *See* 49 C.F.R. 1511.5(c). These same regulations make clear that the amount of the carrier fee "will be redetermined for fiscal years 2005 and beyond, and such redeterminations may be based on the carrier's respective market share or any other appropriate measure ***." 49 C.F.R. 1511.5(g).

The carriers' reliance on TSA's October 2004 Federal Register notice is also misplaced. The agency issued this notice (which is reprinted in the addendum to this brief) at the beginning of fiscal year 2005, when the cost limits established in its interim final regulations were set to expire, and when the broader fee-setting discretion conferred by 49 U.S.C. 44940(a) (2) (B) (iii) took effect. The notice expressly stated that "[b]eginning in fiscal year 2005, *** TSA may change the way the per-carrier limit is determined" and that the agency now had the statutory authority to set the amount of each carrier's fee according to any "appropriate measure in lieu of the carrier's actual screening costs in calendar year 2000." 69 Fed. Reg. 58943 (Oct. 1, 2004), citing 49 U.S.C. 44940(a) (2) (B) (iii). TSA explained, however, that it had "not yet determined whether it will reset each carrier's [Aviation Security Infrastructure Fee] payment based on market share or another appropriate measure" (*ibid.*) and concluded that the prior fee limits would therefore remain in effect "until further notice." 69 Fed. Reg. 58943 (Oct. 1, 2004).

ADDENDUM 37

Contrary to the carriers' contentions, nothing in this decision to temporarily retain the status quo suggests that TSA irrevocably bound itself to apply an "actual cost" criterion for fiscal years 2005 and beyond. Rather, the October 2004 Federal Register states that the prior cost limits would remain in effect only until "further notice," thereby leaving TSA free to consider new information - such as that provided by the GAO report - and to adjust the fee limits whenever it deemed appropriate. [8]

The carriers' final contention that TSA has not "implemented" the discretion conferred by 49 U.S.C. 44940(a) (2) (B) (iii) is similarly unavailing. *See* Pet. Joint Br. at 8 n.7. As petitioners' amicus notes (ATA Br. at 5 & n.3), TSA has continued to set fee limits on the basis of a measure of the carriers' screening costs, rather than on the basis of market share or other non-cost criteria authorized by 49 U.S.C. 44940(a) (2) (B) (iii). But the fact that TSA has not exhausted the full quantum of discretion conferred by this statute does not somehow render it inapplicable, especially when the matter at issue is whether TSA has exceeded the limits of its discretionary authority.

In asserting that TSA's cost-based assessments exceeded its lawful authority, petitioners must thus show that the challenged fee assessments violate *this* statute, not statutory criteria applicable to different years, not a regulation that, by its own terms, ceases to apply in 2005, and not a Federal Register notice that continues the status quo ante only until the agency decides otherwise. Contrary to petitioners' contentions, and as TSA concluded below, these statutory criteria do not "constrain[] the methods that the agency may use *** including the use of industry averages to establish estimates of actual security costs incurred by the individual airlines in calendar year 2000." *Southwest Decision,* AR. 32 at 2, JA 560. Petitioners' contention that the use of industry average costs exceeds TSA's statutory authority is thus without merit.

### III TSA Has Statutory Authority To Consider The Costs Of Screening Non-Passengers In Determining The "Overall Limit" On Air Carrier Fees.

The Aviation and Transportation Security Act, in addition to imposing limits on the amount each individual carrier may be assessed, also imposes an "overall" limit on the aggregate amount of carrier fees that may be imposed on the industry in a fiscal year. This limit provides that the carrier fees collected by TSA "may not exceed, in the aggregate, the amounts paid in calendar year 2000 by carriers *** for screening passengers and property, as determined by the Under Secretary." 49 U.S.C. 44940(a) (2) (B) (i). In the decisions at issue here, TSA, after independent review of GAO's estimates, concluded that the industry's screening costs for calendar year 2000 were $448 million. It accordingly issued revised assessments setting carrier fees at amounts that would, in the aggregate, equal but not exceed this limit. *See, e.g.*, *Southwest Initial Decision,* AR. 24 at 2, JA 274.

Petitioners contend that this calculation overstates the "overall limit" because GAO included within its estimate of industry-wide costs the costs incurred in screening sight-seers or other individuals who were meeting or accompanying passengers rather than traveling themselves. Pet. Joint Br. at 34-35. They stress that the statutory limit is defined as the amounts paid for "screening passengers and property" and so may not include any costs carriers incurred in determining whether non-passengers pose a threat to travelers.

These contentions make little sense in light of the historical context of the statute. As explained above, the Aviation and Transportation Security Act federalizes aviation security services that had previously been a private responsibility. In assuming these federal responsibilities, Congress, acting in the aftermath of September 11th, clearly intended to augment and improve civil aviation security. *See* 49 U.S.C. 44901. There is nothing, however, to suggest that Congress also intended to bestow a windfall on carriers by assuming the full burden of providing services that inured to the benefit of the industry, and that had previously been provided at the industry's expense.

Petitioners nonetheless impliedly construe the statutory reference to "screening passengers" as a reference to the "examination" or "evaluation" of whether a passenger poses a threat to aviation security. Thus, in the petitioners' view, the plain language of the statute excludes the costs carriers incurred in evaluating the security status of non-passengers. This, however, is by no means the only plausible reading of the statutory text. In ordinary parlance, the term "screen" may also refer to an action taken to "guard from injury or danger," "shield from harm," or "protect from the attack of an enemy by means of an advance guard."

ADDENDUM 38

*Webster's Third New International Dictionary* at 2040 (1993). Used in this sense, the statutory reference to amounts paid for "screening passengers" would include any aviation security costs incurred in safeguarding passengers from danger.

Moreover, the statute refers, not merely to screening passengers, but to screening "property" as well. That function has historically included determining whether anyone - passenger or non-passenger - who passes through a security checkpoint is carrying weapons, hazardous materials, or other items of "property" that might threaten aviation security. *See* 49 C.F.R. 1540.111 (providing for inspection of any individual's person or accessible property to determine whether they carry weapons, explosives, or incendiary material). Thus, even if "screening" only connotes "inspection" or "evaluation," it would still authorize examination of the property carried in the bags or on the person of a non-passenger.

Related provisions of the statute are consistent with this interpretation. Congress, for example, has employed identical language in directing TSA to ensure aviation security by "screening all passengers and property." *See* 49 U.S.C. 44901(a). TSA, consistent with Congress's intent to empower the agency to take all reasonable measures to protect passenger safety, has construed this provision as authorizing the inspection of the person and property of *any* individual - passenger or non-passenger - who enters the Controlled boarding area. *See* 49 C.F.R. 1540.105-107. Petitioners' notion that this phrase nonetheless excludes the inspection of non-passengers and the property they carry suggests a limitation on TSA's authority that is completely at odds with the statute's overriding purpose of safeguarding passengers from harm.

The Court must defer to TSA's construction of the statute in these circumstances. Supreme Court deference principles make clear that alternative dictionary definitions of a statutory term, or indications that a statute's plain terms admit of two or more ordinary usages, are firm indications of statutory ambiguity. *National Cable & Telecommunications Ass'n v. Brand X Internet Services,* 545 U.S. 967, 989 (2005); *National Railroad Passenger Corporation v. Boston & Maine Corp.,* 503 U.S. 407, 418 (1992). Under *Chevron*, the reviewing court, where presented with such ambiguity, must defer to the agency's view if based upon any of the "permissible" readings of the statutory text. *Ibid*. As TSA's interpretation here is rooted in a plausible reading of the statutory text, the Court must defer to it absent some persuasive indication of a contrary legislative intent.

TSA's interpretation is not merely "permissible" but compelled by the statute's structure, history and underlying purposes, all of which demonstrate that Congress intended to vest TSA with the authority to collect user fees equal to the full amount carriers spent on civil aviation security in calendar year 2000. It is well settled that, in determining the meaning of a statute, the reviewing court should not consider a word or phrase in isolation, but must rather evaluate its meaning in context, looking to the structure and language of the statute as a whole, as well as the statute's object and policy. *Philbrook v. Glodgett,* 421 U.S. 707, 713 (1975). Moreover, where the statutory text is amenable to more than one interpretation, the court should adopt the construction that is most consistent with the legislative purpose. *See, e.g.*, *United States v. X-Citement Video, Inc.,* 513 U.S. 64, 68-69 (1994) (rejecting the "most natural grammatical reading" of the statute, where it would lead to anomalous and absurd results); *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 575 (1982).

These principles all support TSA's decision to take account of the costs of evaluating non-passengers when determining the statute's "overall" cost limit. Congress authorized TSA to impose user fees on air carriers to defray the newly-assumed federal costs of aviation security services. *See* 49 U.S.C. 44940(a) (2) (A). It directed TSA to "ensure" that carrier user fees are "reasonably related" to the federal costs of providing civil aviation services. *See* 49 U.S.C. 44940(b). And when Congress learned that carriers were paying substantially less in user fees than the industry's own estimates of the amount carriers had previously spent on aviation security services, it enacted additional statutory provisions directing an examination of the carriers' cost claims and recovery of any underpayment. *See* Homeland Security Appropriations Bill for 2005, P.L. 108-334, Title II, 118 Stat. 1298 (2004). The statute's structure and history thus show that Congress expected TSA to recover in user fees the full amount carriers had spent on ensuring passenger security in calendar year 2000, including any amounts spent on evaluating the security status of non-passengers. TSA's interpretation of the statutory cost limits is fully consistent with this legislative objective.

ADDENDUM 39

Petitioners' interpretation, in contrast, serves no discernable legislative purpose. By petitioners' own estimate, the exclusion of security costs associated with screening non-passengers would reduce user fee revenues by $123 million annually. Pet. Joint Br. at 35. Yet petitioners do not dispute that evaluating non-passengers is necessary to ensure passenger security. Nor do they maintain that such services were beyond the scope of the security services carriers performed in calendar year 2000. They instead suggest that the literal language of the statutory cost limits compels the exclusion of costs associated with these necessary security services, regardless of whether such exclusions make sense or bear any relation to the underlying purposes of the statutory scheme.

TSA had ample basis for rejecting this mechanical and ultimately nonsensical interpretation. The agency's contrary view is consistent with the statutory text and far better suited to realizing Congress's intent to ensure that carriers continue to pay a fair share of the costs of civil aviation security. TSA's interpretation is thus, at a minimum, a "permissible" reading of the statute to which the Court must defer here.

#### IV. TSA's Increased Fee Assessments Are Consistent With The 2005 Appropriations Act.

#### A. GAO's Findings Are A Sufficient Basis For Additional Fee Assessments.

In April 2005, GAO completed the review of carrier costs directed by Congress in the Department of Homeland Security's 2005 Appropriations Act, P.L. 108-334. GAO found that the carrier reports mandated by TSA regulations had understated the industry's calendar year 2000 security costs by an estimated $129 million. GAO concluded that, as a result, TSA was not obtaining all the user fee revenue authorized by law. *GAO Report,* AR. 1 at 14, JA 18. After independent review of these findings, TSA concluded that it could no longer set carrier fees on the basis of the carrier's own cost reporting in the absence of independent audit. It accordingly devised an alternative methodology for determining carrier costs in instances where the carrier was unable or unwilling to provide a sufficient audit and, in petitioners' case, imposed increased fee assessments for 2005 and subsequent years.

Petitioners and their amicus argue that these assessments violate substantive limitations imposed by TSA's 2005 appropriations legislation, P.L. 108-334. They maintain, in particular, that the appropriations legislation makes TSA's authority to impose additional fee assessments for fiscal year 2005 and subsequent years contingent on a determination by GAO that a specific carrier has not paid the "appropriate" fee. Pet. Joint Br. at 40, ATA Br. at 23. They further contend that GAO did not make the individualized findings of an underpayment that are assertedly necessary under this law to trigger TSA's power to collect additional fees. *Ibid*.

Petitioners misconstrue P.L. 108-334. The pertinent section of the Appropriations Act states:

> beginning with amounts due in calendar year 2005, if the result of this review is that an air carrier or foreign air carrier has not paid the appropriate fee to the Transportation Security Administration pursuant to section 44940(a)(2) of title 49 United States Code, the Secretary of Homeland Security shall undertake all necessary actions to ensure that such amounts are collected.

P.L. 108-334, 118 Stat. 1304.

The carriers argue that the "review" referenced here is an individualized review of a specific carrier, and that the resulting determination of whether appropriate fees have been paid accordingly refers to an individual, carrier-specific finding made after review of an individual carrier. *See* ATA Br. at 22-23. But the statute refers to a "review" of the industry, not a specific carrier:

ADDENDUM 40

the Government Accountability Office shall *review \*\*\* the calendar year 2000 cost information for screening passengers and property* pursuant to section 44940(a) (2) of title 49, United States Code, of *air carriers and foreign air carriers engaged in air transportation and intrastate air transportation \*\*\*."*

*Id.*, 118 Stat. 1303 (emphasis added).

The statute thus provides that if the result of "*this* review," *i.e.*, an *industry-wide* review "of air carriers and foreign air carriers" - *plural* not singular - is that "an air carrier or foreign air carrier has not paid the appropriate fee" then additional collections are authorized. Here, GAO found a substantial industry underpayment. And as TSA reasoned, an industry-wide underpayment presupposes that at least one air carrier has not paid the appropriate fee. *See, e.g.*, *United Decision,* AR. 65 at 4, JA 835. Indeed, given the magnitude of the industry's underpayment - a $129 million deficiency, or more than 25% of the $448 million GAO estimated was due under applicable law (*GAO Report,* AR. 1 at 7-8, JA 11-12) - it is likely that *many* air carriers had not paid the appropriate fee. GAO's 2005 report thus affords a sufficient basis for the additional fee assessments challenged here.

**B. TSA's Authority To Collect Additional Fees Is Not Dependent Upon The Findings of The GAO.**

In any event, TSA's authority to collect additional fees is not contingent on a prior determination by the GAO in the first instance. The Aviation and Transportation Security Act, wholly independent of P.L. 108-334, authorizes TSA to impose fees on air carriers, to revise a prior fee assessment, and to collect additional fees if a carrier has not paid the amounts otherwise required by law. The Act thus vests TSA with broad authority to impose fees on carriers to defray the costs of civil aviation security services. 49 U.S.C. 44940(a) (2). It permits TSA to begin collecting such fees, or to subsequently modify them, merely upon notice to the carriers. 49 U.S.C. 44940(d) (1) & (3). And it empowers TSA to require carriers to provide such information as the agency deems "necessary to verify that fees have been collected and remitted at the proper time and in the proper amounts" (49 U.S.C. 44940(e) (4)) - a grant of authority which, in conjunction with TSA's authority to determine appropriate fees, affords TSA the power to impose additional assessments if it concludes that a carrier's prior reported costs are in error. Taken together, these provisions afford TSA sufficient authority and powers to impose and collect the additional fee assessments challenged here.

Contrary to petitioners' contentions, P.L. 108-334 does not qualify or repeal this statutory authority, nor does it make TSA's power to set and collect fees dependent upon a prior determination by the GAO. Rather, P.L. 108-334 directs TSA to consider the GAO's findings and, "beginning with amounts due in calendar year 2005" to take "necessary actions" to collect the "appropriate" amount if it is determined that carriers have not paid the fees required by law. *Id.*, 118 Stat. 1304. Moreover, the statute does not, as petitioners imply, state that TSA shall take such action if *GAO* determines that a carrier has not paid the appropriate fee. It instead states that TSA shall take such action if "the result of this review" is that a carrier has not paid the appropriate fee (*ibid.*) - a phraseology that, through its use of the passive voice, shifts the focus to an evaluation of GAO's findings rather than a specific determination by the GAO. Such provisions leave TSA with ultimate authority to make the determination as to whether an "appropriate" amount has or has not been paid by a particular carrier, and to decide what further actions are "necessary."

This construction of the statute is further supported by the presumption against implied repeals of existing statutory authority. P.L. 108-334 does not expressly purport to amend the Aviation and Transportation Security Act. Consequently, the appropriations statute can only be read to limit TSA's existing authority to set and modify fees if it is deemed to impliedly repeal in part TSA's authority to determine appropriate fee assessments. Implied repeals, however, are strongly disfavored. The established rule is that, "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari,* 417 U.S. 535, 550 (1974). "When there are two acts upon the same subject, the rule is to give effect to both if possible." *Id*. at 551 (internal quotation omitted). The Supreme Court has stressed that this rule applies with even greater force with respect to appropriations

legislation which, though capable of changing substantive law, is generally presumed not to do so. *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 190-91 (1978). These principles raise a strong presumption against construing P.L. 108-334 as qualifying or otherwise constraining TSA's existing fee-setting authority. [9]

P.L. 108-334 is readily amenable to a different construction that is consistent with the presumption against implied repeals. The statute is easily read as: (1) directing the Comptroller General conduct a detailed review of the security costs reported by carriers, (2) requiring TSA to consider the findings and to take "all necessary action" to ensure that the appropriate amounts, *as ultimately determined by TSA,* are collected, and (3) mandating that if TSA determines there have been underpayments, TSA must - rather than may - collect additional amounts retroactively, "[b]eginning with amounts due in calendar year 2005." [10] *Id.,* 118 Star. 1304. Under this interpretation, no prior determination by the GAO is necessary to revise petitioners' fee assessments, and the asserted absence of such a determination raises no issue as to whether TSA acted within its statutory authority.

TSA did characterize GAO's determination as a "condition precedent" to the collection of additional fees that GAO had in fact satisfied, and then proceeded to make its own, independent determination of whether carriers had paid the appropriate fee. *Southwest Decision,* AR. 32 at 2, JA 560. But while an agency decision must ordinarily stand or fall on its stated rationale, a well-recognized exception permits the reviewing court to rely on an alternative ground that does not turn on factual determinations or policy judgments entrusted to the agency but depends instead on legal questions that are "within the power of the appellate court to formulate." *SEC v. Chenery Corp.,* 318 U.S. 80, 88 (1943); *Shea v. Director, OWCP, U.S. Dept. of Labor,* 929 F.2d 736, 738-39 & n.4 (D.C. Cir. 1991); *GTE South, Inc. v. Morrison* 199 F.3d 733, 741-42 (4th Cir. 1999).

All these criteria are met here. The alternative ground - that P.L. 108-334 does not constrain TSA's pre-existing authority to collect additional fees - concerns an issue of statutory construction that is within the Court's "power to formulate" and that does not implicate factual determinations or discretionary choices committed to the agency. Moreover, the alternative ground is consistent with jurisprudential doctrine of constitutional avoidance, whereby a court should strive to avoid needless constitutional confrontations. *Cf. National Mining Ass'n v. Kempthorne,* 512 F.3d 702, 710 (D.C. Cir. 2008) (noting that doctrine of constitutional avoidance trumps *Chevron* deference to agency's construction of statute). For all these reasons, these alternative arguments may be considered by the Court, and they also support affirmance of TSA's decision.

### V. TSA's Cost Estimates Are Reasonable And Must Therefore Be Sustained Under The Highly Deferential, "Arbitrary And Capricious" Standard Of Review.

Petitioners, in asserting that TSA's cost determinations are arbitrary and capricious as well as *ultra vires,* advance three objections to the cost estimates TSA employed in determining the limit on their individual fee assessments. First, they maintain that TSA arbitrarily rejected their individual cost reports by insisting on an independent audit verification that was "impossible" to provide. Second, they assert that TSA's cost estimates unreasonably assume that all petitioners incurred the same average cost per passenger screened, despite evidence that the carriers' divergent circumstances and business practices yielded considerable variation in carrier screening costs. Finally, they argue the GAO data and conclusions underlying TSA's estimates are so riven with technical and methodological error that it was arbitrary and capricious for TSA to rely upon them.

Judicial review of TSA's determinations on these matters is highly deferential. Administrative decisions concerning the reliability of a carrier's reported costs or the feasibility of an audit requirement or the validity of GAO's sampling methodologies and statistical techniques implicate matters of policy judgment and expertise in highly technical subject areas. Deference to such determinations is the norm and requires the reviewing court to sustain the agency's choices unless they are demonstrably irrational. *See, e.g., Village of Bensenville v. FAA,* 376 F.3d 1114, 1122 (D.C. Cir. 2004); ("[W]e owe considerable deference to an agency's exercise of its judgment and expertise in estimating costs"); *Cobell v. Norton,* 428 F.3d 1070, 1076 (D.C. Cir. 2005) (Agency's choice of accounting methodology entitled to deference); *West Virginia v. EPA,* 362 F.3d 861, 867 (D.C. Cir. 2004) ("Agency determinations based upon highly complex and technical matters are entitled to great deference") (internal citation

ADDENDUM 42

and quotation omitted). *Milk Train, Inc. v. Veneman,* 310 F.3d 747, 754 (D.C. Cir. 2002) ("An agency typically has wide latitude in determining the extent of data-gathering necessary to solve a problem") (internal quotation and citation omitted).

TSA's assessments must be sustained under these deferential standards of review. The agency has made reasonable choices as to how to verify a carrier's claimed costs, and reasonable decisions as to how to determine fee limits in instances where no independently verified cost information has been provided.

## A. TSA Reasonably Rejected Cost Reports That Were Not Verified By An Independent Audit.

TSA's implementing regulations require carriers to submit an independent audit expressing an opinion as to the accuracy and reasonableness of carrier's cost report. 49 C.F.R. 1511.9. Such audits serve an important, independent check on the costs each carrier claims to have incurred in providing screening services in calendar year 2000 and thus further TSA's ability to ensure that any fee limit based on those costs is appropriate and fair.

Petitioners do not dispute the importance of ensuring that cost reports are complete, accurate, and reliable. They maintain, however, that TSA's insistence on an independent audit is an unreasonable means of achieving this objective because such audits are impossible to perform. In particular, they note that the carriers' accounting systems were not set up to capture the information TSA requires, and that in many instances there was no precise way of determining how to allocate aggregated or indirect costs into the cost categories required by TSA's Appendix A form. *See* Pet. Joint Br. at 13. In such circumstances, petitioners argue, independent accountants are unable to render an unqualified opinion as to accuracy or reasonableness of the carriers' cost report, and the agency's insistence that independent audit nonetheless be provided is unreasonable.

Petitioners, however, ignore the substantial steps TSA took to address these concerns and facilitate the carriers' ability to satisfy the audit requirement. In 2002, TSA met with representatives of the Air Transport Association and the American Institute of Certified Public Accountants to discuss and consider these concerns. *Objections to Audit Requirement,* AR 28e. at 20, JA 365. In response to the industry's objections, TSA announced that it would accept a *qualified* audit report that reflected the auditor's explanation as to his or her inability to provide an unqualified opinion, provided that the auditor's work papers also accompany the submission. *Id*. a 20-21, JA 356-66; *see also Southwest Decision,* AR. 32 at 3, JA 561. TSA explained:

> If an auditor is unable to express an unqualified opinion, and instead provides a qualified opinion or disclaimer report, the carrier may comply with the requirements of Section 1511.9 [requiring an independent audit] by submitting a report from its auditor that details the basis for the qualified opinion or disclaimer report. *** Such reports must include each cost category or cost element in question, the carrier's asserted cost and basis for each, the auditors' procedures for examining such, [and] the reason(s) why the auditor could not independently confirm the carrier's assertion(s) ***.

AR. 28e at 21, JA 366.

Petitioners ignore this significant modification of the audit requirement. Indeed, although they repeatedly refer to the impossibility of providing an *unqualified* audit opinion, they fail to address the feasibility of providing the *qualified* audit opinions ultimately deemed acceptable by TSA. *See, e.g.*, Pet. Joint Br. at 12, 27, 48-50. This relaxed audit standard, however, was intended to give all carriers the flexibility to comply with the audit requirement. It reflects a reasonable effort to balance TSA's interest in independent verification of cost data against the practical difficulties identified by the industry and the American Institute of Certified Public Accountants. As TSA found, *most* carriers were ultimately able to submit a sufficient audit, notwithstanding petitioners' assertion that compliance with the audit requirement was "impossible." *Southwest Decision,* AR. 32 at 3, JA 561. Petitioners thus err in asserting that the audit requirement is unreasonable.

ADDENDUM 43

## B. TSA Reasonably Relied On Average Industry Screening Costs In Instances Where The Individual Carrier's Costs Were Not Verified By An Independent Audit.

TSA's reliance on the industry's average screening cost per passenger is also reasonable, especially where cost data for individual carriers has not been verified by an independent audit. Petitioners, in contesting this aspect of TSA's fee determination, maintain that TSA is required to set the per carrier limit on the basis of the screening costs each carrier actually incurred. They thus argue that a fee limit based on the average industry cost for screening a passenger is not a true measure of a specific carrier's actual cost, that record evidence shows that some of the petitioners incurred screening costs substantially below the industry average, and that it is therefore arbitrary and capricious for TSA to assess fees that do not fully reflect these individual differences.

These contentions are incorrect for several reasons. First, petitioners misstate the statutory standards governing TSA's exercise of discretion. They frame the issue as turning on whether TSA employed reasonable means of determining each carrier's actual screening costs and conclude that measures based on average industry costs rather than specific carrier costs are an arbitrary means of making this determination. But as explained above, the governing statute does not require the per carrier limit to be based on actual screening costs for the fiscal years at issue here. Rather, for 2005 and the subsequent fiscal years, the statute vests TSA with broad discretion to set a per carrier limit on the basis of "market share *or any other appropriate measure in lieu of actual screening costs* in calendar year 2000." 49 U.S.C. 44940(a) (2) (B) (iii) (emphasis added).

Here, TSA had an eminently reasonable basis for relying on the industry's average cost for screening a passenger: petitioners' failure to provide an audit affording TSA satisfactory assurance that their individual claimed costs were complete, accurate, and reliable. Though petitioners downplay the point, TSA only applied this alternative methodology to carriers who: (a) failed to provide an independent audit, and (b) reported a screening cost per passenger below the industry average. Those carriers who did provide independent audit were assessed fees based on their reported costs, not an approximation based on average industry costs. TSA used a different Criterion to set petitioners' fee limits - the industry's average screening cost per passenger - because it concluded that, in the absence of a sufficient audit, no more reliable information on petitioners' actual screening cost per passenger was available. That choice was reasonable in the circumstances presented here.

Second, contrary to petitioners' contentions, TSA had a reasonable basis for insisting on an independent audit and rejecting other means of establishing the reliability of petitioners' claimed cost information. The carriers argue that if TSA had doubts about the reliability of a cost report, it should have verified the reports through some other means by either considering declarations from company financial officials or conducting an audit itself, pursuant to the enforcement powers vested in TSA by 49 U.S.C. 44940(e) (4).

TSA, however, had a reasonable basis for rejecting each of these alternative means of verifying reported costs. The self-interested declarations of corporate financial officers are no substitute for the impartial and objective assessment provided by an independent audit. Indeed, if, as petitioners claim, their books and accounts are structured in a way that precludes effective auditing of screening costs, then it highly unlikely that their financial officials can attest to those same costs with confidence and accuracy. TSA's refusal to accept cost reports that cannot be substantiated by an independent audit is consistent with standard financial practice and both reasonable and prudent, especially in light of other evidence of substantial under-reporting throughout the industry.

Nor did TSA act unreasonably in declining to audit each carrier itself. TSA does have the statutory power to audit the carriers's financial records and to determine the validity of their cost reports first-hand. *See* 49 U.S.C. 44940(e) (4). It concluded, however, that it lacked the resources to conduct an audit of every carrier subject to the fee. *See, e.g.*, *Air New Zealand Decision,* AR. 263 at 1, JA 1870. Petitioners err in challenging this discretionary determination. It is well settled that decisions as to whether to dedicate enforcement resources to a particular matter are committed to the agency's discretion and thus are not subject to judicial review. *Heckler v. Chaney,* 470 U.S. 821, 831-32 (1985). Moreover, even if TSA's decision against conducting its own

ADDENDUM 44

audits were reviewable, it was by no means arbitrary for TSA to decide against committing substantial agency resources to complete audits that agency regulations required petitioners to provide themselves.

Finally, TSA was not obligated to adjust its cost estimates to account for asserted differences in each petitioners' screening cost per passenger. Petitioners maintain that differences in the carriers' resources, business practices, and daily operations yielded substantial differences in their respective screening costs per passenger. They argue that TSA's use of an industry-wide average cost per passenger unfairly obscures these cost savings and overcharges the more efficient carriers.

In the absence of reliable data on a carrier's screening costs, however, this contention is more speculation than fact. As TSA reasoned in rejecting Southwest's position on this issue, absent reliable data, TSA had no way of determining whether a carrier's cost-savings in other areas of its business translated into lower cost screening services; nor did it have any way of determining the degree to which one carrier's costs were more or less than another's. *Southwest Decision,* AR. 32 at 4-5, JA 562-63.

Moreover, none of the carriers claiming to have incurred lower screening costs than their competitors were able to substantiate this contention with verified cost data. TSA found, for example, that although Frontier Airlines, like Southwest, argued that the low costs reported on its Appendix A submission reflected its superior efficiency, an audit by the Department of Homeland Security's Inspector General had found widespread under-reporting by Frontier. The IG thus found that Frontier's "airport stations did not consistently report screening costs," and that "invoices related to these [screening] expenses were not correctly identified in any of the air carrier's spreadsheets used to support reported Appendix A costs." *Frontier Decision,* AR. 85 at 2, JA 957.

Other assertedly low-cost carriers also failed to substantiate their claims. Air New Zealand, for example, claimed that the great majority of its screening costs had been shifted onto other carriers by the terms of a lease agreement. TSA, however, found that *none* of the airlines that were assertedly responsible for these screening costs had separately accounted for them on their Appendix A cost reports. *Air New Zealand Decision,* AR. 263 at 2, JA 1871. TSA explained that it would have considered Air New Zealand's contentions if supported by independent cost verification, but that no such verification had been provided. *Ibid.*

The claims of carriers based in the United Kingdom were similarly unsubstantiated. MyTravel, for example, asserted that its very low screening costs were easily verifiable because all such costs were included within an identifiable, passenger handling fee charged by a single airport handling nearly all its passenger traffic. TSA found, however, that while the total amount of the passenger handling fee could be determined, the carrier had failed to provide any means of verifying its assertions as to what proportion of that handling fee had been dedicated to screening services. *MyTravel Decision,* AR. 273 at 1-2, JA 1909-10. Monarch Airlines operated out of the same airport but admitted that it "is now unable, in 2006, to identify any of its Sanford [airport] bills to substantiate its Appendix 'A' " cost report. *Monarch Airlines Decision,* AR. 245 at 2, JA 1788. First Choice Airways made a similar claim. But it was likewise unable to verify what proportion of the Sanford Airport handling fee was dedicated to passenger screening. Nor could First Choice explain why it used the same per passenger figure to account for screening costs associated with flights originating out of a different airport. *First Choice Decision,* AR. 236 at 2-3, JA 1757-58.

On this record, TSA had ample basis for refusing to accept petitioners' claims to have incurred substantially lower screening costs than the rest of the industry. The industry had reported "actual" screening costs far, far below the "billion dollar a year" estimate it advanced in testimony before Congress, and both the GAO and the Department of Homeland Security's Inspector General concluded that the carriers' actual screening costs were, on an industry-wide basis, significantly under-reported. Against this backdrop, TSA had sound reason to regard with skepticism petitioners' insistence that, unlike their competitors, they had incurred screening costs well below the industry average.

TSA nonetheless made clear that it would accept petitioners' "low cost" claims if substantiated by an independent audit, and it relaxed the audit requirements to facilitate each carrier's ability to provide one. Petitioners failed to do so, however, and their attempts to support their low cost claims with other evidence cannot withstand scrutiny. Rather, a closer review of the record compiled by the putative low-cost carriers shows that invoices for screening services were unaccounted for, that screening costs

supposedly shifted to different carriers were not clearly claimed by any carrier, and that key assumptions used to distinguish screening costs from other costs were unexplained and apparently unexplainable.

By definition, an average captures the central tendency of the group, not the specific circumstances of every individual within the group. That, however, does not make TSA's decision to use average costs to approximate a specific carrier costs irrational. Measuring costs by using averages and estimates grounded in experience is a common and well-accepted financial practice, especially when reliable, individualized data is unavailable. Here, the average cost factor was derived from pertinent industry experience and reserved for instances where, in TSA's judgment, no reliable, carrier-specific information had been provided. Contrary to petitioners' contentions, that is a fair approximation of the costs incurred by petitioners and a reasonable exercise of TSA's broad discretion under 49 U.S.C. 44940(a) (2) (B) (iii) to determine an "appropriate measure" of the per carrier fee limit "in lieu of actual screening costs."

### C. TSA Reasonably Relied On GAO's Findings

Petitioners' assertion that TSA was arbitrary in relying on GAO's cost estimates is also without merit. As explained above, Congress directed GAO to undertake a detailed review of the calendar year 2000 cost information for screening passengers and property. P.L. 108-334, 118 Stat. 1303. The GAO completed its review in 2005. It estimated that carriers had actually incurred $448 million in screening costs, and that they had under-reported their costs by $129 million. *GAO Report,* AR. 1 at 14, JA 18. After indpendently reviewing GAO's findings, TSA used GAO's estimate of total industry costs to determine the industry's average screening cost per passenger, a key factor in setting fee assessments for carriers who, like petitioners, were unable to substantiate a claim to have incurred lower screening costs.

Petitioners, relying on their own expert, now argue that GAO's methods and analysis were critically flawed, that GAO's cost estimates are therefore erroneous, and that TSA acted arbitrarily in basing its fee assessments on GAO's findings. TSA's reliance on GAO's findings, however, is based on a thorough, reasoned evaluation of the competing expert testimony, and its decision to credit GAO's analysis and conclusions must therefore be accorded substantial deference on judicial review.

First, TSA had more than adequate reason to trust the experience, expertise, and impartiality of GAO's review. GAO is charged by statute with evaluating the programs and activities of the United States (*see* 31 U.S.C. 717) and, in its role as "congressional watchdog," has been performing accounting and auditing functions for the federal government since 1921. *See generally <http:// gao.gov/about/index.html>*. Congress specifically instructed GAO to undertake the review at issue here and left the GAO broad discretion to use any "methodology deemed appropriate by the Comptroller General." P.L. 108-334, 118 Stat. 1303. The mere fact that an expert selected by the industry disagrees with GAO's findings does not render TSA's preference for the considered judgments of the government's own highly-experienced expert irrational. *Cf. Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive").

Second, an independent assessment conducted by the Department of Homeland Security's Inspector General confirmed the thrust of GAO's conclusions. The Inspector General, exercising independent statutory authority, conducted an audit and detailed review of cost reports submitted by a large, medium, and small air carrier. *IG Audit,* AR. 4 at 16, JA 163. The IG found, among other irregularities, that "air carriers misidentified passenger and property screening invoices as non-screening invoices, did not include all applicable account codes having screening costs, or simply omitted appropriate costs which in turn kept those costs from being reported in the Appendix A." *Id.* at 20, JA 167. The IG concluded that, "Our report is consistent with GAO's findings and highlights similar concerns with the integrity and reliability of CY 2000 expenses reported by the air carriers in FY 2002." *Id.* at 2, JA 149.

Finally, TSA did not uncritically accept GAO's findings without considering the criticisms of the industry's expert. To the contrary, TSA undertook a point-by-point review of petitioners' various objections to GAO's sampling methodologies,

confidence intervals, treatment of ostensible data point outliers, and linear regression model. It concluded that GAO's findings were reliable and afforded an adequate basis for TSA's fee assessments. *See Southwest Decision,* AR. 32 at 5-10, JA 563-68.

TSA devoted considerable attention to the specific objections petitioners press in their brief to this Court. With respect to law enforcement costs, for example, TSA found that GAO had reasonably assumed that, where airports billed carriers directly for such services, all such services were properly attributable to aviation security, and that, where airports grouped law enforcement expenses with other costs, GAO had made a reasonable cost allocation assumption that "appears conservative" and that was "based on numerous interviews and informational meetings with key stakeholders, subject-matter experts, [and] former airline officials ***." *Id.* at 8, JA 566.

With respect to the costs carriers incurred in paying private screening contractors, TSA found that GAO had relied on a large sample size using data from the second through tenth largest screening contractors, and that GAO's approach was apt to be more reliable than the approach suggested by petitioners' expert. *Id*. at 7, JA 565. [11]

And with respect to other airport screening costs, TSA found that GAO had relied on a stratified sampling methodology drawing data from 19 of the 20 largest airports and 40 additional airports, and that data from each airport in the stratified sample was assigned a sampling weight permitting GAO reasonably to extrapolate the cost data to other airports. *Id*. at 9, JA 569.

Petitioners urge the Court to find that TSA should have credited petitioners' expert rather than the GAO. Such contentions, however, fundamentally misconstrue the role of the reviewing court and the deference that must be accorded an agency under the "arbitrary and capricious" standard of review. "Arbitrary and capricious" review is highly deferential. It does not empower the Court to substitute its judgment for that of the agency, nor does it place the questions at issue before the Court for *de novo* review. It instead requires that the agency's decision be sustained if the agency has considered the relevant factors and articulated a rational connection between the facts found and the choice made. *State Farm Mut. Ins. Co.,* 463 U.S. at 43. TSA's careful and considered review of petitioners' objections and the reliability of GAO's findings plainly satisfies these requirements and must therefore be affirmed.

### VI. TSA Employed Fair Decisionmaking Procedures That Comply With The Administrative Procedure Act And The Due Process Clause.

Petitioners contend that TSA violated requirements of procedural fairness by refusing to provide an oral hearing, by failing to provide an independent decisionmaker, and by failing to produce certain documents pertaining to the fee assessment. TSA, however, accorded petitioners direct notice of the initial fee determination, the right to appeal the initial determination to a higher level within the agency, and an extensive opportunity to present written briefing and documentary evidence in support of their position. These procedures afforded petitioners a full and fair opportunity to be heard and went considerably beyond the requirements of the APA and the Due Process Clause.

### A. The APA's Requirements For An Evidentiary Hearing Do Not Apply Absent A Statutory Requirement That The Agency's Determination Be Made After A Formal Hearing

Petitioners, citing 5 U.S.C. 554(d) and 557, contend that TSA's hearings violate the APA because the agency's decisionmaker consulted with subordinate officials responsible for making the initial fee assessment. Pet. Joint Br. at 62-64. This, petitioners argue, violates APA provisions requiring an agency adjudicator to refrain from "*ex parte*" contacts on a fact at issue, and to maintain a strict functional separation from other officials investigating or prosecuting the matter on review. *Ibid*. The case law, however, makes clear that the APA's formal hearing requirements cited by petitioners do not apply unless Congress has required the agency to make a decision after a hearing "on the record," or unless there is some other clear indication of a congressional intent to require the agency to comply with formal hearing procedures - requirements that are plainly absent from the Aviation and Transportation Security Act.

ADDENDUM 47

The Supreme Court addressed the applicability of the APA's formal hearing requirements in *United States v. Florida East Coast Ry. Co.,* 410 U.S. 224 (1973). There, the Interstate Commerce Commission conducted a rulemaking to resolve an issue concerning railroad freight charges. The ICC accorded the parties an opportunity to file written statements of fact and position on the disputed matter but denied them a right to an oral hearing. The aggrieved parties challenged these procedures, asserting that the ICC determination had not been issued in accordance with section 556 and 557 of the APA. The Supreme Court, however, held that these APA requirements apply only where the statute governing the substantive question requires that the agency's decision be made "on the record after opportunity for an agency hearing." *Id*. at 234-38.

Petitioners do not cite *Florida East Coast Railway*. They apparently believe that because TSA's determinations are the result of an "adjudication" rather than a rulemaking, *Florida East Coast Railway* is distinguishable and all of the APA's procedural requirements for a formal, on-the-record hearing apply. *See* Pet. Joint Br. at 63-64 & n. 128.

No such distinction, however, has been recognized by the case law. The Court has consistently held that adjudicatory or quasi-adjudicatory proceedings are not subject to the APA's formal hearing requirements unless Congress has either expressly specified that the agency's decision must be made after a hearing "on the record," or given some other, clear indication of a legislative intent to impose a formal hearing requirement. *See Gencom Inc. v. FCC,* 832 F.2d 171, 174 n.2 (D.C. Cir. 1987) (APA requirements for trial-like hearing apply only where statute requires decision after hearing "on the record"); *Izaak Walton League of America v. Marsh,* 655 F.2d 346, 361 (D.C. Cir. 1981) ("Under the APA, a formal adjudication is necessary under Sections 556 and 557 only when some statute requires a determination 'on the record after opportunity for an agency hearing.' 5 U.S.C. s 554 (1976)"), *cert. denied sub nom. Atchison, Topeka & Santa Fe Ry. v. Marsh,* 454 U.S. 1092 (1981); *New York State Dept. of Law v. FCC,* 984 F.2d 1209, 1218 (D.C. Cir. 1993) (section 554(c) of the APA applies only to agency adjudications that must be made after a hearing on the record); *but see U.S. Lines, Inc. v. Federal Maritime Commission,* 584 F.2d 519, 536 (D.C. Cir, 1978) ("While the exact phrase "on the record" is not an absolute prerequisite to application of the formal hearing requirements, the Supreme Court has made clear that these provisions do not apply unless Congress has clearly indicated that the "hearing" required by statute must be a trial-type hearing on the record"); *accord City of West Chicago, Ill. v. U.S. Nuclear Regulatory Comm'n,* 701 F.2d 632, 643-44 (7th Cir. 1983).

Nothing in the Aviation and Transportation Security Act purports to require fee determinations to be made after a formal administrative hearing. The statute does not impose any requirement that fee assessments or collection be made after an opportunity for a hearing "on the record." Nor does it otherwise suggest that a trial-like hearing is required. Indeed, the statute does not expressly impose any hearing requirement whatsoever. It instead provides that a fee may be established or modified merely upon publication of notice in the Federal Register. 49 U.S.C. 44940(d)(1) & (3). Petitioners' assertion that the additional requirements of section 554 and 557 of the APA nonetheless apply is thus meritless. And absent some statutory basis for imposing the APA's structural requirements for a formal hearing, their contention that the APA imposes limits on ex parte contacts or the functional independence of the decisionmaker is meritless as well. *See, e.g.*, *District No. 1, Pacific Coast Dist., Marine Engineers' Beneficial Ass'n v. Maritime Admin.,* 215 F.3d 37, 43 (D.C. Cir. 2000) (APA limits on *ex parte* contacts only apply to adjudications or rulemakings that must be conducted "on the record"); *Marketing Assistance Program, Inc. v. Bergland,* 562 F.2d 1305, 1308-09 (D.C. Cir. 1977) (APA provisions requiring separation of decisionmaking and investigative functions apply only to proceedings that must be ??

Note: Page 73 missing in original document.

?? similar. Rather, according to petitioners' assertions, the challenged "*ex parte*" contacts merely involve staff analyses of carriers' administrative appeals and recommendations as to an appropriate agency decision on the legal issues presented. *Carr Affidavit,* AR. 29, Exh. 1, ¶¶ 5-9, JA. 553. Such staff analyses do not entail the presentation of new or "secret" evidence. Nor do they impair a party's meaningful opportunity to address the matters to be considered by the decisionmaker. They instead serve to aid the decisionmaker in analyzing and addressing evidence and argument that is already a matter of public record. That is not an "*ex parte* contact" in the first instance. *Cf. United States v. Morgan,* 313 U.S. 409, 421-22 (1941) (reviewing

ADDENDUM 48

court may not probe the mind of an administrative decisionmaker by exploring reasons for rejecting staff recommendation); *Gottlieb v. Pena,* 41 F.3d 730, 737 (D.C. Cir. 1994) (agency's failure to disclose staff's recommended decision so as to permit party's review and comment does not violate due process).

Nor is it unconstitutional *per se* for agency officials who participated in the initial determination of a claim to participate in the agency's adjudication of an administrative appeal. The Supreme Court rejected this contention in *Withrow v. Larkin,* 421 U.S. 35 (1975). There, the Court found that:

It is not surprising, therefore, to find that '(t)he case law, both federal and state, generally rejects the idea that the combination (of) judging (and) investigating functions is a denial of due process. ...' Similarly, our cases, although they reflect the substance of the problem, offer no support for the bald proposition applied in this case by the District Court that agency members who participate in an investigation are disqualified from adjudicating.

*Id*. at 52 (internal citation omitted); *see also FTC v. Cement Institute,* 333 U.S. 683 (1948); Pierce, 2 *Administrative Law Treatise,* §9.9 at pp. 685-91 (4th ed. 2002).

Second, petitioners err in asserting that due process requires an oral hearing. Due process does not require any one set of procedural protections. It is rather a flexible concept that should be adapted to the circumstances of the case. *Morrisey v. Brewer,* 408 U.S. 471, 481 (1972). The precedent thus makes clear that an oral hearing is not required in all circumstances, and that a "paper" hearing limited to consideration of documentary evidence and written argument may afford a constitutionally sufficient opportunity to be heard. *See, e.g., C.N.G. Transmission Corp. v. FERC,* 40 F.3d 1289, 1294-95 (D.C. Cir. 1994); *Holy Land Found. for Relief and Dev't v. Ashcroft,* 333 F.3d 156, 164 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 1218 (2004).

Citing the standards established by *Mathews v. Eldridge,* 424 U.S. 319 (1976), for determining what process is constitutionally "due," petitioners argue that there are issues of credibility, veracity, and bias that can only be effectively resolved through an oral hearing. Pet. Joint Br. at 65-66. The *Mathews* factors, however, which require consideration of the risk or error under current procedures, the value of additional procedures, and the fiscal and administrative burdens that additional procedures would impose on the agency (*see id*. at 335), weigh against imposing an oral hearing requirement.

There is little risk of erroneous deprivation under the procedures employed by TSA, and little additional value to be derived from an oral hearing. As TSA reasoned, the issues in the case do not turn on any issue of individual credibility or veracity. *Southwest Decision,* AR. 32 at 11, JA 569. They instead depend on questions of statutory construction, the validity of GAO's sampling and statistical methods, and the accuracy of the carriers' reported cost information. Such matters can be and were fully explored with the benefit of documentary evidence and written argument. [12]

Moreover, petitioners' demand for an oral hearing would greatly multiply the fiscal and administrative burdens imposed on TSA. Petitioners make clear that they wish to examine and cross-examine agency employees and officials, employees and officials of the GAO, and employees of the GAO's contractors. Pet. Joint Br. at 66. As TSA concluded, the time and resources that the agency would be required to devote to such hearings would add significant additional administrative burdens, without measurably enhancing the accuracy or fairness of the decisionmaking process. *Southwest Decision,* AR. 32 at 11, JA 569. For all these reasons, petitioners err in asserting that due process requires an oral hearing.

Finally, petitioners' contention that they were denied an opportunity to present information crucial to their claims is at odds with the record. Petitioners had access to the GAO report documenting industry-wide under-reporting as well as to the report's Appendix I, which sets forth a detailed explanation of GAO's methods for gathering, sampling, and analyzing data. *GAO Report,* AR. 1, JA 1-31. They also had access to the report of GAO's principal contractor, Simat, Helliensen & Eichner, Inc., which further describes, the scope and methodology of GAO's review. *S.H.& E. Report,* AR. 2, JA 33-143. In addition, petitioners were free to develop and submit for TSA's consideration their own expert reports. They were thus free to submit expert analysis of the GAO's methods as well as alternative, expert assessments of their own screening costs in calendar year 2000. *See, e.g.,*

ADDENDUM 49

*Campbell Decl.,* AR. 28.o, JA 397-414. Given that the data in question concerns petitioners' own costs and business practices, the available records and information afforded petitioners a more than sufficient opportunity to contest TSA's decision. *C.f. Cable & Wireless P.L.C. v. FCC,* 166 F.3d 1224, 1234 (D.C. Cir. 1999) (wireless carriers had access to information on their own switching costs and therefore had adequate opportunity to challenge agency's cost assumptions). Petitioners, in sum, had sufficient information and adequate opportunity to contest TSA's initial fee determinations. TSA's decisions therefore satisfy due process requirements.

### VII. The Individual Carrier Claims Are Meritless.

### A. American Airlines Has Not Complied With Statutory And Regulatory Requirements For Presenting A Contract Claim Against TSA.

In its individual brief, American Airlines asserts that TSA owes it $13.9 million under an agreement pertaining to the design and installation of an inline baggage security system, and that this amount must therefore be offset against any user fees American owes the government. TSA declined to consider American's contract claim in the context of these fee assessment appeals, reasoning that the contract claim must first be resolved in a separate contract dispute proceeding before an offset may be considered. *American Decision,* AR. 42 at 9, JA 637. American now asserts that TSA erred in refusing to recognize its asserted common law right of offset. American Airlines Br. at 5-6.

American, however, cannot advance this claim without first complying with statutory requirements for asserting a contract claim against TSA. TSA's authorizing statute provides that contracts pertaining to the acquisition of equipment and other matters are to be administered under the "acquisition management system" established by the FAA pursuant to 49 U.S.C. 40110. 49 U.S.C. 114(o). [13] That statute in turn generally provides that a contract dispute "shall be adjudicated" by the FAA's Office of Dispute Resolution. 49 U.S.C. 40110(d) (4). Implementing regulations specify a set of administrative procedures for presenting the dispute to a contracting officer and administrative adjudicative office. 14 C.F.R. 17.23-17.39. The regulations further provide that judicial review of the contract dispute may be sought only after these administrative remedies are exhausted. 14 C.F.R. 17.43. American has failed to invoke let alone exhaust these procedures. TSA was therefore correct in holding that the contract claim was not properly before it.

Nor are the merits of the claim properly before this Court. American cannot press the contract claim in this Court without first complying with statutory procedures governing judicial review of a contract claim against the agency. Those procedures make judicial review contingent on presenting the contract claim through the agency's contract dispute resolution procedures and obtaining a final administrative decision. As American failed to exhaust these administrative procedures, there is no "final" order on the contract claim permitting judicial review under 49 U.S.C. 46110. *Cf. City of Dania Beach v. FAA,* 485 F.3d 1181, 1187-88 (D.C. Cir. 2007) ("final" order must mark the consummation of the agency's decisionmaking process, and must determine rights or obligations or give rise to legal consequences).

American discusses none of these statutory requirements. It instead asserts that, because debtors generally have a common law right of offset against creditors, it may assert an offset claim against TSA without complying with the statutory and regulatory requirements for resolving a contract dispute with the agency. There is no authority for this proposition. None of the cases cited by American purports to hold that the common law right of offset trumps the obligation to comply with statutory and legal requirements for asserting a contract claim against the federal government. To the contrary, the pertinent case law holds that compliance with exhaustion requirements is not excused merely because the claim is asserted by way of offset or counterclaim. *See, e.g., Resolution Trust Corp. v. Schroeder,* 86 F.3d 114, 117 n.3 (8th Cir. 1996); *United States v. Bisson,* 839 F.2d 418, 420 (8th Cir. 1988); *see generally* Wright, Miller & Kane, 6 *Federal Practice and Procedure,* § 1427 (2007 Westlaw ed.). Moreover, even if TSA could have entertained the contract claim, American presented no evidence reasonably supporting its contentions and makes no record-based substantive argument to this Court as to why it should prevail on the merits. American's contract claims are thus not subject to the Court's review.

**B. Northwest Airlines' Fees Were Properly Based On The Federal Cost of Providing Civil Aviation Security Services.**

Northwest argues that its user fees must be reduced to account for security costs that were not assumed by the federal government. TSA rejected this contention, finding that, even assuming, for purposes of argument, that Northwest continued to incur security costs, the statute does not provide for any reduction in user fees to account for residual security costs that are still borne by a carrier. *Northwest Decision,* AR. 200 at 7, JA 1620.

TSA's construction of the statute is correct. TSA, subject to the per carrier and overall carrier fee limits discussed above, is authorized to impose a user fee equal to the difference between the costs of providing "civil aviation security services" and the fees collected from passengers. 49 U.S.C. 44940(a) (1) & concluded, however, that Spirit's audit addressed only the process for remitting fees to the agency without verifying the carrier's claimed security costs, and that the audit therefore did not comply with regulatory requirements. *Spirit Decision,* AR. 252 at 2, JA 1824. It is reasonable for TSA to require independent verification of a carrier's claimed costs, and the agency's interpretation of its regulations and interpretive guidance as imposing this requirement is controlling unless patently erroneous. *See Thomas Jefferson University v. Shalala,* 512 U.S. 504, 512 (1994). TSA therefore correctly imposed additional fee liability on Spirit.

## CONCLUSION

TSA's decisions should be affirmed.

**Appendix not available.**

## Footnotes

\*     Authorities chiefly relied upon are marked with an asterisk.

1     Pertinent statutes and regulations are reprinted in the addendum to this brief.

2     Issues unique to specific carriers and raised in the individual briefs submitted by American Airlines, Northwest Airlines, and Spirit Airlines are identified and discussed in Part VII of the argument section of our brief. *See* pp. 78-83, *infra.*

3     TSA was initially established within the Department of Transportation. 49 U.S.C. 114(a). The agency and the functions relevant here were subsequently transferred to the Department of Homeland Security. 6 U.S.C. 203(2).

4     The statutory reference to the "Under Secretary" refers to the official who headed TSA when the agency was under the Department of Transportation, before its transfer to the Department of Homeland Security. Such references should now be construed, depending on the context, to the Administrator of TSA or the Secretary of Homeland Security. *See* 6 U.S.C. 557.

5     49 U.S.C. 44940(d)(1) exempts rules implementing an air carrier fee from the "notice and comment" procedures of 5 U.S.C. 553 of the APA. TSA nonetheless published the rules on an "interim final" basis and announced that it would afford an opportunity for public comment. 67 Fed. Reg. 7926 (2002).

6     TSA generally relied on the same rationale when making decisions on issues common to all the petitioners. For ease of reference, we will henceforth cite only to the administrative determinations concerning Southwest Airlines unless discussing an issue that is either unique to a particular carrier or otherwise unaddressed in the Southwest decision.

ADDENDUM 51

7   TSA made this downward adjustment to ensure that the sum of additional assessments did not exceed the total, $104 million underpayment.

8   Petitioners may argue that they did not receive notice of the subsequent increase in assessments through publication in the Federal Register, and that the additional assessments therefore violate the Federal Register notice requirement of 49 U.S.C. 44940(d) (3). Each individual petitioner, however, received actual written notice of the increased assessment. *See, e.g.*, *Southwest Initial Decision,* AR. 24, JA 273-80. It is well-settled that actual notice is a sufficient substitute for publication in the Federal Register. *See NMA v. MSHA,* 512 F.3d 696, 699 (D.C. Cir. 2008); *see also* 5 U.S.C. 553(b) (Federal Register notice of proposed rule making unnecessary where affected party has actual notice); 5 U.S.C. 706 (requiring reviewing court to take due account of the rule or prejudicial error).

9   Moreover, the carriers' assertion that P.L. 108-334 makes TSA's authority to set fees contingent on a prior determination by the GAO would, if accepted, raise a substantial question as to the statute's constitutionality. The GAO is not an agency of the Executive Branch [*see* 31 U.S.C. 702(a)] and, under the separation of powers principles set forth in *Bowsher v. Synar,* 478 U.S. 716, 729-34 (1986), Congress may not assign executive functions to the Comptroller General or other officials subject to congressional control. The carriers nonetheless assert that under P.L. 108-334, it is the Comptroller General who must determine, before TSA may act, whether an individual carrier has paid the appropriate fee under the statute or should instead be subject to further assessment under the Aviation and Transportation Security Act. This is arguably an executive function that Congress has previously vested in TSA. A statutory interpretation assigning such functions to the GAO would raise significant constitutional concerns and should be avoided unless such a construction is plainly contrary to congressional intent. *See Public Citizen v. U.S. Dept. of Justice,* 491 U.S. 440, 465-66 (1989).

10  Though Congress thus mandated that TSA collect underpayments with respect to 2005, the agency previously had discretionary authority to do so. In particular, TSA's final resolution of the amounts due on the government's fee assessment for a given fiscal year is an "adjudication," not a rulemaking, a point petitioners have conceded. Pet. Joint Br. at 64 n. 128; *see also Attorney General's Manual on the Administrative Procedure Act* pp. 14-16 (Dept. of Justice 1947) (noting that a determination of claims for money is an "adjudication" for purposes of the APA). Unlike rulemakings, and contrary to the contentions of Northwest Airlines (*see* Northwest Br. at 8), an agency may, through adjudication, determine how an existing law applies to past events, correct an error in the prior application of existing law, or formulate a new rule of law to be applied to completed events without running afoul of retroactivity principles. *See Bowen v. Georgetown University Hospital,* 488 U.S. 204, 219-224 (Scalia, J., concurring); *SEC v. Chenery,* 332 U.S. 194 (1947); *Verizon Telephone Companies v. FCC,* 269 F.3d 1098, 1108-09 (D.C. Cir. 2001).

11  The ten screening contractors initially selected by GAO accounted for approximately 84-93% of the entire market. *SH& E Report,* AR. 2 at 39, JA 72. GAO was forced to exclude the largest company because gaps in the company's data rendered it unsuitable for analysis. *GAO Report,* AR. 1 at 9, JA 13. The remaining nine companies, however, still accounted for approximately 62% of the market. *Id.* at 19, JA 23.

12  The cases cited by petitioner in support of an oral hearing requirement are not to the contrary. The Court required oral hearings in *Gray Panthers v. Schweiker,* 652 F.2d 146 (D.C. Cir. 1980) because it concluded that the affected parties - elderly and disabled Medicare beneficiaries who may have had limited ability to digest or prepare complex written material - could not adequately present their case if limited to a written hearing. It is unlikely that the extensively represented petitioners suffer from a similar infirmity. *Reeve Aleutian Airways, Inc. v. United States,* 982 F.2d 594 (D.C. Cir. 1993), is also inapposite. It holds only that a party must have an adequate opportunity to rebut adverse evidence through oral or written submissions; it does not hold that oral hearings are required in every such circumstance. *See id.* at 601 and cases cited therein.

13  Congress recently amended statutory provisions governing administration of TSA contracts. The amendments, however, will not take effect until June 2008. *See* P.L. 110-161, § 568, 121 Star. 1844 (Dec. 26, 2007).

ADDENDUM 52

**End of Document**                                           © 2024 Thomson Reuters. No claim to original U.S. Government Works.

ADDENDUM 53

# EXHIBIT E

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

**[CASE BEING CONSIDERED FOR TREATMENT PURSUANT TO RULE 34(j) OF THE COURT'S RULES]**

**No. 17-1116**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————

NICHOLAS J. BONACCI,

Petitioner,

v.

TRANSPORTATION SECURITY ADMINISTRATION,

Respondent.

———————

On Petition for Review of Orders of the Transportation Security Administration

———————

**PUBLIC REDACTED BRIEF FOR RESPONDENT**

———————

CHAD A. READLER
  *Acting Assistant Attorney General*

JESSIE K. LIU
  *United States Attorney*

SHARON SWINGLE
MICHAEL SHIH
  *Attorneys, Appellate Staff
  Civil Division, Room 7268
  U.S. Department of Justice
  950 Pennsylvania Avenue NW
  Washington, DC 20530
  (202) 353-6880*

---

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

### A.    Parties and Amici

Petitioner is Nicholas J. Bonacci.  Respondent is the Transportation Security Administration (TSA).  There are no amici.

### B.    Orders Under Review

Plaintiff-Appellant seeks review of two orders that relate to TSA's procedures for expediting the screening of pilots and flight attendants.  *See infra* pp. 4-10.

### C.    Related Cases

This case has not previously been before this Court.

> /s/ *Michael Shih*
> MICHAEL SHIH

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

## TABLE OF CONTENTS

**Page**

GLOSSARY

STATEMENT OF JURISDICTION ................................................................ 1

STATEMENT OF THE ISSUES ................................................................. 2

PERTINENT STATUTES ......................................................................... 2

STATEMENT OF THE CASE ................................................................... 3

I.      Statutory Background.................................................................... 3

II.     Regulatory Background................................................................ 3

        A.      The Known Crewmember Program ............................................. 4

        B.      The Universal Pat-Down Procedure............................................. 8

        C.      Factual Background.................................................................. 10

III.    Prior Proceedings........................................................................ 11

SUMMARY OF ARGUMENT ................................................................. 11

STANDARD OF REVIEW...................................................................... 13

ARGUMENT ....................................................................................... 14

I.      Petitioner's Challenge to the Random-Screening Component of the
        Known Crewmember Program Lacks Merit. ...................................... 14

        A.      Petitioner's challenge is untimely.............................................. 14

        B.      Petitioner lacks standing. ........................................................ 15

        C.      The Known Crewmember Program does not violate the APA. ............. 18

ii

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

II.     Petitioner's Challenge to the Universal Pat-Down Procedure Lacks
        Merit. ................................................................................................... 25

        A.     Petitioner lacks standing. ........................................................... 25

        B.     The universal pat-down procedure does not violate the APA. ............... 26

CONCLUSION ................................................................................................ 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

iii

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

## TABLE OF AUTHORITIES

**Cases:**                                                                      **Page(s)**

*American Hosp. Ass'n v. Bowen,*
   834 F.2d 1037 (D.C. Cir. 1987)................................................................21, 27

*\*Avia Dynamics, Inc. v. FAA,*
   641 F.3d 515 (D.C. Cir. 2011).................................................................14, 15

*Cassidy v. Chertoff,*
   471 F.3d 67 (2d Cir. 2006)............................................................................24

*Chamber of Commerce of U.S. v. U.S. Dep't of Labor,*
   174 F.3d 206 (D.C. Cir. 1999)......................................................................28

*Clapper v. Amnesty Int'l USA,*
   133 S. Ct. 1138 (2013) ..................................................................................16

*Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,*
   653 F.3d 1 (D.C. Cir. 2011) .............................................. 8, 18, 22, 27, 28

*Illinois Dep't of Transp. v. Hinson,*
   122 F.3d 370 (7th Cir. 1997) ........................................................................16

*International Bhd. of Teamsters v. TSA,*
   429 F.3d 1130 (D.C. Cir. 2005)....................................................................15

*James V. Hurson Assocs. v. Glickman,*
   229 F.3d 277 (D.C. Cir. 2000)......................................................................27

*JEM Broad. Co. v. FCC,*
   22 F.3d 320 (D.C. Cir. 1994)........................................................................22

*\*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .................................................................................16, 17

---

\*  Authorities upon which we chiefly rely are marked with asterisks.

iv

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

*MacWade v. Kelly*,
　460 F.3d 260 (2d Cir. 2006) ................................................................ 24

*Mendoza v. Perez*,
　754 F.3d 1002 (D.C. Cir. 2014) ........................................................... 17

*Mobil Oil Expl. & Producing Se. Inc. v. United Distribution Cos.*,
　498 U.S. 211 (1991) ............................................................................ 24

*Redfern v. Napolitano*,
　727 F.3d 77 (1st Cir. 2013) ................................................................. 22

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
　549 U.S. 422 (2007) ............................................................................ 15

*Steel Co. v. Citizens for a Better Env't*,
　523 U.S. 83 (1998) .............................................................................. 17

*Summers v. Earth Island Inst.*,
　555 U.S. 488 (2009) ............................................................................ 17

*United States v. Marquez*,
　410 F.3d 612 (9th Cir. 2005) .............................................................. 24

*Wallaesa v. FAA*,
　824 F.3d 1071 (D.C. Cir.),
　*cert. denied*, 137 S. Ct. 389 (2016) .................................................... 14

**Statutes:**

Administrative Procedure Act:

　5 U.S.C. § 553(b)(A) ............................................................................ 21
　5 U.S.C. § 706(2)(A) ......................................................................... 13, 14

v

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

FAA Extension, Safety, and Security Act of 2016,
Pub. L. No. 114-190, 130 Stat. 615 (2016) ................................................... 24
49 U.S.C. § 44901(a) ........................................................................... 3, 19
49 U.S.C. § 44903(b) ...................................................................... 3, 12, 19, 20

6 U.S.C. § 203(2) ................................................................................... 1

6 U.S.C. § 551(d) .................................................................................. 1

6 U.S.C. § 552(d) .................................................................................. 1

6 U.S.C. § 557 ..................................................................................... 1

49 U.S.C. § 114(d) ................................................................................. 3

49 U.S.C. § 114(f)(3) ............................................................................. 20

49 U.S.C. § 114(f)(11) ..................................................................... 3, 12, 19

49 U.S.C. § 114(f)(15) ..................................................................... 3, 12, 19

49 U.S.C. § 114(*l*) ................................................................................ 3

49 U.S.C. § 40113(a) .............................................................................. 3

49 U.S.C. § 44904(a) .............................................................................. 3

49 U.S.C. § 44904(e) .............................................................................. 3

49 U.S.C. § 46110 ..................................................................... 1, 11, 14, 16

49 U.S.C. § 46110(a) ............................................................................. 1, 2

49 U.S.C. § 46110(c) ............................................................................. 13

**Regulation:**

49 C.F.R. § 1540.105(a)(2) ................................................................... 18, 20

vi

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

**Legislative Material:**

147 Cong. Rec. S11973 (daily ed. Nov. 16, 2001) ............................................................ 20

**Other Authorities:**

Air Line Pilots Ass'n, *Known Crewmember Fact Sheet*,
   http://www3.alpa.org/portals/alpa/misc/Known
   -Crewmember-Fact-Sheet.pdf (file created Aug. 3, 2011)
   (last visited Jan. 31, 2018) ...................................................................4, 5, 15

Air Line Pilots Ass'n, *Known Crewmember Program FAQ*,
   http://www.knowncrewmember.org/
   Pages/FAQ.aspx (last visited Jan. 31, 2018) ...................................................6, 7, 18, 22

TSA, *Security Screening:  Pat-Down Screening*,
   https://www.tsa.gov/travel/security-screening
   (last visited Jan. 31, 2018) ...................................................................... 8

73 Fed. Reg. 64,018 (Oct. 28, 2008)...........................................................................20, 21

81 Fed. Reg. 11,364 (Mar. 3, 2016)...........................................................................8, 22, 26

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

## GLOSSARY

| | |
|---|---|
| AIT | Advanced Imaging Technology |
| APA | Administrative Procedure Act |
| TSA | Transportation Security Administration |

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

## STATEMENT OF JURISDICTION

On April 11, 2017, petitioner Nicholas J. Bonacci filed this petition for review under 49 U.S.C. § 46110. That statute permits a person "disclosing a substantial interest" in an order issued by the Transportation Security Administration (TSA) to obtain judicial review of that order in the courts of appeals.[1] *Id.* § 46110(a). Such a petition "must be filed not later than 60 days after the order is issued." *Id.* This petition challenges two orders that modify TSA's procedures for expediting the screening of pilots and flight attendants. TSA implemented the first order in 2011. TSA made the second order public in March 2017.

As explained in greater detail below, this Court lacks jurisdiction over both of petitioner's challenges. Petitioner's challenge to the first order is untimely because he petitioned for review well after the sixty-day period established by statute. Petitioner also lacks standing to bring the challenge and, for the same reasons, has failed to allege facts "disclosing a substantial interest" in the challenged order as required to satisfy the statutory prerequisite for a petition for review under § 46110(a). Petitioner's challenge to the second order is timely. Nonetheless, petitioner lacks

---

[1] Section 46110 applies to certain orders issued by "the Under Secretary of Transportation for Security." 49 U.S.C. § 46110(a). When TSA was created, Congress appointed the Under Secretary of Transportation for Security as the head of TSA. *Id.* § 114(b)(1). In 2002, Congress transferred the functions of TSA and of the Under Secretary to the Department of Homeland Security. 6 U.S.C. §§ 203(2), 551(d). Statutory references to the Under Secretary are thus deemed to refer to TSA and to its Administrator. *See id.* §§ 552(d), 557.

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

ADDENDUM 64

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

standing for purposes of Article III, and lacks a "substantial interest" in the challenged order as required by § 46110(a).

## STATEMENT OF THE ISSUES

This petition for review concerns two TSA orders.  The first order pertains to TSA's Known Crewmember Program, which establishes expedited screening procedures for pilots and flight attendants who meet certain requirements.  The petition challenges TSA's longstanding policy of randomly selecting a small percentage of participants in that program for additional security screening.  The questions presented are (1) whether the petition for review is timely; (2) whether petitioner has standing to challenge the random-selection procedure; and (3) whether the random-selection procedure violates the Administrative Procedure Act (APA).

The second order modifies the pat-down procedures used to screen individuals seeking entrance to an airport's sterile area through a security checkpoint.  The questions presented are (1) whether petitioner, who does not allege that he has ever received a pat-down under the modified procedures, has standing to challenge them; and (2) whether the modified procedures violate the APA.

## PERTINENT STATUTES

Pertinent statutes are reproduced in the addendum to this brief.

2

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

## STATEMENT OF THE CASE

### I.  Statutory Background

Congress vests responsibility for civil aviation security in the TSA Administrator.  49 U.S.C. § 114(d).  The Administrator must "assess current and potential threats to the domestic air transportation system" and take action to protect against those threats.  *Id.* § 44903(b); *id.* § 44904(a), (e).  To execute those responsibilities, Congress gave the Administrator broad authority to "oversee the implementation, and ensure the adequacy, of security measures at airports and other transportation facilities," and to "exercise such other powers, relating to transportation security as the [Administrator] considers appropriate, to the extent authorized by law."  *Id.* § 114(f)(11), (15).  The Administrator may implement these security measures through regulations.  *Id.* §§ 114(*l*); 40113(a); 44903(b).  In addition, Congress directed TSA to screen "all passengers and property . . . that will be carried aboard a passenger aircraft," *id.* § 44901(a), and to protect "passengers and property on an aircraft . . . against an act of criminal violence or aircraft piracy," *id.* § 44903(b).

### II.  Regulatory Background

This petition for review implicates two orders that relate to TSA's procedures for expediting the screening of pilots and flight attendants.

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

A.    The Known Crewmember Program

The first challenged order concerns TSA's longstanding procedure for randomly selecting certain pilots and flight attendants for additional security screening under the Known Crewmember Program.

The Known Crewmember Program dates back to 2010, when TSA determined, consistent with its risk-based approach to security, that pilots could be screened differently from ordinary passengers without presenting an unreasonable security risk. TSA therefore exempted pilots from new screening procedures introduced for use at security checkpoints. SA3.[2] At around the same time, TSA began designing a program that would allow for expedited screening of pilots who presented adequate identification. SA1-2. TSA's press release announcing this initiative made clear that "[f]light deck crewmembers who utilize this program will . . . be subject to random screening and other layers of security." SA2. This initiative became the Known Crewmember Program.

In 2011, TSA began implementing the Known Crewmember Program in selected airports. The program established an "alternative form of screening to the traditional checkpoint model." *See* Air Line Pilots Ass'n, *Known Crewmember Fact Sheet* 1 ("*Fact Sheet*"), http://www3.alpa.org/portals/alpa/misc/Known-Crewmember-

---

[2] The abbreviation "SA" denotes the government's supplemental appendix.

4

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

Fact-Sheet.pdf (file created Aug. 3, 2011) (last visited Jan. 31, 2018).  Under this new model, TSA authorized airports to create "alternative access portal[s]" where pilots could verify their identity and employment status in a computer database.  *Id.* at 2.  Upon successful verification, pilots could "enter the sterile area of an airport" without undergoing further screening unless they were randomly selected to be "screened in the traditional checkpoint fashion."  *Id.*  TSA instructed participants to "[c]ooperate" with TSA agents if designated for random screening—"a normal feature of any alternative form of screening" that TSA incorporated into the program "for [pilots'] protection and to ensure the integrity of the system."  *Id.*  Although the precise procedures governing the random-screening component of the program constitute Sensitive Security Information and have been submitted *in camera* and *ex parte*, TSA's public statement made clear that program participants should expect to be randomly screened.

In TSA's judgment, random screening is necessary to counter the potential threat to security posed by the grant of privileged access to sterile areas.  "[A] passenger who had been thoroughly screened without error" at a checkpoint "could nonetheless become lethally dangerous with the help of an insider who covertly provides the passenger with a prohibited item once he enters the sterile area."  SA80.  The threat is not hypothetical.  In December 2014, TSA discovered that employees

5

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

had formed a gun-smuggling ring at the Atlanta International Airport.  SA60.  And in 2016, a terrorist detonated a bomb aboard Daallo Airlines Flight D3-159 that he obtained within the sterile area from someone dressed as an airport worker.  SA69-70.  Like passengers, pilots and flight attendants could, in the absence of a physical screening regime, "bring dangerous . . . item(s) into the sterile area, hand-off these items to conspirator(s) and bring down additional aircrafts."  SA19.

In 2012, TSA expanded the Known Crewmember Program to include flight attendants employed by U.S.-based airlines.  SA5.  The agency retained the random-screening requirement.  In a press release announcing the expansion, TSA reiterated that the agency "will always incorporate random and unpredictable security measures throughout the airport screening process."  SA13.

The Known Crewmember Program was in effect across seventy-four domestic airports in 2017, when this petition for review was filed.  SA137.  Apart from its increased scale, the current version of the program does not significantly differ from the program as initially implemented.  Participants must still verify their identity and employment status against a computer database, upon which they are allowed to "proceed into the sterile area[] with no other screening or inspection."  Air Line Pilots Ass'n, *Known Crewmember Program FAQ* ("*FAQ*"), http://www.knowncrewmember .org/Pages/FAQ.aspx (last visited Jan. 31, 2018).  In limited cases, a participant "may

6

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

be selected for random screening," which at certain airports may require the participant to be screened like any other individual attempting to access the sterile area through a security checkpoint. *Id.* TSA "may vary the percentage of random selection based upon [the agency's] operational need." *Id.*

The standard operating procedures governing screening vest some discretion over key features of the program—including the extent to which random screening is used—in the Federal Security Directors who manage TSA operations at any given airport. SA115. Under those procedures, each director may determine placement of her airport's Known Crewmember access point ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ *Id.* ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

SA118. The nature of such screening depends on the location of the Known Crewmember access point. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ SA119. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮. *Id.*

7

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

### B.    The Universal Pat-Down Procedure

The second order challenged by petitioner, which TSA issued in March 2017, modifies pat-down procedures used to screen any individual seeking entrance to an airport's sterile area through a security checkpoint.

TSA uses pat-down procedures to determine whether prohibited items or other threats to transportation security are concealed on the person.  However, not everyone will experience a pat-down at a security checkpoint.  Pat-downs are used: (1) to resolve alarms from primary screening; (2) as an alternative screening method for individuals who decline to undergo screening by scanners equipped with Advanced Imaging Technology (AIT);[3] (3) for enhanced screening; and (4) as a component of "random or unpredictable security measures."  *See* TSA, *Security Screening:  Pat-Down Screening*, https://www.tsa.gov/travel/security-screening (last visited Jan. 31, 2018).

A participant in the Known Crewmember Program will rarely be subject to a pat-down.  The participant must first be randomly selected for additional screening at a Known Crewmember Program access point proximate to a screening checkpoint.

---

[3] TSA uses AIT scanners as its primary screening method at certain security checkpoints.  81 Fed. Reg. 11364 (Mar. 3, 2016); *see Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1 (D.C. Cir. 2011).

8

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

One of the foregoing circumstances in which a pat-down is deployed must then occur.

Historically, TSA's pat-down procedures have varied in intensity and scope based on the need to respond to various threats to transportation security. Before 2017, TSA agents were trained in five pat-down techniques: the standard pat-down, the modified standard pat-down, the resolution pat-down, the AIT groin-alarm-resolution pat-down, and the enhanced selectee pat-down. SA111. The comprehensiveness of these techniques turned on factors such as whether the pat-down was needed to resolve an alarm from a primary-screening system; the nature of that alarm; and the severity of the risk posed by the passenger. *See id.*

A 2015 audit conducted by the Office of Inspector General within the Department of Homeland Security uncovered weaknesses in TSA's screening procedures.[4] *See* SA98. Specifically, the audit revealed that TSA's many pat-down procedures were less effective than desired due to the "cognitive burden" they imposed on TSA's checkpoint agents. *See* SA98, 111.

---

[4] The audit report is classified because it contains detailed accounts of the Inspector General's methods and findings. Should this Court wish to review the full report, TSA stands ready to provide it *ex parte* and under seal for the Court's *in camera* review.

9

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

TSA responded to this finding by modifying its pat-down procedures. In March 2017, TSA replaced several different procedures with a single streamlined procedure dubbed the "universal pat-down." SA98. TSA designed the universal pat-down to reduce the cognitive burden on TSA agents and to "improve overall on-body threat detection." *Id.* TSA observed a ▮▮▮ decrease in screening errors after testing the new procedure in the field. SA99.

The universal pat-down establishes a minimum floor for thoroughness that is higher than certain previous pat-down procedures. SA98. The salient difference is that the universal pat-down—unlike some of TSA's previous pat-down procedures—

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ *Id.*

Importantly, the order adopting the universal pat-down did not alter the circumstances under which a pat-down is administered to a passenger. The order means only that certain passengers who would have earlier received a pat-down less comprehensive than the universal pat-down will now receive the universal pat-down instead.

## C.    Factual Background

Petitioner Nicholas J. Bonacci has worked as an airline pilot for approximately thirty years. *See* Pet. 2. He is currently employed by an airline that participates in the

10

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

Known Crewmember Program. *Id.* Petitioner's flight crew is based out of the George Bush Intercontinental Airport in Houston, Texas. *Id.* at 11.

## III.    Prior Proceedings

On April 11, 2017, petitioner filed this petition for review under 49 U.S.C. § 46110. The petition challenges TSA's longstanding policy of randomly designating participants in the Known Crewmember Program for additional screening. Pet. 18. The petition also challenges TSA's adoption of the universal pat-down as applied to program participants randomly selected for additional screening using procedures in effect at security checkpoints. *Id.* Petitioner asked this Court to prevent TSA from implementing the challenged screening practices pending review. The Court denied petitioner's motion because he failed to satisfy "the stringent requirements for an injunction pending court review." *See* Sept. 28, 2017 Order.

## SUMMARY OF ARGUMENT

**1.** Petitioner's challenge to the random-selection component of the Known Crewmember Program fails at the threshold for two independent reasons. First, the claim is untimely because petitioner sought review well outside the sixty-day filing period established by 49 U.S.C. § 46110. Second, petitioner lacks Article III standing to challenge the random-screening policy because, as petitioner himself noted, he "is

11

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

not harmed, per se, by enhanced screening." Pet. 8; Mot. 8. And the only harms petitioner has identified are not constitutionally cognizable.

Petitioner's challenge fails on the merits as well. He principally contends that TSA cannot subject pilots and flight attendants to screening methods that TSA also applies to passengers. But this argument ignores TSA's broad authority to "ensure the adequacy[] of security measures at airports," 49 U.S.C. § 114(f)(11); to "prescribe regulations" protecting airline passengers from "act[s] of criminal violence or aircraft piracy," *id.* § 44903(b); and to "exercise such other powers[] relating to transportation security as [TSA] considers appropriate," *id.* § 114(f)(15). Each of these provisions is alone sufficient to authorize the challenged order. Nor was TSA required to promulgate the challenged order using notice-and-comment rulemaking. The order is a procedural rule designed to help TSA concentrate its limited resources on areas where the agency's attention is likely to prove most fruitful; it does not itself create any new substantive standards.

**2.** Petitioner's challenge to the universal pat-down should be rejected for similar reasons. Although the challenge is timely, petitioner still lacks standing to bring it. Petitioner does not claim that he was subject to such a pat-down in the past, and petitioner cannot reasonably claim that he faces a nonspeculative and imminent threat of being designated for pat-down screening in the future. Moreover, petitioner

12

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

has already conceded that enhanced screening does not harm him "per se."  Pet. 8;

Mot. 8.  The challenge should therefore be dismissed for want of subject-matter

jurisdiction.

Petitioner's merits arguments are also unavailing.  Here too, petitioner contends

that TSA lacks statutory authority to require pilots and flight attendants to undergo

the universal pat-down.  That argument lacks merit for the reasons given above.

Petitioner also contends that the universal pat-down should have been adopted

through notice-and-comment rulemaking.  But this order is also a procedural rule

embodying TSA's decision to simplify its officers' screening efforts.  Although the

universal pat-down will cause some passengers to receive a more comprehensive

pat-down than they would have under TSA's prior procedures, petitioner has at no

point argued that the differences between the old and new procedures implicate

privacy or health concerns in so significant a manner as to mandate

notice-and-comment rulemaking.

### STANDARD OF REVIEW

This Court's review of the challenged TSA orders is governed by 49 U.S.C.

§ 46110(c) and the Administrative Procedure Act, 5 U.S.C. § 706(2)(A).  TSA's

"[f]indings of fact . . . , if supported by substantial evidence, are conclusive."  49

U.S.C. § 46110(c).  Because § 46110(c) is silent about the standard of review for

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

nonfactual matters, the standard is supplied by the APA. *See Wallaesa v. FAA*, 824 F.3d 1071, 1077 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 389. The APA requires that agency action be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

## ARGUMENT

### I. Petitioner's Challenge to the Random-Screening Component of the Known Crewmember Program Lacks Merit.

Petitioner challenges (Br. 6) TSA's decision to randomly designate participants in the Known Crewmember Program for additional screening. This challenge fails at the threshold because it is untimely, and because petitioner lacks standing to bring it. And even if petitioner could overcome those impediments to review, he has failed to show that the challenged decision violates the APA.

### A. Petitioner's challenge is untimely.

A petition for review under 49 U.S.C. § 46110 must be filed "not later than 60 days after the [challenged] order is issued." "[T]he filing period begins to run on the date the order is officially made public." *Avia Dynamics, Inc. v. FAA*, 641 F.3d 515, 519 (D.C. Cir. 2011).

TSA has made clear since the inception of the Known Crewmember Program that participants could be randomly designated for additional screening. In 2011, the Air Line Pilots Association (which operates the program in partnership with TSA)

14

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

issued a fact sheet explaining that the program does not "mean that [participants] will never be screened in the traditional checkpoint fashion." *Fact Sheet* 2. To the contrary, participants "may be directed to passenger-screening lines as part of a random screening-selection process," which "is a normal feature of any alternative form of screening." *Id.* TSA again publicized this aspect of the program in 2012, when it announced that the agency—which had decided to expand the program to include flight attendants—"will always incorporate random and unpredictable security measures throughout the airport screening process." SA13.

Petitioner brought his challenge in April 2017, well past the sixty-day window for review. Petitioner's brief does not respond to this argument and does not articulate "reasonable grounds" for his untimely filing. *See Avia Dynamics*, 641 F.3d at 521. The petition for review should therefore be denied on this ground alone. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

**B.    Petitioner lacks standing.**

In the alternative, the petition should be dismissed because petitioner lacks Article III standing to challenge the random-screening policy. As the party invoking jurisdiction, petitioner bears the burden of proving his standing. *See International Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1133-34 (D.C. Cir. 2005). In particular, petitioner must show that the challenged order "inva[des]" a "legally protected interest which is

15

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (quotation marks, citations, and footnote omitted).  Although threatened injuries can satisfy the requirement of imminence, such threats must be "*certainly impending*"; "[a]llegations of *possible* future injury are not sufficient." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quotation marks omitted; alteration in original).

Petitioner has failed to clear this bar.  Petitioner asserts that, "on several occasions in 2017," he was randomly designated for additional screening at the George Bush Intercontinental Airport in Houston, where he is based.  Br. 3-4.  But petitioner has conceded that he "is not harmed, per se, by enhanced searching."  Pet. 8; Mot. 8.  This Court thus lacks jurisdiction over petitioner's claim.[5]

The injuries that petitioner does assert are not constitutionally cognizable.  He contends (Br. 4-5) that he has standing because TSA lacks statutory authority to require program participants to pass through a security checkpoint.  However, "vindication of the rule of law" is an "undifferentiated public interest" which "does

---

[5] Similarly, petitioner cannot satisfy the statutory predicate for a § 46110 petition, which requires a petitioner to allege facts "disclosing a substantial interest" in the TSA order he is challenging.  The term "substantial interest" encompasses the constitutional standing requirement derived from Article III.  *Illinois Dep't of Transp. v. Hinson*, 122 F.3d 370, 371-72 (7th Cir. 1997).  Petitioner's inability to meet Article III's injury-in-fact requirement means petitioner has also failed to "disclos[e] a substantial interest" in any order he lacks standing to challenge.

16

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

not suffice" to establish standing. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 106 (1998) (quotation marks omitted). For a plaintiff to "state an Article III case or controversy," he must do more than raise "a generally available grievance about government" that asserts "only harm to his and every citizen's interest in proper application of the Constitution and laws." *Lujan*, 504 U.S. at 573-74. Petitioner's assertion of unlawfulness is a generalized grievance that does not give rise to an injury-in-fact.

Petitioner also contends (Br. 4-5) that he has standing because TSA's order does not comply with the APA's procedural requirements. But this Court has explained that, "[w]hen [petitioners] challenge an action taken without required procedural safeguards, they must establish [that] the agency action threatens their concrete interest." *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014). The injury-in-fact requirement "is a hard floor of Article III jurisdiction that cannot be removed by statute." *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009). Because petitioner does not allege—and indeed has disclaimed—any concrete injury flowing from the instances in which he has been subject to additional screening, his asserted procedural harms do not support Article III standing either.

Finally, petitioner contends (Br. 4) that he has standing because he does not know how to comply with the random-screening component of the Known

17

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

Crewmember Program. But petitioner has failed to identify any harm that results from such uncertainty. There is no reasonable dispute that an individual attempting to enter the sterile area of an airport "is bound to comply with whatever screening procedure . . . TSA is using on the date he is to fly at the airport from which his flight departs." *Electronic Privacy Info. Ctr. (EPIC) v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011); *see* 49 C.F.R. § 1540.105(a)(2). To proceed into the sterile area, an individual must simply pick from, and adhere to, "the set of choices presented by the TSA when he arrives at the security checkpoint." *EPIC*, 653 F.3d at 7. TSA has publicly explained that Known Crewmember Program participants may be randomly designated for additional screening, which may require participants to pass through a security checkpoint. *See supra* pp. 6-7. The program's website describes this aspect of the program in detail. *See FAQ.* The only uncertainty is whether a participant will be allowed into the sterile area without screening or will be randomly selected for additional screening. Petitioner's inability to predict the category into which he would fall—and what set of procedures he would be required to follow—does not amount to a constitutionally cognizable injury.

C.  **The Known Crewmember Program does not violate the APA.**

Even if petitioner could overcome these threshold obstacles, the petition should be denied because petitioner's APA challenges lack merit.

18

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

**1.**  Petitioner's principal argument is that TSA lacks statutory and regulatory authority to require randomly selected Known Crewmember Program participants to undergo screening methods that also apply to passengers—which petitioner characterizes as "passenger screening."  Br. 6, 24-25.  This argument is belied by TSA's broad authority to "ensure the adequacy[] of security measures at airports" and to "exercise such other powers[] relating to transportation security as [TSA] considers appropriate."  49 U.S.C. § 114(f)(11), (15).  The argument also ignores TSA's power to "prescribe regulations" protecting airline passengers from "act[s] of criminal violence or aircraft piracy."  *Id.* § 44903(b).  Each of these statutory provisions supplies TSA with the requisite authority to issue the challenged order.

Petitioner has failed to identify any statute supporting his argument that TSA is prohibited from designating, at random, a percentage of participants in the Known Crewmember Program for additional screening.  Petitioner relies solely on 49 U.S.C. § 44901(a).  *See* Br. 24-25.  That provision instructs TSA to "provide for the screening of all passengers and property . . . that will be carried aboard a passenger aircraft," but does not expressly refer to pilots and flight attendants.  49 U.S.C. § 44901(a).  The provision does not prohibit TSA from exercising its broad regulatory authority, granted in other statutory provisions that § 44901(a) does not purport to repeal, to screen pilots and flight attendants using the same procedures that TSA applies to

19

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

passengers.[6]  *See, e.g., id.* § 114(f)(3) (requiring TSA's Administrator to "develop policies, strategies, and plans for dealing with threats to transportation security"); *id.* § 44903(b) (directing the TSA Administrator to "prescribe regulations to protect passengers and property").  Moreover, the legislative history cited by petitioner actually supports TSA.  *See* Br. 25 (citing 147 Cong. Rec. S11973, S11981 (daily ed. Nov. 16, 2001) (statement of Sen. Kohl)).  The quoted floor speech reaffirms Congress's desire to create "a new Federal and comprehensive safety network for our airports," in which "screening of passengers and their luggage" is just one of many "important" security measures.  *Id.*

Petitioner also cites (Br. 29-30) a final rule TSA issued to implement the Secure Flight Program.  Under that program, "TSA will receive passenger . . . information, conduct watch list matching against the . . . Federal government's consolidated terrorist watch list, and transmit a boarding pass printing result back to aircraft operators."  73 Fed. Reg. 64018, 64018 (Oct. 28, 2008).  The rule defined the term "passenger" to exclude "crew member[s]" listed "on the flight manifest" and "individual[s] with flight deck privileges . . . traveling on the flight deck."  *Id.* at 64062.

---

[6] Because petitioner cannot prevail even assuming that his reading of § 44901(a) is correct, this Court need not address petitioner's contention (Br. 26-28) that the term "passengers" in § 44901(a) must be interpreted to exclude pilots and flight attendants.

20

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

That definition, which applies only to the Secure Flight Program, *see id.*, is irrelevant to the screening procedures used by TSA to restrict access to the sterile areas of airports.

2.  Petitioner next argues (Br. 22, 32-33) that TSA violated the APA by providing for random additional screening of Known Crewmember Program participants without first undergoing notice-and-comment rulemaking.  Here, however, petitioner does not challenge the *method* of additional screening that TSA employs; indeed, petitioner has elsewhere admitted that he "is not harmed, per se, by enhanced searching."  Pet. 8; Mot. 8.  This aspect of his challenge is restricted solely to the use of random selection to identify program participants for additional screening.  This policy is a "rule[] of agency organization, procedure, or practice" that is exempt from the APA's notice-and-comment requirement.  *See* 5 U.S.C. § 553(b)(A).  Procedural rules include "enforcement plan[s]" designed to help agency employees "concentrate their limited resources on particular areas" where their attention "will prove most fruitful."  *See American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1050 (D.C. Cir. 1987).  The challenged policy reflects TSA's risk-based approach to screening, under which the agency focuses its resources on higher-risk populations while expediting the screening experience of lower-risk populations.  TSA created the Known Crewmember Program to allow low-risk populations such as pilots and crewmembers to pass through security checkpoints more efficiently.  TSA built

21

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

random screening into that program "as a check and balance" to ensure the program's integrity. *See FAQ.* Thus, the random-screening policy does not itself create any new substantive standards. *See JEM Broad. Co. v. FCC*, 22 F.3d 320, 326-28 (D.C. Cir. 1994).

Petitioner's reliance on *EPIC*, 653 F.3d 1, is misplaced. That case concerned TSA's decision to deploy two never-before-used models of AIT scanners without first undergoing notice-and-comment rulemaking. This Court characterized that decision as a substantive rule, not a procedural one, because its "substantive effect [was] sufficiently grave so that notice and comment are needed." *Id.* at 5 (quotation omitted). The scanners at issue "produc[ed] an image of [an] unclothed passenger" for a TSA agent to view. *Id.* at 4, 5-6.[7] "[F]ew if any regulatory procedures impose[d]" so "directly and significantly upon so many members of the public" by implicating "issues of privacy, safety, and efficacy." *Id.* at 6. By contrast, the random-screening component of the Known Crewmember Program applies in very limited circumstances and does not meaningfully affect program participants. Indeed, petitioner does not argue that the procedure modifies his checkpoint experience in

---

[7] Since 2013, all AIT scanners deployed by TSA have been equipped with software that eliminates such passenger-specific images. *See* 81 Fed. Reg. 11364, 11365 (Mar. 3, 2016). That shift also eliminated the "backscatter" AIT system that precipitated the health and safety concerns that animated the *EPIC* decision. *See, e.g.*, *Redfern v. Napolitano*, 727 F.3d 77, 80-82 (1st Cir. 2013).

22

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

any meaningful respect.  Petitioner's objection—to the allegedly "recondite and . . . *sub rosa*" way in which TSA adopted the random-screening procedure—is instead entirely procedural.  *See* Br. 33.  Thus, TSA's decision to provide for random screening of a small percentage of participants in the Known Crewmember Program was not a substantive rule for which notice-and-comment rulemaking was required.

**3.**  Petitioner argues in passing (Br. 4) that the challenged order is arbitrary and capricious because pilots and flight attendants are randomly selected for additional screening at security checkpoints while other airport employees are not.  As a factual matter, petitioner understates the extent to which such workers are subject to search.  TSA has given each Federal Security Director authority to conduct random screening of aircraft service personnel, airport personnel, concessionaires, vendors, and their equipment within the sterile area.  SA106-10.

SA94.  TSA has further recommended that airport operators "increase the number of" these inspections to answer the unique threats posed by insiders.  SA32.  Finally, Congress has directed TSA to reinforce existing procedures by "expand[ing] the use of transportation security officers . . . to conduct enhanced, random and unpredictable . . . inspections of airport workers" within the sterile area.

23

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

FAA Extension, Safety, and Security Act of 2016, Pub. L. No. 114-190, § 3407(b), 130 Stat. 615, 661 (2016).  TSA is working with airport operators, airline operators, and state authorities to implement this mandate.

In any event, petitioner's argument lacks merit.  "[A]n agency need not solve every problem before it in the same proceeding."  *See Mobil Oil Exploration & Producing Se. Inc. v. United Distribution Cos.*, 498 U.S. 211, 231 (1991).  Here, TSA reasonably concluded that a random-screening regime is required to protect airline travelers from the unique threat posed by insiders with privileged access to an airport's sterile area.  *See United States v. Marquez*, 410 F.3d 612, 617 (9th Cir. 2005) (explaining that random screening can "increase[] the deterrent effects of airport screening procedures").  The Court should decline petitioner's invitation to second-guess TSA's expert assessment of these risks and the appropriate response to them.  *See Cassidy v. Chertoff*, 471 F.3d 67, 84 (2d Cir. 2006); *MacWade v. Kelly*, 460 F.3d 260, 274-75 (2d Cir. 2006).

**4.**  Finally, petitioner appears to argue (Br. 19-20) that TSA's random-screening policy departs from two agency statements that, in his telling, disavow any intent to screen crew members like passengers.  The statements say nothing of the sort.  One is a 2010 letter that predates the Known Crewmember Program and indicates only that TSA had at that point decided to exempt certain eligible crewmembers from AIT screening.  *See* Pet. App. 26-27.  The letter expressly states that TSA "will continue to

24

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

examine" screening procedures for crew members "and make adjustments," *id.*—as TSA did when it created the Known Crewmember Program. The other is a press release, which also predates the program, announcing that TSA would not require pilots to undergo AIT screening. *See* Pet. App. 28-31. Neither is inconsistent with TSA's subsequent decision to allow the vast majority of pilots and flight attendants to enter an airport's sterile area by verifying their identity and employment status, while requiring a small minority to undergo additional screening.

## II. Petitioner's Challenge to the Universal Pat-Down Procedure Lacks Merit.

The petition for review separately challenges (Br. 1) TSA's order adopting the universal pat-down procedure. The challenge is timely because it was brought less than sixty days after the order was issued. However, petitioner lacks standing to bring this challenge as well. And even if petitioner had standing, his challenge fails on the merits.

### A. Petitioner lacks standing.

Petitioner has failed to show that the universal pat-down procedure has injured him in a constitutionally cognizable way. Although petitioner claims that he has been randomly selected for additional screening at one airport, he does not claim to have been subjected to the universal pat-down procedure as part of that process. Nor does petitioner claim that he faces an impending threat of being subjected to a pat-down—

25

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

a claim that in any event would be too speculative to support standing. As explained above, *supra* p. 7, the Federal Security Director at each airport has discretion to designate, at random, ▒▒▒▒▒▒▒▒▒▒▒▒ participants in the Known Crewmember Program for additional screening. Such screening may, but need not, involve the same procedures used to screen individuals passing through a security checkpoint. SA118-19. And even if petitioner were in imminent danger of being subjected to the universal pat-down procedure, he has conceded that he "is not harmed, per se, by enhanced searching." Pet. 8; Mot. 8. Petitioner's only response to these jurisdictional obstacles is to reiterate the three theories of injury whose flaws this brief has discussed at length. *See supra* pp. 16-18. This Court thus lacks jurisdiction over petitioner's challenge.[8]

**B.     The universal pat-down procedure does not violate the APA.**

Even if petitioner had standing to sue, his APA challenge fails on the merits.

**1.** Petitioner does not contest the lawfulness of the universal pat-down procedure as applied to all individuals. Instead, petitioner argues that a screening procedure that TSA applies to passengers cannot lawfully be applied to pilots such as

---

[8] For identical reasons, petitioner cannot satisfy the statutory predicate for a § 46110 petition. *See supra* p. 16 n.5.

26

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

himself.  That argument, as explained above, is foreclosed by the broad regulatory authority Congress has vested in the agency.  *See supra* pp. 19-20.

2.  Petitioner also argues (Br. 31-33) that TSA was required to promulgate the universal pat-down using notice-and-comment rulemaking.  But the order adopting the universal pat-down is a procedural rule embodying TSA's decision to simplify its officers' screening efforts.  *See American Hosp. Ass'n*, 834 F.2d at 1051.  TSA adopted the order to reduce the cognitive burden on checkpoint agents that resulted from the overlapping pat-down procedures TSA previously required them to follow.  SA98.  And TSA implemented the order by updating the standard operating procedures that TSA officers must follow when conducting security screening.  SA126-36.  The order is therefore exempt from the APA's notice-and-comment requirements.

Petitioner's reliance on *EPIC* is misplaced in this context too.  Although the universal pat-down will cause some passengers to receive a more comprehensive pat-down than they would have under TSA's prior procedures, "an otherwise-procedural rule does not become a substantive one, for notice-and-comment purposes, simply because it imposes a burden on regulated parties." *James V. Hurson Assocs. v. Glickman*, 229 F.3d 277, 281 (D.C. Cir. 2000).  Petitioner at no point argues that the differences between the old and new pat-down procedures are so stark as to necessitate judicial intervention to vindicate the APA's policy of "public participation

27

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

in agency decisionmaking." *EPIC*, 653 F.3d at 6 (quoting *Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 174 F.3d 206, 211 (D.C. Cir. 1999)). Indeed, petitioner acknowledges that "enhanced searching" does not harm him "per se." Pet. 8; Mot. 8. And his discussion of the harm the order allegedly inflicts (Br. 33) targets not the substance of the order but the procedural deficiencies that allegedly attend it.

**3.** Finally, petitioner argues in passing (Br. 22) that the universal pat-down is arbitrary and capricious because TSA does not subject airport workers who are not airline crewmembers to the universal pat-down. As noted, that characterization of the screening procedures applicable to airport workers is inaccurate. *See supra* pp. 23-24. In any event, TSA has reasonably concluded that random additional screening of pilots and flight attendants is warranted in light of the unique security risks posed by individuals with privileged access to an airport's sterile area. *Id.* That expert assessment warrants deference.

28

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION

FILED *EX PARTE* AND UNDER SEAL

## CONCLUSION

For these reasons, the petition for review should be dismissed for want of

jurisdiction or, in the alternative, denied.

Respectfully submitted,

CHAD A. READLER
  *Acting Assistant Attorney General*

JESSIE K. LIU
  *United States Attorney*

SHARON SWINGLE
MICHAEL SHIH
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7268*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 353-6880*

February 2018

29

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION

FILED *EX PARTE* AND UNDER SEAL

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 6,147 words.  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2013 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Michael Shih*

MICHAEL SHIH

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

**CERTIFICATE OF SERVICE**

I hereby certify that on February 1, 2018, I caused an original and six paper copies of the foregoing brief to be filed *ex parte* and under seal with the Clerk of the Court.  When available, and no later than February 15, 2018, a redacted and publicly accessible version of the foregoing brief will be served upon the Court and the parties by way of the Court's CM/ECF system.

*/s/ Michael Shih*
MICHAEL SHIH

~~SENSITIVE SECURITY INFORMATION~~
~~FILED *EX PARTE* AND UNDER SEAL~~

ADDENDUM 94

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

ADDENDUM

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

# ADDENDUM
## TABLE OF CONTENTS

49 U.S.C. § 114 (excerpts) ................................................................................ A1

49 U.S.C. § 44901(a) ......................................................................................... A2

49 U.S.C. § 44903(b) ......................................................................................... A3

49 U.S.C. § 46110 (excerpts) ............................................................................ A4

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

**49 U.S.C. § 114**

## § 114. Transportation Security Administration

(a) In General.—The Transportation Security Administration shall be an administration of the Department of Transportation.

(b) Under Secretary.—

(1) Appointment.—The head of the Administration shall be the Under Secretary of Transportation for Security. The Under Secretary shall be appointed by the President, by and with the advice and consent of the Senate.

\* \* \* \*

(e) Screening Operations.—

The Under Secretary shall—

(1) be responsible for day-to-day Federal security screening operations for passenger air transportation and intrastate air transportation under sections 44901 and 44935;

\* \* \* \*

(f) Additional Duties and Powers.—

In addition to carrying out the functions specified in subsections (d) and (e), the Under Secretary shall—

\* \* \* \*

(11) oversee the implementation, and ensure the adequacy, of security measures at airports and other transportation facilities;

\* \* \* \*

(15) carry out such other duties, and exercise such other powers, relating to transportation security as the Under Secretary considers appropriate, to the extent authorized by law.

\* \* \* \*

(*l*) Regulations.—

(1) In general.—

The Under Secretary is authorized to issue, rescind, and revise such regulations as are necessary to carry out the functions of the Administration.

\* \* \* \*

A1
SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

**49 U.S.C. § 44901**

**§ 44901. Screening passengers and property**

(a) In General.—

The Under Secretary of Transportation for Security shall provide for the screening of all passengers and property, including United States mail, cargo, carry-on and checked baggage, and other articles, that will be carried aboard a passenger aircraft operated by an air carrier or foreign air carrier in air transportation or intrastate air transportation. In the case of flights and flight segments originating in the United States, the screening shall take place before boarding and shall be carried out by a Federal Government employee (as defined in section 2105 of title 5, United States Code), except as otherwise provided in section 44919 or 44920 and except for identifying passengers and baggage for screening under the CAPPS and known shipper programs and conducting positive bag-match programs.

\* \* \* \*

A2
SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

**49 U.S.C. § 44903**

**§ 44903. Air transportation security**

\* \* \* \*

(b) Protection Against Violence and Piracy.—The Under Secretary shall prescribe regulations to protect passengers and property on an aircraft operating in air transportation or intrastate air transportation against an act of criminal violence or aircraft piracy. When prescribing a regulation under this subsection, the Under Secretary shall—

(1) consult with the Secretary of Transportation, the Attorney General, the heads of other departments, agencies, and instrumentalities of the United States Government, and State and local authorities;

(2) consider whether a proposed regulation is consistent with—

(A) protecting passengers; and

(B) the public interest in promoting air transportation and intrastate air transportation;

(3) to the maximum extent practicable, require a uniform procedure for searching and detaining passengers and property to ensure—

(A) their safety; and

(B) courteous and efficient treatment by an air carrier, an agent or employee of an air carrier, and Government, State, and local law enforcement personnel carrying out this section; and

(4) consider the extent to which a proposed regulation will carry out this section.

\* \* \* \*

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

**49 U.S.C. § 46110**

**§ 46110. Judicial review**

(a) Filing and Venue.—

Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

* * * *

(c) Authority of Court.—

When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings. After reasonable notice to the Secretary, Under Secretary, or Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.

* * * *

(d) Requirement for Prior Objection.—

In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Under Secretary, or Administrator only if the objection was made in the proceeding conducted by the Secretary, Under Secretary, or Administrator or if there was a reasonable ground for not making the objection in the proceeding.

* * * *

SENSITIVE SECURITY INFORMATION
FILED *EX PARTE* AND UNDER SEAL

# CERTIFICATE OF SERVICE

I hereby certify that on February 15, 2018, I electronically filed the foregoing document with the Clerk of the Court by using the appellate CM/ECF system.  The participants in the case are registered CM/ECF users and will be served through the CM/ECF system.

/s/ Michael Shih
MICHAEL SHIH
Counsel for Respondent